1
2
3
4                          UNITED STATES DISTRICT COURT
5                         NORTHERN DISTRICT OF CALIFORNIA
6
7    RAISON D'ETRE BAKERY LLC,                 Case No.  23-cv-01401-EMC
8                     Plaintiff,
9            v.                                **ORDER GRANTING IN PART AND
                                               DENYING IN PART DEFENDANT'S
10   MASSACHUSETTS BAY INSURANCE               MOTION FOR SUMMARY
     COMPANY,                                  JUDGMENT**
11
                     Defendant.                Docket No. 24
12
13
14          The instant case involves an insurance dispute.  Plaintiff Raison D'Etre Bakery LLC

15   ("Raison") is a baked goods manufacturer.  It makes products such as cheese crisps that it sells to

16   businesses for resale, including grocery stores such as Whole Foods.  Raison had a business

17   owners insurance policy with Defendant Massachusetts Bay Insurance Co. ("MBIC") for the

18   period September 2020 to September 2021.  In October 2020, during the policy period, Raison's

19   production facility and warehouse were damaged by a fire.  Raison therefore made an insurance

20   claim with MBIC.  According to Raison, MBIC failed to pay for the full losses and expenses

21   sustained.  Raison has asserted claims for breach of contract and breach of the duty of good faith

22   and fair dealing and further seeks punitive damages.  Now pending before the Court is MBIC's

23   motion for summary judgment.  Specifically, MBIC moves for summary judgment on both the

24   contract and bad faith claims, as well as Raison's claim for punitive damages.

25          Having considered the parties' briefs and accompanying submissions, the Court hereby

26   **GRANTS** in part and **DENIES** in part MBIC's motion.

27   / / /

28   / / /

# I.    FACTUAL & PROCEDURAL BACKGROUND

A.    Raison

     As noted above, Raison is a baked goods manufacturer.  One of the products it makes is cheese crisps.  Prior to September 2020, Raison was owned by a company called Ashbury Market.  In September 2020 – just a few weeks before the fire occurred in October 2020 – a new company by the name of Ridgeline acquired most of Raison's shares.  *See* Holmstrom Depo. at 11; Brogan Depo. at 11, 17.

     About four weeks after Ridgeline's acquisition of Raison, the fire occurred.  *See* Holmstrom Depo. at 17.  The fire damaged Raison's production facility and warehouse.  *See* Mack Decl. ¶¶ 5-6.

B.    Insurance Policy

     At the time of the fire, Raison had an insurance policy with MBIC.  The insurance policy provides coverage "for **direct physical loss of or damage to Covered Property** at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss."  Mack Decl., Ex. 1, at 43[1] (policy) (emphasis added).  Covered Property includes "Buildings [and] Building Personal Property."  Mack Decl., Ex. 1, at 43.   The policy has a limit of $1,712,500 for Business Personal Property.  *See* Mack Decl., Ex. 1, at 7.

     In addition to the above, the policy provides coverage for (1) **loss of Business Income**, (2) **loss of Extended Business Income**, and (3) **Extra Expense**.

- **Loss of Business Income.**  The policy states: "We will pay for the actual loss of Business Income you sustain due to the necessary 'suspension' of your 'operations' during the 'period of restoration.'"  Mack Decl., Ex. 1, at 49.  Business Income includes "Net Income . . . that would have been earned or incurred if no physical loss or damage had occurred."  Mack Decl., Ex. 1, at 49.  The Declarations page for Raison's policy states that loss of Business Income is limited to "ACTUAL BUSINESS LOSS SUSTAINED NOT EXCEEDING 12 CONSECUTIVE

---

[1] Pages referenced here for the policy are *ECF* pages.

MONTHS." Mack Decl., Ex. 1, at 7.

- **Loss of Extended Business Income.** Extended Business Income is essentially Business Income for an additional period of time. The period for loss of Extended Business Income "[b]egins on the date property . . . is actually repaired, rebuilt or replaced (to the extent necessary to resume 'operations') and 'operations' are resumed" and ends on "[t]he date you could restore your 'operations,' with reasonable speed, to the level which would generate the Business Income amount that would have existed if no direct physical loss or damage had occurred." Mack Decl., Ex. 1, at 50; *see also* Mack Decl., Ex. 1, at 22. The Declarations Page for Raison's policy states that the maximum period for loss of Extended Business Income is 360 days. *See* Mack Decl., Ex. 1, at 10.

- **Extra Expense.** The policy states: "We will pay the necessary Extra Expense you incur during the 'period of restoration' that you would not have incurred if there had been no direct physical loss or damage to property at the described premises." Mack Decl., Ex. 1, at 51. Extra Expense is defined as expense incurred, *e.g.*, (a) "[t]o avoid or minimize the 'suspension' of business and to continue 'operations'"; (b) "[t]o minimize the 'suspension' of business if you cannot continue 'operations'"; and (c) to "[r]epair or replace any property . . . to the extent it reduces the amount of loss that otherwise would have been payable." Mack Decl., Ex. 1, at 51. Extra Expense is covered for only "12 consecutive months beginning immediately after the date of direct physical loss or damage." Mack Decl., Ex. 1, at 51.

C.    Payments for Losses and Expenses

MBIC paid the full policy limit of $1,712,500 for loss of Business Personal Property. *See* Mack Decl. ¶ 11. In addition, MBIC paid $6,428,194 for loss of Business Income and Extended Business Income. *See* Mack Decl. ¶ 11. Thus, the total amount that MBIC paid to Raison was $8,158,919. *See* Mack Decl. ¶ 11.

Raison contends that, under the terms of the insurance policy, MBIC should have paid

1   more for loss of Business Income, loss of Extended Business Income, and Extra Expense.

2                              **II.      DISCUSSION**

3   A.      Legal Standard

4           Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment

5   [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and

6   the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue of fact is

7   genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party.

8   *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  "The mere existence of a

9   scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could

10  reasonably find for the [nonmoving party]."  *Id.* at 252.  At the summary judgment stage, evidence

11  must be viewed in the light most favorable to the nonmoving party and all justifiable inferences

12  are to be drawn in the nonmovant's favor.  *See id.* at 255.

13  B.      Claim for Breach of Contract

14          As noted above, Raison has asserted two claims against MBIC: (1) breach of contract and

15  (2) breach of the duty of good faith and fair dealing.  For the first claim, MBIC argues that it is

16  entitled to summary judgment because it complied with the terms of the insurance policy by

17  paying *more* than what Raison was owed.  In response, Raison asserts that, under the terms of the

18  insurance policy, MBIC did not pay what was owed; specifically, MBIC should have paid more

19  for loss of Business Income, loss of Extended Business Income, and Extra Expense.

20          1.      Loss of Business Income

21          The parties' dispute regarding loss of Business Income (as well as Extended Business

22  Income) relates to Albertsons, which was one of Raison's customers.  (In the evidence of record,

23  Albertsons is also referred to as Safeway.)

24          At the time of the fire in October 2020, Albertsons was a relatively new customer of

25  Raison.  *See* Holmstrom Depo. at 34 (agreeing that Albertsons was a new account).  The two

26  companies first became acquainted in 2019.  *See* Brogan Depo. at 55.  In or about November

27  2019, Raison made a presentation to Albertsons.  *See* Brogan Depo. at 60; Villareal Depo. at 20.

28  A few months later, in January 2020, Albertsons created a request for proposal ("RFP") for

United States District Court
Northern District of California

4

United States District Court
Northern District of California

1    Raison.  *See* Brogan Depo. at 55, 60-61; Mack Decl., Ex. 2 (RFP).  In May 2020, Albertsons gave

2    Raison a business award pursuant to the RFP.  Specifically, Albertsons agreed to launch Raison's

3    cheese crisps as an Albertsons private label "Own Brand" item starting in July 2020.  *See* Mack

4    Decl., Ex. 20 (award letter, for period July 2020-June 2021, "confirm[ing] Buyer's acceptance of

5    the Proposal, subject to the terms and conditions set forth herein"; "[t]he terms and conditions

6    agreed to herein will remain effective for the one (1) year, unless sooner terminated by the

7    parties").

8            In August 2020, Raison first shipped product to Albertsons distribution centers.  *See*

9    Brogan Depo. at 62, 104.  Although the product was shipped in August, it appears that time was

10   needed for the product to get from the distribution centers to the store shelves; there is some

11   evidence that the cheese crisps may not have been available for actual purchase by an end

12   customer until September 2020.  *See* Brogan Depo. at 95, 104.  As noted above, the fire took place

13   in mid-October 2020.  Thus, viewing the evidence most favorably to Raison, there was only a

14   limited period of time in which Raison made sales to Albertsons before the fire took place.

15           Raison argues that, even though Albertsons was a new customer, it was still a customer

16   and, due to the fire, Raison lost Business Income it would have earned from sales of cheese crisps

17   to Albertsons.  MBIC agrees that Raison lost Business Income related to Albertsons, but MBIC

18   disputes the *amount* Raison lost.  MBIC acknowledges that Raison provided projections about its

19   sales to Albertsons, but MBIC contends that those projections were speculative.[2]  *See* Mot. at 1

20   (arguing that "Raison seeks an astronomical amount of [Business Income] benefits based on an

21   unrealistic projection for its new line of business with Albertsons").

22           Based on this position, MBIC made the decision to pay out only 65% of Raison's

23   estimation of projected sales to Albertsons.  *See* Mack Decl. ¶ 13.  MBIC maintains that this was a

24   fair decision because it hired an accounting consultant (JS Held) to assist it on Raison's claim, *see*

25

26   _____

27   [2] MBIC suggests that Raison is seeking more in Business Income loss because "it was
     significantly underinsured by more than $1.5 million for its [Business Personal Property]" which
     led to Raison's "owners and executives [having] to invest significant capital of their own to keep
28   the company running.  Raison is now attempting to recoup that investment and more through its
     unsupported BI claim."  Mot. at 1.

Mack ¶ 8 (noting that, shortly after the fire, "MBIC retained JS Held as its economics and forensic accounting consultant to assist in analyzing Raison's Business Income claim"), and the accounting consultant actually advised MBIC to pay *less* "because they did not think that high of a percentage was justified by the historical data." Mack Decl. ¶ 15; *see also Pilgrim* Depo. at 93, 95 (testifying that JS Held did recommend that MBIC pay less than 65% as an advance payment on the Business Income claim; specifically, the recommendation was to advance 37.52% of the projected sales). MBIC also asserts that its decision was fair because it left the door open for Raison to provide additional evidence to support its Business Income claim. For example, MBIC told Raison that, if it could show, upon relaunch of sales to Albertsons, actual sales at the level of its projections, then MBIC would provide supplemental payments. *See* Mack Decl. ¶ 13 & Ex. 7 (MBIC Status Report, Bates Stamp 1355) (stating that "[t]he insured will be at 100% capacity in January/February 2022" and "[w]e will allow the insured to prove up the forecasted sales after reopening").

In the pending motion, MBIC argues that the Court should issue summary judgment in its favor on Raison's Business Income claim because there is no dispute that Raison "is not entitled to any further benefits under the Policy, and in fact Raison has been overpaid on its claim." Mot. at 14. The Court rejects this argument because there is a genuine dispute of fact about the amount of Business Income loss. It is not possible to say, based on the record provided, that a reasonable jury could reach only one conclusion, one favorable to MBIC.

The critical factual question is whether Raison's projections about its future sales to Albertsons were sufficiently reasonable.[3]  A reasonable jury could so find, especially as all reasonable inferences are made in Raison's favor at this point in the proceedings (*i.e.*, because MBIC is the party moving for summary judgment). In this regard, the Court takes note of the following evidence that weighs in Raison's favor.

- Raison's projections about its future sales were based on an analysis done by Josh

---

[3] In its reply brief, MBIC argues that using "reasonableness" as the measuring stick is improper. *See* Reply at 1 (arguing that Raison has the burden of proving an "accurate" forecast, not a reasonable one). Although MBIC's position is not entirely meritless, it is missing the point: Raison is essentially taking the position that its projections were reasonably accurate.

Holmstrom (who became Raison's CEO in or about June 2022). *See* Brogan Depo. at 10; Mack Decl., Ex. 5 (Sheet 2).[4] Mr. Holmstrom based his analysis, in turn, on projections that *Albertsons* had made about its anticipated purchases from Raison (for one year). Albertsons made its projections in conjunction with the RFP that it gave to Raison in January 2020. *See* Mack Decl., Ex. 2 (RFP, estimated total units annual). Implicitly, Albertsons – undisputedly a large grocery chain – would not undertake the task of projecting its purchases from Raison lightly: what it expected to purchase from Raison informed its negotiations with Raison (*e.g.*, what Raison would charge for the product, for shipping, etc.). *See* Bruchey Decl., Ex. P (Schweizer Rpt. at 11) (expert noting that higher volumes yield better rates). Also, Albertsons had an interest in making accurate predictions because its own internal divisions would be impacted. *See* Bruchey Decl., Ex. P (Schweizer Rpt. at 7) (expert testifying that "[t]he launch of a private label product at a national grocery chain requires a substantial amount of communication, which takes time and coordination from the national office all the way down to store personnel[;] [t]his includes division leaders talking to their teams, talking to store employees, about a coordinated and lengthy process of clearing out other products to create shelf space," and "[t]his cannot be done overnight"). Although Albertsons' RFP covered a one-year period only, Ms. Villareal, an Albertsons employee, indicated that she expected the relationship between Albertsons and Raison to last longer; she expressly noted to Raison that Albertsons did not take on a product such as Raison's for it "'not to be successful.'" Brogan Depo. at 82; *see also* Chien Depo. at 24 (Albertsons employee stating that grocery chain launches products it fees

---

[4] Projected sales to Albertsons were as follows:

- Q3 of 2020: almost $299,000.
- Q4 of 2020: more than $2.2 million.
- Q1 of 2021: more than $4 million.
- Q2 of 2021: more than $4.5 million.
- Q3 of 2021: more than $4.7 million.
- Q4 of 2021: more than $5 million.

have potential to be successful). *Accord* Bruchey Decl., Ex. P (Schweizer Rpt. at 4, 6, 9-10) (opining that national grocery store chains are "thorough and methodical when selecting the vendors from whom they will purchase products to be sold under their private label" and "[t]his due diligence is an indication of the commitment national grocery chains make to the success of private label (store brand) products"; adding that "[i]t is not possible to reliably evaluate short term results, such as launches that are [a] few weeks or even a few months old because the launch process takes longer to hit its stride, known as the demand groove"). Finally, Raison's and/or Albertsons' projections were not made out of whole cloth but rather had a specific factual basis. This seems to have included sales figures for Raison's cheese crisps which were being sold in Albertsons stores in Northern California (under Raison's name, Joyful). *See* Bruchey Decl., Ex. P (Schweizer Rpt. at 11) (expert testifying that Raison's projections were "based on sales figures for the Joyful parmesan cheese crisps at northern California Albertsons stores," "on the sale figures of the parmesan cheese crisps at other grocery chains," and "on the surging popularity of the charcuterie trend nationally").

- Mr. Holmstrom, who did the analysis for Raison's projections, prepared the projections at the time he was working for *Ridgeline* and Ridgeline was assessing whether to *acquire* Raison. In other words, Mr. Holmstrom had no incentive to inflate sales Raison would be expected to make to Albertsons because Ridgeline was considering whether to purchase Raison and, if so, for how much. If anything, Mr. Holmstrom had an incentive to make a conservative estimate of Raison's sales to Albertsons.

- Though the projected sales to Albertsons were significant, Raison's expectations of success were not unfounded but rather were supported by its track record with another large grocery chain, *i.e.*, Whole Foods. Although there is some evidence that there are differences between Albertsons customers and Whole Foods, that does not mean that Raison's success with Whole Foods is thereby entirely

1    irrelevant.  It did show the product enjoyed popularity in the marketplace.  There is

2    a genuine dispute of fact as to how relevant Raison's track record with Whole

3    Foods was.  *See e.g.*, Brogan Depo. at 124 (noting similarities between Whole

4    Foods and Albertsons – *e.g.*, both have private label brands, both have large

5    footprint stores, and both would package and shelve the product in the same way);

6    Bruchey Decl., Ex. P (Schweizer Rpt. at 11) (expert testifying that "[t]he success of

7    the parmesan cheese crisps at Whole Foods is an accurate measure of what could

8    have been expected at Albertsons because there is not a significant difference

9    between Whole Foods c[u]stomers and Albertsons' Open Nature private label

10   customers . . . because private label products are intended to be premium").

- Raison submitted expert testimony opining, *inter alia*, that the Business Income

12   loss submitted by Raison to MBIC was "reasonable and consistent with industry

13   standards."  Bruchey Decl., Ex. P (Smart Rpt. at 1), and that the "revenue forecasts

14   . . . would in all likelihood have been achieved by Raison had it not been for the

15   fire."  Bruchey Decl., Ex. P (Schweizer Rpt. at 12) (stating that the forecast was

16   "based on actual data" such as "sales figures for the Joyful[5] parmesan cheese

17   crisps at northern California Albertsons stores," "the sales figures of the parmesan

18   cheese crisps at other grocery chains," and "the surging popularity of the

19   charcuterie trend nationally").[6]

20   To be sure, there is also evidence that weighs in favor of MBIC.  However, that evidence is

21   not so overwhelmingly in favor of MBIC that a reasonable jury could reach only one conclusion in

22   MBIC's favor.  For example:

- MBIC is correct that there is "hard data" showing that actual sales to Albertsons

24   were low and did not meet Raison's projections.  For instance, although Mr.

---

[5] Joyful is Raison's branded parmesan crisps.

[6] MBIC objects to the expert reports on the basis that they are speculative, lacking foundation, and not "grounded in hard, retrospective analysis."  Reply at 8 & n.2.  But this objection goes to the weight of the expert testimony, and not its admissibility.  There is no reason to exclude the expert testimony under *Daubert*.

Holmstrom projected sales of $298,506 in Q3 of 2020 (the fire took place in Q4 of 2020), the actual sales were far less: $172,378.  *See* Mack Decl., Ex. 5 (Sheet 2). In other words, actual sales were only about 58% of what the projected sales were. However, Raison has offered evidence that the actual sales to Albertsons in Q3 of 2020 were anticipated to be low because it was part of the "ramp-up" period (*e.g.*, clearing out old product to make way for new product).  Indeed, Ms. Villareal of Albertsons was not concerned about the low number of actual sales and did not believe that the low number should be read as a predictor of the success of the product.  *See, e.g.*, Villareal Depo. at 96, 99, 101 (testifying, *inter alia*, that divisions may need to be reminded of their commitments, that it takes some time and effort to ensure that purchase orders are placed, that there would not be cause for panic, and that it takes some time to get into the groove and cycle before a product becomes a part of a standard shelf set); *see also* Holmstrom Depo. at 82 (stating that Ms. Villareal told Raison that Albertsons did not undertake new projects such as the one with Raison for them not to be successful); Bruchey Decl., Ex. P (Schweizer Rpt. at 9-10) (expert opining that "[i]t is not possible to reliably evaluate short term results, such as launches that are [a] few weeks or even a few months old because the launch process takes longer to hit its stride, known as the demand groove").  Furthermore, it appears that MBIC may not have taken into consideration evidence that the actual sales for Q3 of 2020 represented sales for just a small portion of Q3 because Raison's product likely did not reach Albertsons' shelves until September 2020 (and then the fire occurred in October 2020).

- There is also "hard data" on Raison's post-fire sales to Albertsons which are unfavorable to Raison.  Raison was able to resume sales to Albertsons in January 2022 (*i.e.*, approximately 15 months after the fire).  The sales to Albertsons in 2022 and 2023 were largely the same as the sales in 2020, even though the 2020 sales arguably covered only a limited period of time before the fire took place in October

2020.  In fact, sales decreased from 2022 to 2023.  *See* Chien Decl., Ex. 10 (Sheet 1) (showing purchase orders for 5,904 twelve packs in 2020; 6,048 twelve packs in 2022; and 4,625 twelve packs in 2023).  Post-relaunch, Raison "never did more than 7% of the projected sales to Albertsons."  Mot. at 2; *see also* Mot. at 9  (stating that "[t]he first three quarters of ales to Albertsons in 2022 when compared to the projected sales for the next three quarters after the loss (Q4 2020-Q2 2021) only hit 7.4%, 1.6%, and 2.1% of the projection").  However, Raison has also submitted evidence suggesting that there were other reasons why the actual sales after relaunch were low – reasons tied to the fire.  For example, by the time of relaunch, Raison's champions at Albertsons (including Ms. Villareal) were no longer at the company, and Raison had lost shelf space to competition.  *See, e.g.*, Brogan Depo. at 107-08 (testifying about loss of Raison's "internal champions" at Albertsons); Brogan Depo. at 43, 47, 93, 108 (stating that Raison lost momentum for about 2 years because of the fire and that competition also increased).[7]  There was also buyer fatigue on the part of the Albertsons divisions – *i.e.*, there was less excitement about the Raison product because of the delays.  *See* Brogan Depo. at 93 (testifying that Chris Salas, an Albertsons employee, asked when Raison could guarantee that it would be back delivering because he was concerned about buyer fatigue with the starting and stopping); *see also* Brogan Depo. at 107 (stating that Raison was told there was not as much enthusiasm as the first time around due to delays).

---

[7] In his deposition, Mr. Brogan identified some of Raison's competitors – *e.g.*, Parm Crisps and Whisps.  *See* Brogan Depo. at 48 (adding that "there's other players" as well, "other cracker companies that were there in our category, and they're chasing our space").

In its reply, MBIC argues that "no such 'replacements' were brought in [at Albertsons] during the time Raison was rebuilding."  Reply at 9.  However, Ms. Chien simply stated that she did not *recall* a specific product being brought in to replace Raison's product.  *See* Chien Depo. at 60.  MBIC suggests Ms. Villareal testified to such (citing pages 133-34 of her deposition) but it failed to provide those pages to the Court.  Furthermore, as a practical matter, it is a reasonable inference that there was some kind of competition for Raison's product or Raison would not sell its product itself.

- Albertsons was not able to sell all of the product it purchased from Raison in 2020 to end customers. *See* Mot. at 16 (arguing that, "[a]lthough Albertson's purchases in 2020 were well below what Raison projected, the end customer bought even less product and Albertson's divisions were stuck with 25% of its Raison inventory on its shelves that it was unable to sell."); Mack Decl. ¶ 5 (citing to information provided from Albertsons reflecting that 70,848 units were ordered by Albertsons from July to November 2020 (the fire took place in October 2020), but by the end of December 2021, 25% units still had not been sold). But as noted above, that 25% could arguably be explained by the fact that Raison's internal champions left during this time, and its product was displaced by competitors' products.

- Raison's projections were based on the assumption that all of Albertsons 13 divisions would sell the cheese crisps. Two of the divisions (SoCal and Intermountain) actually declined to bring the product on. *See* Villareal Depo. at 122 (Albertsons employee stating that she "would not have given up the fight on those last two" but she did not "know how successful I would have been"). But Raison presented evidence that the two divisions' decision was not set in stone. *See* Villareal Depo. at 122 (Albertsons employee stating that she "would not have given up the fight on those last two" although she did not "know how successful I would have been").[8] Moreover, the fact that Albertsons itself – as reflected in its RFP – contemplated all 13 divisions selling the product should be given consideration. In any event, even if only 11 divisions sold the product, Raison's projected sales to the 11 divisions would still mean an underpayment by MBIC (according to Raison, more than $9.6 million). *See* Opp'n at 9 (noting that Raison hired a forensic accountant (Jacqueline Smart) as an expert and she "calculated the

---

[8] In its reply brief, MBIC claims that Ms. Villareal testified in her deposition that "[t]hose final two [divisions] that had said no, they usually – once they said no, they put their foot in the ground and that was it.'" Reply at 10 (citing Villareal Depo. at 115-16, 127). However, MBIC failed to provide those deposition pages to the Court. In any event, Ms. Villareal also testified – as noted above – that she would not have given up on getting those last two divisions on board.

1    BI loss assuming that two of the thirteen distribution centers did not commit to

2    buying Raison's product[;] [w]ith those divisions excluded, the amount still owed

3    for BI and extended BI is $9,605,349"); *see also* Bruchey Decl., Ex. P (Smart Rpt.

4    at 1).[9]

5    •    Even if Raison based its projections in large part on Albertsons' RFP – where

6    Albertsons estimated how much product its divisions would purchase annually –

7    the RFP simply reflected an estimate and did not impose any *obligation* on

8    Albertsons to purchase any amount from Raison.  *See* Chien Depo. at 111

9    (Albertsons employee testifying that "[a]ll we provide for our vendors, when a new

10   item launch[es], is an estimate[,] [a]nd we make it clear, from the beginning, that it

11   is an estimate, and just a forecast").  Even Raison's own employees admitted there

12   was no obligation.  *See* Brogan Depo. at 69 (Raison's former CEO testifying that,

13   once an Albertsons division came on board, that did not guarantee a minimum

14   volume purchase or anything similar); *cf.* Holmstrom Depo. at 48, 52 (testifying

15   that "[i]t's uncommon in the food industry to have written contracts"; agreeing that

16   "there's no written commitment that [a retailer is] going to buy X amount of units

17   every so often").  MBIC acknowledges, however, that a former Albertsons

18   employee, Gloria Villareal,[10] testified during her deposition that any division that

19   agreed to bring on Raison's product would have had to purchase at least 95% of the

20   volume projected in the RFP.  *See* Villareal Depo. at 91 (testifying that, if a

21   division were to come on board, it would be required to buy at least 95% of the

22   estimated annual volume in the RFP).  But it argues that this testimony should be

23

24   [9] As noted below, MBIC has objected to the reports of Raison's experts but that objection is
25   overruled.

26   [10] Ms. Villareal's title was assistant product manager on the deli team category.  *See* Villareal
     Depo. at 13-14 (testifying, *inter alia*, that her role "for that category was to look at existing items
27   that are products that are on shelf and see how they're doing saleswise" and to "go to food fairs,
     food shows, and look for new and innovative items to see if there's something else that . . . other
28   stores may have on shelf that – that Albertson[']s . . . did not have and if there was an opportunity
     for an item like that").  She was one of the main persons with whom Raison interacted.

United States District Court
Northern District of California

13

United States District Court
Northern District of California

given no credit because Stephanie Chien, Ms. Villareal's supervisor, testified in her own deposition that Ms. Villareal was incorrect.  *See* Chien Depo. at 110-11 (testifying that Ms. Villareal was incorrect and that "[w]e have never given any vendor any sort of commitment on what the divisions are required to take 95 percent, or otherwise, of the volumes that we forecast[;] [w]e don't . . . have [that] control over the divisions").  At summary judgment, the Court cannot resolve this credibility dispute between Ms. Villareal and Ms. Chien.  Furthermore, even if there were no firm requirement to purchase 95% of the estimated product volume in the RFP, Ms. Villareal still testified that, "[w]ithin the Own Brands team, there's a leadership team that holds those division[s] to those numbers," and she had never seen a product "fall flat[] on its face."  Villareal Depo. at 92-93; *see also* Bruchey Decl., Ex. P (Schweizer Rpt. at 9) (expert testifying that "[i]t is customary that retailers honor their forecasts as they are calculated by the grocer and relied upon by the vendor" and, "[w]hen forecasts are not met, it can cause reputational damage to the grocer within the industry[;] [f]or this reason, grocers are committed to creating forecasts that they believe can be met").

Accordingly, the Court denies the motion for summary judgment on the claim for breach of contract.  There is a genuine dispute of fact as to whether Raison's projections about its future sales to Albertsons were reasonable.

2.      Extended Business Income

In addition to the dispute about loss of Business Income from Albertsons, there is a dispute about loss of *Extended* Business Income from Albertsons.  As indicated above, the insurance policy provided that Business Income loss would be covered for one year, but Raison could get Extended Business Income for an additional period up to one year under specific circumstances. The period for loss of Extended Business Income "[b]egins on the date property . . . is actually repaired, rebuilt or replaced (to the extent necessary to resume 'operations') and 'operations' are resumed" and ends on "[t]he date you could restore your 'operations,' with reasonable speed, *to the level which would generate the Business Income amount that would have existed if no direct*

14

1    *physical loss or damage had occurred*."  Mack Decl., Ex. 1, at 50 (emphasis added); *see also*

2    Mack Decl., Ex. 1, at 22.

3        MBIC paid for Business Income for the period October 2020 (when the fire occurred) to

4    October 2021.  MBIC then paid for Extended Business Income through December 2021, even

5    though in theory the period for Extended Business Income could last until October 2022.[11]  *See*

6    Opp'n at 8 (noting that "BMIC paid $1,443,015 for the period between October 15, 2021 and

7    December 31, 2021").  MBIC asserts:

> Raison is not entitled to any extended BI benefits beyond December
> 31, 2021, because it did not continue to suffer a loss, and certainly
> not one that was caused by the fire.  However, even if MBIC did
> owe further benefits for the entire extended period of indemnity
> through October 2022, MBIC still significantly overpaid the claim.
> Raison hit 58% of its projected sales to Albertsons in the first
> quarter of the new business relationship in 2020 [*i.e.*, Q3 of 2020].
> After that first quarter, Raison never came close to doing that high
> of a percentage of its projection again.  Even if MBIC agreed to pay
> 58% of the projected sales to Albertsons from the date of loss
> through the entire extended period of indemnity – which is not
> justified by the data – Raison would still only be entitled to BI
> benefits of $4,122,388.  MBIC has already paid Raison $6.428
> million in BI benefits, so even under this generous calculation
> MBIC still overpaid the claim by more than $2 million.

16    Mot. at 17.

17        Some of MBIC's arguments are variations on its arguments on "regular" Business Income.

18    Because there is a genuine dispute of fact on Business Income loss, there is also a genuine dispute

19    of fact on loss of Extended Business Income.

20        There is a further genuine dispute of material fact as to the end date of the extended loss

21    period;  Raison's expert, Ms. Smart, opines that, by December 2021, Raison had not restored its

22    operations "*to the level which would generate the Business Income amount that would have*

23    *existed if no direct physical loss or damage had occurred*."  Mack Decl., Ex. 1, at 50 (emphasis

24    added); *see also* Bruchey Decl., Ex. P (Smart Rpt. at 1) ("[I]t is my opinion the Bakery had not

25    fully recovered from Loss by the end of the extended business interruption period.").  Although

26    MBIC argues that it was clear "Raison never would have generated the level of revenue from the

---

[11] It appears Raison resumed operations in November 2021, although it did not relaunch with
Albertsons until January 2022.

United States District Court
Northern District of California

1    [Albertsons] business that it claimed," Reply at 14, it is a question of fact as to whether Raison's

2    projections were reasonable.

3        Finally, Raison points to evidence that MBIC expected a longer period for Extended

4    Business Income Loss – *i.e.*, beyond December 2021. *See* Mack Depo. at 125-28; Bruchey Decl.,

5    Ex. R (MBIC Status Rpt., Bates Stamp 2189-90, 2194) (noting reopening in November 2021 and

6    "anticipating a 12 month period of restoration with an additional 6 months of extended business

7    income loss"; also noting that expert retained by MBIC, JS Held, indicated that Raison would be

8    at 75% in December and would not reach 100% until April or May 2022). To be sure, MBIC

9    points out that there are other places in the status report where MBIC stated it expected Raison to

10   be back at 100% in January or February 2022, *see* Mack Decl. ¶ 13 & Ex. 7 (MBIC Status Report,

11   Bates Stamp 1355) (stating that "[t]he insured will be at 100% capacity in January/February 2022"

12   and "[w]e will allow the insured to prove up the forecasted sales after reopening"), but that simply

13   underscores that there are genuine disputes of material fact that cannot be resolved at summary

14   judgment.

15           3.    Extra Expense

16       Finally, the parties have a dispute about Extra Expense. As noted above, the policy states:

17   "We will pay the necessary Extra Expense you incur during the 'period of restoration' that you

18   would not have incurred if there had been no direct physical loss or damage to property at the

19   described premises." Mack Decl., Ex. 1, at 51. Extra Expense is defined as expense incurred,

20   *e.g.*, (a) "[t]o avoid or minimize the 'suspension' of business and to continue 'operations'"; (b)

21   "[t]o minimize the 'suspension' of business if you cannot continue 'operations'"; and (c) to

22   "[r]epair or replace any property . . . to the extent it reduces the amount of loss that otherwise

23   would have been payable." Mack Decl., Ex. 1, at 51. Extra Expense is covered for only "12

24   consecutive months beginning immediately after the date of direct physical loss or damage."

25   Mack Decl., Ex. 1, at 51.

26       In its motion, MBIC contends that, based on a chart/spreadsheet provided by Raison,

27   Raison could be claiming that it is owed as much as "an additional $792,357 in extra expense

28   benefits." Mot. at 18; *see also* Austin Decl., Ex. 21 (chart). According to MBIC, "none of the

United States District Court
Northern District of California

additional claimed expenses [listed on the chart] meet the requirements for extra expense coverage under the Policy." Mot. at 18. For example:

> (1) "[A] large portion of the extra expenses being claimed by Raison were incurred after October 2021. None of those expenses are covered because they were incurred beyond 12 months after the date of loss." Mot. at 18; *see also* Austin Decl., Ex. 21 (chart indicating that a number of expenses were incurred after October 2021).
>
> (2) "The vast majority of extra expenses being claimed would fall under the Policy's [Business Personal Property] coverage, but MBIC has already paid the full policy limit for that coverage." Mot. at 18.
>
> (3) "Raison's Chief Financial Officer, Mark Borden, testified that all of the remaining extra expenses being claimed were incurred not in connection with keeping the business running or minimizing the suspension of business, but rather they were incurred in connection with the rebuilding of Raison's tenant improvements and other business personal property. Austin Decl., Exh. 14 (Borden Depo. Vol. II, at 7:12-22)." Mot. at 19.

With respect to (1), Raison concedes that some of the expenses listed in the chart at Exhibit 21 of the Austin Declaration are outside the coverage period. However, it also points out that a number of expenses are within the coverage period. *See* Brogan Decl. ¶¶ 3-4 (testifying that he has reviewed Exhibit 21 and that, "[a]lthough that exhibit specifies the time when each of those expenses was incurred, I am hereby declaring that a not-insignificant portion of the expenses listed in the spreadsheet were incurred within 12 months of the October 2020 fire, and were incurred by Raison in an attempt to avoid or minimize the suspension of our business and to expedite the repairs and replacements of the property at our facility"); *see also* Opp'n at 7, 17 (arguing that Extra Expense that MBIC failed to pay for included "generator rentals, temporary refrigeration and storage, truck rentals," and fuel).

As for (2), here there is, to some degree, a contract interpretation question. Raison argues that "the Policy does not say that Extra Expense benefits are capped by the limit for [Business

1   Personal Property]; rather, they are associated with the business interruption coverage of the

2   Policy.  The BPP limit is irrelevant."  Opp'n at 18.  Raison has the better position.  The issue here

3   is whether an expense qualifies under the definition of Extra Expense (which is about avoiding

4   business interruption).

5          Finally, regarding (3), MBIC's argument is not persuasive because it has somewhat

6   mischaracterized the deposition testimony of Mr. Borden, Raison's CFO.  Admittedly, Mr. Borden

7   did testify as follows with respect to the chart at issue: "[A]t the time of the fire, we determined, in

8   order to properly account for all the expenses that are going to be tied to a result of rebuilding and

9   the fire and so – so much and so forth, we created a[n] actual GL account, a chart of accounts, in

10  our system titled Rebuilding Expense."  Borden Depo. at 7.  But Mr. Borden *also* testified that:

> [W]e would close the month every month, we would go through our
> financials and look at all the charges that we categorized to that
> rebuilding expense . . . .
>
> . . . .
>
> We would take all the detail that hit on that.  We would pull it
> together.  We would scrub that to make sure we properly – our
> accounting team and all that could categorize those appropriately,
> and then we would close our books, and we would report those
> numbers to Jim Kinsel [a CPA that Raison retained to assist in
> preparation of the company's financial loss].
>
> Jim would then take that, take this tab, and categorize [the] columns
> . . . and he would look at, okay, is this something – as far as I know,
> that would be BI, the Business Interruption claim, EE, Extra
> Expense claim, BPP, . . . Business Personal Property, or something
> other than that.
>
> So then, he would help us kind of decipher, based on all those
> expenses that we categorized under the rebuilding expense line,
> where that should go with the insurance claim.

23  Borden Depo. at 9.  In other words, even though the chart at issue may have been referenced

24  (shorthand) as the Rebuilding Expense chart, that does not necessarily mean that all expenses on

25  the chart were for rebuilding and did not qualify as an Extra Expense.  Whether something

26  constitutes an Extra Expenses should be determined on a case-by-case basis.

27         The Court therefore denies the motion for summary judgment on Extra Expense.  That

28  being said, the Court notes that one problem here is that it is not clear what *precisely* from the

United States District Court
Northern District of California

1   chart (Exhibit 21 of the Austin Declaration) is deemed an Extra Expense by Raison. Accordingly,

2   the Court encourages the parties to meet and confer further on the issue of Extra Expense as there

3   may well not be a dispute between the parties on the matter. At the very least, any dispute on

4   Extra Expense could be substantially narrowed.

5   C.   Claim for Breach of the Covenant of Good Faith and Fair Dealing

6          MBIC argues that, even if the Court does not grant summary judgment on the claim for

7   breach of contract, it is still entitled to summary judgment on the claim for bad faith.

> The law implies in every contract, including insurance policies, a covenant of good faith and fair dealing. "The implied promise requires each contracting party to refrain from doing anything to injure the right of the other to receive the agreement's benefits. To fulfill its implied obligation, an insurer must give at least as much consideration to the interests of the insured as it gives to its own interests. When the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability in tort.

*Wilson v. 21st Century Ins. Co.*, 42 Cal. 4th 713, 720 (2007).

> To act unreasonably is not a mere failure to exercise reasonable care. It means that the insurer must act or fail to act without proper cause. However, it is not necessary for the insurer to intend to deprive the insured of the benefits of the policy.

CACI 2330 (emphasis added); *see also Bosetti v. United States Life Ins. Co.*, 175 Cal. App. 4th 1208, 1236 (2009) (stating that "'the covenant of good faith can be breached for objectively unreasonable conduct, regardless of the actor's motive'"; also stating that "an insured plaintiff need only show, for example, that the insurer unreasonably refused to pay benefits or failed to accept a reasonable settlement offer" and that "there is no requirement to establish *subjective* bad faith") (emphasis in original); *Century Surety Co. v. Polisso*, 139 Cal. App. 4th 922, 949 (2006) (stating that "a breach of the implied covenant of good faith and fair dealing involves something more than a breach of the contract or mistaken judgment[;] [t]here must be proof the insurer failed or refused to discharge its contractual duties not because of an honest mistake, bad judgment, or negligence, 'but rather by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement'"); *Brown v. Guarantee Ins. Co.*, 155 Cal. App. 2d 679,

United States District Court
Northern District of California

United States District Court
Northern District of California

689 (1957) (stating that "[b]ad faith may involve negligence, or negligence may be indicative of bad faith, but negligence alone is insufficient to render the insurer liable").[12]

According to MBIC, as a matter of law, it handled Raison's insurance claim reasonably because there was at least a genuine dispute about the amount of Raison's insurance claim; thus, there is no viable cause of action for bad faith. *See Wilson*, 42 Cal. 4th at 723 (stating that "'an insurer denying or delaying the payment of policy benefits due to the existence of a genuine dispute with its insured as to the existence of coverage liability or the amount of the insured's coverage claim is not liable in bad faith even though it might be liable for breach of contract'"); *Century Surety*, 139 Cal. App. 4th at 949 (stating that, under the genuine dispute doctrine, "an insurer does not act in bad faith when it mistakenly withholds policy benefits, if the mistake is reasonable or is based on a legitimate dispute as to the insurer's liability"). MBIC argues as follows:

> MBIC issued regular advance payments on both the BPP and BI portions of the claim, and ultimately paid the full BPP limit of $1.72 million in addition to another $6.428 million in BI and extended BI. Mack Decl., Exh. 6. Raison's BI calculation is based entirely on projections that it prepared before it began its new line of business with Albertsons in July 2020 and before the October 2020 fire. Austin Decl., Exh., 12 (Holstrom Depo. at 31:1-32:23; 104:9-105:5). Raison began selling its products to Albertsons for 3.5 months before the loss, and in that time, Raison did less than 58% of the sales that it projected. Mack Decl., Exh. 5 (Sheet 2, at p. 12.) After sales to Albertsons resumed in 2022, Raison never did more than 7% of its projected sales to Albertsons. *Id.* However, Raison admits it never adjusted its projections to account for the significant sales shortfall before and after the loss. MBIC allowed for 65% of the projected sales to Safeway in its BI calculation, and this was in fact a significant overpayment of the claim. Additionally, two of the thirteen Albertsons divisions also declined to bring on Raison's products at all, but Raison did not adjust its projection, which is based on Raison selling to all 13 Albertsons divisions.
>
> MBIC retained JS Held as its forensic accounting expert within four days of receiving Raison's claim. Mack Decl., Exh. 3. California law allows an insurer to rely on the opinion of its expert and precludes a finding of bad faith where the insurer's coverage position was based on expert opinion. Here, MBIC relied on the reasonable advice and opinions of JS Held in determining how much

---

[12] "[T]he reasonableness of the insurer's actions and decision to deny benefits [is assessed] as of the time they were made rather than with the benefit of hindsight." *Century Surety*, 139 Cal. App. 4th at 949.

> BI coverage Raison was entitled to.  Mack Decl., ¶ 17.  In fact, Micah Pilgrim of JS Held recommended that MBIC pay less than 65% because he did not think the limited historical sales data related to Raison's business with Albertsons supported that high of a percentage.  Nonetheless, Mack went out of his way to pay as much as he could reasonably justify on the BI claim. Anything more than what MBIC paid on the BI claim would be pure speculation.
>
> As even further evidence of MBIC's good faith, during the claim MBIC even offered to voluntarily pay for Raison to relocate to another location in an effort to minimize the extent of its BI loss.  The relocation never went through, but MBIC's willingness to pay for the move even though it was not required to do so by the Policy is indicative of its overall good faith with respect to the claim as a whole.

Mot. at 21-22.

MBIC's position has merit, notwithstanding the fact that the issue on summary judgment is only whether a reasonable jury *could* conclude that the insurer acted unreasonably.  *Cf. Wilson*, 42 Cal. 4th at 724 (stating that "'an insurer is not entitled to judgment as a matter of law where, viewing the facts in the light most favorable to the plaintiff, a jury could conclude that the insurer acted unreasonably'").  This is not a case where the insurance company denied a claim outright or paid only a pittance.  Furthermore, given the "hard data" on pre- and post-fire sales (including the fact that the end customer did not buy all of the Raison product available and Albertsons was left with 25% of the Raison inventory on its shelves), there were legitimate questions as to whether Raison's projections about its sales to Albertsons were reasonable.  In short, there was a "genuine dispute" about the amount of the covered business income loss.  *See Wilson*, 42 Cal. 4th at 723.  MBIC had a reasonable and legitimate basis for its conclusion.  In addition, Raison reasonably left the door open for Raison to provide more information to back up its claim – *e.g.*, to show that its actual sales were more than 65% of the projected sales that MBIC did pay for.  There also appeared to be a genuine debate as to when Raison would be back up to 100% of operations and sales – the end date for payments for Extended Business Income loss.

In its papers as well as at the hearing, Raison's main argument in response was that the bad faith claim was still viable because MBIC failed to conduct a reasonable investigation.  Raison points out that, during the claims process, MBIC never reached out to Albertsons to discuss the projected sales – and failed to do so even though there were internal discussions at JS Held

(MBIC's forensic consultant) that such conduct might be warranted or helpful.[13]  *See Wilson*, 42 Cal. 4th at 720-21 ("While an insurance company has no obligation under the implied covenant of good faith and fair dealing to pay every claim its insured makes, the insurer cannot deny the claim 'without fully investigating the grounds for its denial.'  To protect its insured's contractual interest in security and peace of mind, 'it is essential that an insurer fully inquire  into possible bases that might support the insured's claim' before denying it."); *id.* at 723 ("The genuine dispute rule does not relieve an insurer from its obligation to thoroughly and fairly investigate, process and evaluate the insured's claim.").

The problem for Raison is that it has failed to cite to any authority suggesting that an insurance company has, as part of its duty to investigate, a duty to contact an insured's *customer*. In fact, as MBIC argues,

> [a]ny such requirement would not make sense, as a business's relationships with its customers are delicate and an insurance company should not risk interfering with that relationship by contacting the insured's customers directly.  MBIC's accounting consultant, Micah Pilgrim [of JS Held], echoed this sentiment in his deposition when he explained that his company specifically does not contact the insured's customers in order to avoid interfering with that relationship.  Austin Decl., Exh. 18 (Pilgrim Depo. at 44:3-18) ("The vast majority of insureds are concerned about how [contacting the insured's customers] would be perceived by their customer, and so out of respect of the insured, we typically don't venture that far past the data that's been presented.").

Reply at 13.  Furthermore, as the Court noted at the hearing, Raison, and not MBIC, was in a better position to seek out information from Albertsons since Albertsons was a Raison customer. Nothing suggests that MBIC did not give Raison every opportunity to obtain the evidence it could assemble to back up its loss of Business Income claim, including that which it obtained and could have obtained from Albertsons.

---

[13] It appears that JS Held also suggested to MBIC that someone with expertise in the grocery store market should be consulted.  In its reply brief, MBIC points out that it did consult with someone – specifically, Gary White.  *See* Reply at 14-15; Mack Reply Decl. ¶ 3 ("In response to requests from Micah Pilgrim of JS Held, MBIC retained Gary White as a retail and industry expert in May 2022.  Attached hereto as Exhibit 23 is a true and correct copy of the reports Gery White provided to MBIC throughout the claim.") (emphasis omitted).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    The Court therefore finds that, as a matter of law, no reasonable jury could find that MBIC

2    acted in bad faith (*i.e.*, unreasonably) when it decided to pay 65% of the projected sales and left

3    the door open to Raison providing more information to substantiate its insurance claim.  Summary

4    judgment on the bad faith is therefore appropriate.

5    D.    Claim for Punitive Damages

6        Because the Court has granted MBIC's motion for summary judgment on the bad faith

7    claim, it need not opine on MBIC's motion for summary judgment on punitive damages.

8    However, the Court still addresses the punitive damages issue because, even assuming Raison

9    were correct that it has a viable bad faith claim, no reasonable jury could find in its favor on

10   punitive damages – which as a practical matter would gut its bad faith claim.  In other words,

11   punitive damages are available for the bad faith claim alone, and not for the claim for breach of

12   contract.  If no reasonable jury could find in Raison's favor on punitive damages, then, practically

13   speaking, the bad faith claim does not provide for any relief different from that provided for by the

14   claim for breach of contract.

15       Indeed, recovery of punitive damages would be even more difficult for Raison to recover.

16   Under California law, a plaintiff must prove punitive damages by clear and convincing evidence.

17   Raison argues that it is not required to prove punitives by clear and convincing evidence at

18   summary judgment (as opposed to trial).  But the case it cites in support, *Pacific Gas & Electric*

19   *Co. v. Superior Court*, 24 Cal. App. 5th 1150 (2018), actually cuts against its position.  The

20   California Supreme Court noted in *PG&E* that, "'where the plaintiff's ultimate burden of proof

21   will be by clear and convincing evidence, the higher standard of proof *must be taken into account*

22   in ruling on a motion for summary judgment or summary adjudication, since if a plaintiff is to

23   prevail on a claim for punitive damages, it will be necessary that the evidence presented meet the

24   higher evidentiary standard.'"  *Id.* at 1159 (emphasis added); *see also id.* (stating that "[s]ummary

25   judgment or summary adjudication on the issue of punitive damages is proper only when no

26   reasonable jury could find the plaintiff's evidence to be clear and convincing proof of malice,

27   fraud or oppression") (internal quotation marks omitted).  The U.S. Supreme Court essentially has

28   the same view.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("[W]e are

convinced that the inquiry involved in a ruling on a motion for summary judgment . . . necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."); *id.* at 254 ("For example, there is no genuine issue if the evidence presented in the opposing affidavits is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence."); *id.* ("Thus, in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden.").

In the case at bar, no reasonable jury could find malice, oppression, or fraud on the part of MBIC, particularly by clear and convincing evidence, given that MBIC had hard data and a consultant's analysis to support its position, and it gave Raison the opportunity to show that, post relaunch, its actual sales were more than 65% of its projected sales to Albertsons.  Accordingly, summary judgment on the punitive damages claim is granted.

### III.    CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part MBIC's motion for summary judgment.  The motion is granted as to the claim for breach of the covenant of good faith and fair dealing and the claim for punitive damages.  The motion is denied as to the claim for breach of contract.  Accordingly, the only claim that shall proceed to trial is the claim for breach of contract.

Although this case is set for trial, the Court orders the parties to meet and confer to determine whether they wish to pursue any Court-sponsored ADR program now that they have the benefit of the Court's summary judgment ruling.  The parties shall report back within a week of the date of this order.

This order disposes of Docket No. 24.

**IT IS SO ORDERED**.

Dated: February 9, 2025

_____
EDWARD M. CHEN
United States District Judge

24