# MBIC's Motion In Limine No. 1

STEPHEN M. HAYES (SBN 83583)
shayes@hayesscott.com
TYLER R. AUSTIN (SBN 293977)
taustin@hayesscott.com
RACHEL M. SMITH (SBN 339978)
rsmith@hayesscott.com
HAYES SCOTT BONINO
ELLINGSON & GUSLANI LLP
333 Twin Dolphin Drive, Suite 230
Redwood City, California 94065
Telephone: (650) 637-9100

Attorneys for Defendant
MASSACHUSETTS BAY INSURANCE COMPANY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAISON D'ETRE BAKERY LLC,<br><br>    Plaintiff,<br><br>    v.<br><br>MASSACHUSETTS BAY INSURANCE COMPANY; and DOES 1 through 10,<br><br>    Defendants. | **CASE NO. 3:23-cv-01401 EMC**<br><br>**DEFENDANT MASSACHUSETTS BAY INSURANCE COMPANY'S MOTION IN LIMINE NO. 1 FOR AN ORDER EXCLUDING OR LIMITING EVIDENCE OR ARGUMENT THAT ALBERTSON'S DIVISIONS WERE OBLIGATED TO PURCHASE AT LEAST 95% OF THE ANNUAL VOLUME OF PLAINTIFF'S ESTIMATES; DECLARATION OF TYLER R. AUSTIN**<br><br>**Date:**        September 8, 2025<br>**Time:**        8:30 am<br>**Courtroom:**   5<br>**Judge:**       Hon. Edward M. Chen |

Defendant Massachusetts Bay Insurance Company ("MBIC") hereby respectfully moves this Court for the following orders to exclude the following evidence from trial:

1.    An order excluding evidence, testimony or argument that Albertsons divisions were obligated to purchase at least 95% of the annual volume of plaintiffs estimates in the Request for Proposal ("RFP.")  The 95% purchase conclusion has no foundation and has been impeached by an Albertsons superior employee, and it would confuse and mislead the jury.

Plaintiffs and their counsel should be instructed not to mention, interrogate upon, or in any other manner, convey to the jury (unless permission in the contrary is first obtained from the court outside of the jury's presence), anything concerning the issues identified above.

# I.
# INTRODUCTION

Plaintiff intends to rely on one witness – former Albertson's employee, Gloria Villareal – for the proposition that Albertsons was committed to purchase 95% of the projected volume of cheese crisps in a Request for Proposal ("RFP") to Raison.  However, Ms. Villareal's direct supervisor at Albertsons, Stephanie Chien, testified that Ms. Villareal's 95% commitment was incorrect:

> THE WITNESS:  I will say the information she [Villareal] gave was incorrect.
>
> …
>
> A. **We have never given any vendor any sort of commitment on what the divisions are required to take 95 percent, or otherwise, of the volumes that we forecast**.  We don't that have control over the divisions.  There's no expectation, or commitments the divisions have given to us.
>
> All we provide for our vendors, when a new item launch, is an estimate.  And we make it clear, from the beginning, that it is an estimate, and just a  forecast. [1]  [Austin Dec. Exh. 1 (Chien Dep. Tr. 110:19-111:22, emphasis added.)]

---

[1]    Ms. Chien testified that at the time of the decision to purchase plaintiff's product, Ms. Villareal was an Assistant Manager and she worked under Ms. Chien.  [Austin Dec. Exh. 1 (Chien Dep. Tr. 14:17-15:3.)]

-1-

Moreover, the testimony of every single current and former Raison employee that testified on the topic **confirmed that Albertson's did not have any minimum purchase commitments or obligations** to Raison. This includes Raison's current and former Chief Executive Officers and part owners of the company, David Brogan and Josh Holmstrom, as well as Raison's former Chief Growth Officer, Joanne Salvaggio.

Because Ms. Chien holds a superior position within Albertsons and was Ms. Villareal's supervisor, her testimony carries more weight. Ms. Chien's testimony was also consistent with the testimony of all of Raison's own witnesses. It would be confusing and misleading for the jury to hear competing testimony from two Albertsons employees regarding this critical issue.

It would also be unnecessarily time-consuming to conduct a mini trial on which witness within Albertsons is correct. Ms. Chien, as the superior employee and the one who remains employed by Albertsons, has the position to provide the more credible testimony.

For these reasons, the Court should exclude any evidence, testimony or argument that Albertsons divisions were obligated to purchase at least 95% of the annual volume of plaintiffs estimates. This issue should not be submitted to the jury.

## II.

## LEGAL STANDARD

The Court has the inherent power to authorize *in limine* rulings in an effort to manage the course of the trial. (*Luce v. U.S.*, 469 U.S. 38, 41, fn. 4 (1984).)

Rule 402 of the Federal Rules of Evidence requires that all evidence introduced at trial be relevant. (Fed. R. Evid. 402 ("All relevant evidence is admissible . . . . Evidence which is not relevant is not admissible").) "Relevant evidence" is that "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." (Fed. R. Evid. 401.) The Court must conduct a jury trial so that inadmissible evidence is not suggested to the jury by any means. (Fed. R. Evid. 103(d).) "When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist." (Fed. R. Evid. 104(b).) The

-2-

Court must conduct any hearing about a preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible so that a jury cannot hear it if justice so requires. (Fed. R. Evid. 104(a) and 104(c).) District judges have "broad discretion" in the handling of evidentiary questions. (*United States v. Holmquist*, 36 F.3d 154, 163 (1st Cir. 1994).)

The Court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. (Fed. R. Evid. 403.) "Unfair prejudice" has been defined as an undue tendency to suggest a decision on an improper basis, commonly an emotional one. (*Cohn v. Papke*, 655 F.2d 191(9th Cir. 1981).) Evidence with little or no probative value on a particular issue is typically outweighed by any prejudicial effect inherent in the proffered evidence. (*United States v. Bell*, 573 F.2d 1040 (8th Cir. 1978).) The district court has "wide latitude" in determining the admissibility of evidence under Rule 403. (*U.S. v. Joetzki*, 952 F.2d 1090, 1094 (9th Cir. 1991).)

**III.**
**THE CLAIM THAT ALBERTSON'S DIVISIONS WERE REQUIRED TO BUY 95% OF THE ESTIMATED VOLUME IN THE RFP HAS BEEN DISPROVEN AND SHOULD NOT BE SUBMITTED TO THE JURY**

Plaintiff bases its business interruption claim on flawed projections. With respect to Albertsons, the only historical data available shows that plaintiff's product was floundering at best before the fire and simply continued to do so after plaintiff resumed operations. Plaintiff has not and cannot submit a single piece of hard evidence that supports its projected sales to Albertsons. In an effort to salvage its inaccurate forecasts, plaintiff will attempt to present inaccurate evidence to the jury suggesting that Albertsons divisions were required to buy 95% of the estimated volume in its Request for Proposal ("RFP") on an annual basis. This contention is factually incorrect, has been disproven, and should be excluded.

All of Raison's current and former employees that testified on the topic testified that Raison did not have a contract with Albertsons and there were no minimum purchase requirements or commitments. [Austin Decl., Exh. 3 (Holmstrom Depo. at 48:10-49:5, 51:10-52:1, 52:14-17); Exh. 4 (Brogan Depo. at 27:3-6, 33:6-13, 69:10-13, 85:16-23); Exh. 5 (Salvaggio Depo. at 13:13-15:1.)]

-3-

In other words, there was no way to guarantee Raison would ever meet the sales volumes it projected. This is consistent with what Raison told MBIC during the claim.

However, Gloria Villareal, the Assistant Product Manager at Albertson's who worked on the launch of Raison's product into Albertson's in 2020, contradicted the testimony of Raison's own executives and claimed that each of Albertson's 11 divisions that agreed to bring on Raison's product was required to buy 95% of the projected sales volumes that were included in Albertson's RFP on an annual basis. [Austin Decl. Exh. 2 (Villareal Depo. at 91:9-14.)] Villareal is the one and only witness in the entire case that made this claim.

To the contrary, Villareal's boss, Stephanie Chien, testified that Villareal "was incorrect" about the 95% requirement. [Austin Decl. Exh. 1 (Chien Depo. at 110:10-111:1.)] Chien testified that Albertsons did not have any internal policy or any other obligation requiring its divisions to buy 95% of the RFP volume estimates. [Austin Decl. Exh. 1 (Chien Depo. at 52:16-53:1, 54:2-6, 110:10-111:22.)] Chien further testified that division Sales Managers and Buyers decided how much of each product to bring into Albertson's stores,[2] and Villareal and Chien had no control over that decision. [Austin Decl. Exh. 1 (Chien Depo. at 21:25-22:8.)] As discussed further below, this is exactly what Raison's witnesses testified to.

Chien also testified, unequivocally, that Albertsons never committed to any minimum purchase requirements with Raison or anyone else: "We have never given any vendor any sort of commitment on what the divisions are required to take 95 percent, or otherwise, of the volumes that we forecast. We don't that [*sic*.] have control over the divisions. There's no expectation, or commitments the divisions have given to us." [Austin Decl. Exh. 1 (Chien Depo. at 111:4-9.)]

Chien's testimony is consistent with the testimony of every single Raison witness that addressed this subject. Raison's person most qualified witness and Chief Executive Officer, Josh Holmstrom, testified that Raison did not have a contract with Albertson's and Albertson's had no minimum purchase requirement or commitment: "Q. But **there's no written commitment that they're going to buy X amount of units every so often, correct?  A.  That's correct**." [Austin

___

[2]    [Austin Decl. Exh. 1 (Chien Depo. Tr., at 20:7-21:24.)]

**DEFENDANT'S MOTION IN LIMINE NO. 1 FOR AN ORDER EXCLUDING OR LIMITING EVIDENCE OR ARGUMENT THAT ALBERTSON'S DIVISIONS WERE OBLIGATED TO PURCHASE AT LEAST 95% OF THE ANNUAL VOLUME OF PLAINTIFF'S ESTIMATES – CASE NO.: 3:23-cv-01401 EMC**

Decl. Exh. 3 (Holmstrom Depo. at 52:14-17) (emphasis added); *see also* Exh. 3 at 48:10-49:5 (Albertson's only provided an award letter, not a contract, and "It's uncommon in the food industry to have written contracts for distribution."); 51:10-52:1 (instead of written commitments to purchase a minimum amount of product, "The process in which we undergo is we have conversations with the retailers.  They let us know what launch time they want to have. They let us know the store count that they are going to be in and then they put in initial POs. **And ultimately, at that point, it's really up to the product to be successful**.")  (emphasis added.)]

Similarly, Raison's former Chief Executive Officer from the time that the Albertson's deal was finalized, David Brogan, also testified there was no contract with Albertson's and no guaranteed volume commitment: "Q.  Now, once a[n Albertson's] region came on board, **that still didn't guarantee any minimum volume purchases or anything like that.  Is that right?  A. Yes**."  [Austin Decl. Exh. 4 (Brogan Depo. at 69:10-13)] (emphasis added); *see also* Exh. 4 at 27:3-6 ("Q. … am I correct that Raison generally did not have written agreements in place with the stores that it sold to?  A.  Correct."); 33:6-13 (Albertson's memorialized the relationship with an award letter); 85:16-23 (Albertson's RFP and award letter was "not a contract for the supplied goods.  It's just saying, 'Hey, you've won the business.'")

Raison's Chief Growth Officer during the Raison re-launch with Albertson's, Joanne Salvaggio, also testified there was no minimum volume commitment from Albertson's, and that although Gloria Villareal and Albertson's headquarters could suggest that the divisions buy more product, whether and how much product was purchased was entirely up to each division:

> Q. Did anyone at Albertsons ever communicate to you that Albertsons had any sort of minimum purchase requirement with respect to Raison's product?  A.  No. … It was more they were there to say we can suggest things to the divisions, but the divisions … have to authorize it to bring it on. … Q. Okay.  And then once the divisions decided to bring the product on, **it was also still up to the divisions how much they would buy; is that right? … [A.]  Yes**. … my understanding was that it was the division's decision what they would bring in, what they would buy, and how they would replenish.  [Austin Decl., Exh. 5 (Salvaggio Depo. at 13:13-15:1) (emphasis added.)]

Thus, the evidence in this case consists of, on the one hand, a single former Albertson's

-5-

employee, Gloria Villareal, that claimed Albertson's divisions were required to buy at least 95% of the volume estimate in the RFP on an annual basis.  On the other hand, the evidence consists of testimony from Villareal's direct superior and current Albertson's employee, Stephanie Chien, who directly refuted and overruled Villareal's claim, making it clear that Albertson's has "never given any vendor any sort of commitment on what the divisions are required to take 95 percent, or otherwise, of the volumes that we forecast."  [Austin Decl., Exh. 1 (Chien Depo. Tr. at 110:19-111:22.)]  The evidence also consists of testimony from three different current and former Raison employees who all testified that Albertson's never had any minimum volume purchase commitment or obligation to Raison.

## IV.
## CONCLUSION

For the foregoing reasons, MBIC respectfully requests the court grant its motion *in limine* excluding or limiting evidence or argument that Albertson's divisions were obligated to purchase at least 95% of the annual volume of plaintiff's estimates.

Dated:  July 11, 2025

HAYES SCOTT BONINO
ELLINGSON & GUSLANI LLP


By:_____*/S/ Tyler R. Austin*_____
STEPHEN M. HAYES
TYLER R. AUSTIN
RACHEL M. SMITH
Attorneys for Defendant
MASSACHUSETTS BAY INSURANCE
COMPANY

-6-

## DECLARATION OF TYLER R. AUSTIN

I, Tyler R. Austin, declare as follows:

1. I am an attorney with Hayes Scott Bonino Ellingson & Guslani LLP, counsel of record for Defendant Massachusetts Bay Insurance Company ("MBIC") in the above-referenced matter. I have personal knowledge of each matter stated herein and, if called as a witness, I could and would competently testify thereto.

2. I submit this Declaration in support of MBIC's motion in limine to exclude arguments that Albertson's divisions were obligated to purchase at least 95% of the annual volume of plaintiff's estimates.

3. Attached hereto as **Exhibit 1** is a true and correct copy of relevant portions of the deposition transcript of Stephanie Chien at 14:17-15:3; 20:7-21:24; 21:25-22:8; 52:16-53:1; 54:2-6; 110:10-111:22.

4. Attached hereto as **Exhibit 2** is a true and correct copy of relevant portions of the deposition transcript of Gloria Villareal at 91:9-14.

5. Attached hereto as **Exhibit 3** is a true and correct copy of relevant portions of the deposition transcript of Josh Holmstrom at 48:10-49:5; 51:10-52:1; 52:14-17.

6. Attached hereto as **Exhibit 4** is a true and correct copy of relevant portions of the deposition transcript of David Brogan at 27:3-6; 33:6-13; 69:10-13; 85:16-23.

7. Attached hereto as **Exhibit 5** is a true and correct copy of relevant portions of the deposition transcript of Joanne Salvaggio at 13:13-15:1.

I declare under the penalty of perjury under the laws of the United States and of the State of California that the foregoing is true and correct.

Executed on July 11, 2025 at Davis, California.

_/s/ Tyler R. Austin_
Tyler R. Austin

-7-

# Exhibit 1

# "EXHIBIT FILE UNDER SEAL"

# Exhibit 2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RAISON D'ETRE BAKERY, )  Case No. 3:23-cv-014101 EMC
                      )
          Plaintiff,  )
                      )
      vs.             )
                      )
MASSACHUSETTS BAY     )
INSURANCE COMPANY,    )
                      )
          Defendant.  )
_____)

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

GLORIA VILLAREAL

THURSDAY, AUGUST 8, 2024

Reported By:  Shirley Koch, RPR
              California CSR No. 10849

1262701

                  UNITED STATES DISTRICT COURT

                NORTHERN DISTRICT OF CALIFORNIA


RAISON D'ETRE BAKERY, ) Case No. 3:23-cv-014101 EMC
                      )
          Plaintiff,  )
                      )
      vs.             )
                      )
MASSACHUSETTS BAY     )
INSURANCE COMPANY,    )
                      )
          Defendant.  )
_____)









     VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

GLORIA VILLAREAL, appearing remotely from Fremont,

California, and commencing from 11:05 a.m. to

2:15 p.m., Thursday, the 8th of August, 2024, taken

on behalf of the Plaintiff and reported

stenographically before Shirley Koch, Certified

Shorthand Reporter for the State of California, CSR

No. 10849, RPR.


LEXITAS (800.282.3376)

2

1262701

REMOTE APPEARANCES:


    FOR THE PLAINTIFF:

            SHERNOFF BIDART ECHEVERRIA
            BY:  SAMUEL L. BRUCHEY
            sbruchey@shernoff.com
            600 South Indian Hill Boulevard
            Claremont, California  91711
            (909) 621-4935


    FOR THE DEFENDANT:

            HAYES SCOTT BONINO ELLINGSON & GUSLANI
            BY:  TYLER R. AUSTIN
            taustin@hayesscott.com
            333 Twin Dolphin Drive
            Suite 230
            Redwood City, California  94065
            (650) 637-9100



ALSO PRESENT:

            TOM McCARTHY, Videographer


**LEXITAS** *(800.282.3376)*

3

I N D E X

EXAMINATION BY                                          PAGE

     MR. BRUCHEY                                    6, 119

     MR. AUSTIN                                     81, 126


EXHIBITS REFERENCED:              PAGE FIRST REFERENCED:

     Exhibit 3                         25

     Exhibit 4                         27

     Exhibit 6                         38

     Exhibit 8                         95


QUESTIONS MARKED
(NONE)


INFORMATION REQUESTED
(NONE)



Case 3:23-cv-01401-EMC     Document 47     Filed 07/25/25     Page 16 of 93

1262701

Gloria Villareal
Raison D'Etre Bakery LLC vs. Massachusetts Bay Insurance Company

THURSDAY, AUGUST 8, 2024

11:05 A.M. PACIFIC TIME

THE VIDEOGRAPHER:  We are going on the record at approximately 11:05 a.m. Pacific time. This is the video deposition of Gloria Villareal taken by the plaintiff in the matter of Raison D'être Bakery versus Massachusetts Bay Insurance Company filed in -- in the United States District Court for the Northern District of California.  The civil action number is 3:23-cv-014101 EMC.

This is a remote deposition with participants from multiple locations being held on August 8th, 2024.

My name is Tom McCarthy.  I am a notary public and legal videographer.  The court reporter is Shirley Koch, and we are representing Lexitas located in Long Beach, California.

Please note that audio and video recording will take place unless all parties agree to go off the record.

Starting with the noticing attorney, counsel and all present will now state their appearance, affiliation, and location for the record, after which the court reporter will swear in

1262701

You give them a little bit of wiggle room. And, because they know their divisions better than we do, and they would at that point correct our calculations if needed.

BY MR. AUSTIN:

Q. Okay. And when you say they -- they could have a little bit of wiggle room, do you have an approximate percentage that the divisions could increase or decrease their volume commitment as opposed to the numbers, the estimated volume that Albertsons came up with in the first place?

A. They can go anywhere above the number. They cannot go below 5 percent of the number.

Q. Okay. So, let's say the estimated volume for a specific division that Albertsons made at the front end, let's just say was 100 units annually to have that number.

Any specific division cannot -- is required to buy at least 5 percent of that number. So at least five?

A. No.

MR. BRUCHEY: No. That's not correct. Misstates testimony.

THE WITNESS: No.

BY MR. AUSTIN:

Case 3:23-cv-01401-EMC vs. Document 47 Filed 07/25/25 Page 18 of 93

Gloria Villareal
Raison D'Etre Bakery LLC vs. Massachusetts Bay Insurance Company

1262701

Q.  Okay.  So -- so what -- what's -- tell me how that works.

A.  If they said they only wanted 95 units versus a hundred, they have that wiggle room.  The 5 percent is -- is that, not only 5 percent of the number we've committed.

Q.  Got it.  Got it.

A.  Yeah.

Q.  So once -- once any division comes on, they are then required to buy at least 95 percent of the estimated annual volume in the RFP; is that right?

A.  Correct.  But they were always -- the option was always there for them to go above and beyond.

Q.  Uh-huh.

A.  It was required that they would communicate that so that I could, in turn, communicate that to Raison.  So they could allow for that volume increase, which would be above and beyond what we had originally discussed.  So that they had the right products on hand to allow for that -- to -- to meet those demands.

Q.  Okay.  And so at the time of the loss, each of the nine divisions that were "committed," does that mean that they had given you their commit that

1262701

they would buy at least 95 percent of the estimated annual volume number in the RFP?

A. That is correct.

MR. BRUCHEY: Let me -- let me belatedly object that that question misstates testimony.

BY MR. AUSTIN:

Q. Okay. And then those last two divisions that were coming on board, had they given their commitment that they would buy at least 95 percent of that number annually as well?

A. They would have, yes.

Q. Okay.

A. And if -- if I can add a little more to that. Within the Own Brands team, there's a leadership team that holds those division to those numbers.

Q. Okay. And how do they go about enforcing that and holding the divisions to those numbers?

A. Various sales meetings, various reportings, calculations. You know, "You committed to buy 100 and you've only bought 50. You -- you know, put in your POs for the other 50."

Q. So what happens if any given division makes a commitment to buy a new product, and everyone thinks it's going to do well, but then it comes in

**LEXITAS** (800.282.3376)

Case 3:23-cv-01401-EMC   Document 47   Filed 07/25/25   Page 20 of 93

1262701

Gloria Villareal

Raison D'Etre Bakery LLC vs. Massachusetts Bay Insurance Company

don't know.  I do not know.

MR. AUSTIN:  Okay.  All right.  I don't --
yeah.  I don't have any more questions.

MR. BRUCHEY:  Okay.  And neither do I, so
we can conclude.

Thank you very much, Ms. Villareal.

THE WITNESS:  You're welcome.  Thank you.

MR. AUSTIN:  Madam Court Reporter, do you
need my transcript order on the record?

THE REPORTER:  Yes, please.

MR. AUSTIN:  I'll just take an electronic
copy of the final.  And can I get an electric rough
as well whenever it's ready?  It's not a huge rush.

THE REPORTER:  Certainly.

MR. BRUCHEY:  I'll take an electronic rough
as well, if you could send me that at the same time.

THE REPORTER:  Certainly.  Thank you much.

THE VIDEOGRAPHER:  This concludes today's
video deposition.  The original media of today's
proceedings will remain in the custody of Lexitas.

Going off the record at approximately
2:15 p.m.

(At 2:15 p.m., the deposition of

GLORIA VILLAREAL was adjourned.)

Gloria Villareal
Raison D'Etre Bakery LLC vs. Massachusetts Bay Insurance Company

DEPOSITION OFFICER'S CERTIFICATE

STATE OF CALIFORNIA        )
                           )         ss.
COUNTY OF ORANGE           )

I, Shirley Koch, hereby certify:

I am a duly qualified Certified Shorthand Reporter in the State of California, holder of Certificate Number CSR 10849 issued by the Court Reporters Board of California and which is in full force and effect.  (Fed. R. Civ. P. 28(a).)

I am authorized to administer oaths or affirmations pursuant to California Code of Civil Procedure, Section 2093(b) and prior to being examined, the deponent was first duly sworn by me. (Fed. R. Civ. P. 28(a), 30(f)(1).)

I am not a relative or employee or attorney or any counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in this action. (Fed. R. Civ. P. 28.)

I am the deposition officer that stenographically recorded the testimony in the foregoing deposition and the foregoing transcript is a true record of the testimony given by the witness.

**LEXITAS** (800.282.3376)

Gloria Villareal
Raison D'Etre Bakery LLC vs. Massachusetts Bay Insurance Company

(Fed. R. Civ. P. 30(f)(1).)

The dismantling, unsealing, or unbinding of the original transcript will render the Deposition Officer's Certificate null and void.

Before completion of the deposition:

____ Reading and Signing was requested.

____ Reading and Signing was waived.

_X__ Reading and Signing was not requested.

If requested, any changes made by the deponent (and provided to the reporter) during the period allowed, are appended hereto.  (Fed. R. Civ. P. 30(e).)

Dated:  August 16, 2024.

_____
Shirley Koch, CSR 10849
Certified Shorthand Reporter

# Exhibit 3

**In the Matter Of:**

RAISON D ETRE BAKERY V. MASSACHUSETTS BAY INSURANCE

3:23-cv-014101 EMC

# JOSHUA HOLMSTROM, PMK

*February 28, 2024*



800.211.DEPO (3376)
*EsquireSolutions.com*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RAISON D'ETRE BAKERY LLC,

      Plaintiff,

  vs.               No. 3:23-cv-014101 EMC

MASSACHUSETTS BAY INSURANCE
COMPANY; and DOES 1 through 10,

      Defendants.
_____


REMOTE VIDEOCONFERENCE DEPOSITION OF

RAISON D'ETRE BAKERY LLC'S PMK

JOSHUA HOLMSTROM

Wednesday, February 28, 2024

11:02 a.m. - 2:48 p.m.

Volume 1


JODI L. BOSETTI, CSR No. 11316, RPR



ESQUIRE
DEPOSITION SOLUTIONS

*800.211.DEPO (3376)*
*EsquireSolutions.com*

APPEARANCES OF COUNSEL


For Plaintiff:

        SHERNOFF BIDART ECHEVERRIA, LLP
        BY:   SAMUEL L. BRUCHEY
        Attorney at Law
        600 S. Indian Hill Boulevard
        Claremont, California 91711
        (310) 246-0503
        sbruchey@shernoff.com


For Defendants:

        HAYES SCOTT BONINO ELLINGSON & GUSLANI, LLP
        BY:   TYLER R. AUSTIN
        BY:   RACHEL M. SMITH
        Attorneys at Law
        333 Twin Dolphin Drive, Suite 230
        Redwood City, California 94065
        (650) 637-9100
        taustin@hayesscott.com
        rsmith@hayesscott.com



JOSHUA HOLMSTROM, PMK                           February 28, 2024
RAISON D ETRE BAKERY V. MASSACHUSETTS BAY INSURANCE           3

                                INDEX


WITNESS                                        EXAMINATION

JOSHUA HOLMSTROM
Volume 1



            BY MR. AUSTIN                              4


                   EXHIBITS

DEPOSITION                                            PAGE

 Exhibit 1     Notice of Raison's deposition           7

 Exhibit 2     Full-year Summary Financials as of     31
               9-30-2020

 Exhibit 3     January 16th, 2020, e-mail from        76
               Patrice LaFrank to David Brogan

 Exhibit 4     Proposal dated 1-23-20                 78

 Exhibit 5     E-mail dated 4-11-2020 to Sean         79
               McFall

 Exhibit 6     E-mail to David Brogan dated           87
               5-8-2020

 Exhibit 7     E-mail to Joanne Bolonda dated         89
               8-3-2021

 Exhibit 8     Spreadsheet                            91

 Exhibit 9     Spreadsheet                           109



Videoconference, Wednesday, February 28, 2024

11:02 a.m. - 2:48 p.m.


JOSHUA HOLMSTROM,

having been administered an oath, was examined and

testified as follows:


EXAMINATION

BY MR. AUSTIN:

Q   Good morning/afternoon, Mr. Holmstrom.  My    11:02
name is Tyler Austin and I'm the attorney for the
insurance company, Massachusetts Bay Insurance
Company.

We met briefly off the record, but could you
state and spell your name for the record, please.    11:03

A   Joshua, J-O-S-H-U-A, Holmstrom,
H-O-L-M-S-T-R-O-M.  I go by Josh.

Q   Okay.  Thank you.

Have you ever had your deposition taken
before, Mr. Holmstrom?    11:03

A   No, I have not.

Q   So I'll just go over some kind of ground
rules with you before we get started here.

So you are currently under oath, and although
we are doing this somewhat informally by Zoom here,    11:03



particular retailer.

Q   The stores listed on these projections on Exhibit 2, did Raison have agreements in place with all of these stores as of the date of the loss, October 2020?

12:07

A   I mean, could you be more specific about which stores you're referring to.

Q   Well, so are there any stores on these projections that Raison did not have an agreement with as of October 16th, 2020?

12:08

A   As of what date?

Q   October 16th, 2020, the date of the loss. And I can give you control if you would like to scroll yourself.

A   Will you go to the store accounts, please.

12:08

Q   I think -- let's see here.

A   So the answer is yes, we believed that all of these stores currently had accepted or were currently carrying the item.  So as it relates to Safeway, as I mentioned, those store accounts were confirmed by the buyer and were in the process of rolling out.  But in all the other grocery, that was our best estimate at the time, and all other natural, that was our best estimate at the time of what we believed our distribution was based on the information we had.

12:09

12:09



Whole Foods, those stores, were pulled directly from the data that Whole Foods provided us. And then I believe the only other new account -- and I believe Fresh Thyme and Hy-Vee, those were new accounts that had rolled out and those were store accounts that we had either identified through -- we had either identified through a distributor partner as that was the store account we were in, or we had been told by a retailer.

Q   Okay.  I'm not 100 percent positive if we got to this.  So out of all of the, I guess, stores and other buyers listed here, did you have written agreements in place with each of these specific stores, of course not in the AO grocery or AO natural, but the other specific stores?

A   It's uncommon in the food industry to have written contracts for distribution.  The distribution -- go ahead.

Q   Sorry, go ahead.

A   No, please.

Q   Yeah, so all of this is, you know -- I'm trying to develop my understanding as I go here, so pardon the inappropriate questions.

So I know later we'll look at a proposal, I think it was called, from Raison to, for example,



Safeway. And then Safeway responded with, I think it was called an award letter. Is that generally how these sales would go, these transactions?

A That was a more formalized process than most follow.

Q So then with these other companies, there was nothing in writing with respect to the sales and the purchases? It was just kind of based on what they ordered as you went?

A That is correct.

Q And that goes for every company listed on here, other than Safeway, right?

A That is correct, to my understanding. Again, there are a lot of customers in that all other grocery and all other natural channel. Just for clarity on that, those are generally smaller retailers that go through distributors, but, to my knowledge, that is correct.

Q How was the timeline of these stores coming online determined? Like, for example, the -- I don't know if it's Meijer Store, M-E-I-J-E-R, beginning in July of 2021, how were those determinations made?

A So, again, this forecast was based on as much as we knew at the time. So any of the new distribution that was on this sheet at that time were



conversations that we were having with -- that the team was having with particular retailers.  So the Meijer Distribution was assumed based on initial conversations with that customer and our thoughts on when that might roll out based on the initial conversation.

          MR. BRUCHEY:  Is it okay if we take that break?

          MR. AUSTIN:  Yeah, yeah.

          (Recess.)

BY MR. AUSTIN:

     Q   Mr. Holmstrom, you understand you're still under oath?

     A   Yes.

     Q   So I wanted to follow up on a couple of topics from earlier.

          So you were talking about the fact that, you know, most of these purchases are done, you know, not pursuant to any agreement, they're done more informally.  So am I correct that customers never make like a written commitment to purchase X minimum amount of units from you guys every so often?  There's nothing like that?

     A   Well, let me be really clear.  The relationships that we have with our customers are very long-term.  So one of the things that we were very



attracted to at Raison when we bought the business was the fact that they had longstanding relationships with many of these customers.  These volumes that are in this forecast, many of these customers had been with them and had a longstanding track record of consistent ordering for a long period of time.  So I want to make sure that there's clear.

As it relates to -- as it relates to -- will you repeat the last part of your question.

Q   Yeah.  So are there ever any customers that make, say, written commitments to purchase a minimum amount of product every so often?

A   So my next point on that would be that when we -- when we build a relationship with a retailer, we do ask that those particular distributors, who are distributing those retailers' orders, serve in quantities in which to order.  So we do ask the retailers for that.

The process in which we undergo is we have conversations with the retailers.  They let us know what launch time they want to have.  They let us know the store count that they are going to be in and then they put in initial POs.  And ultimately, at that point, it's really up to the product to be successful. And that's how it generally works with small brands

12:27

12:27

12:27

12:28

12:28



800.211.DEPO (3376)
EsquireSolutions.com

like ours.

Q   Okay.  You said you asked that the retailers buy certain quantities.  Do you mean that if you're going to submit an order, we ask that it be for at least this much; is that what you mean?                12:28

A   Correct.  Yes, correct.

Q   Okay.  But there's no --

A   And that's really due to help with transportation and operational efficiencies.  So we, obviously, do our best to partner with them to make          12:28 sure that the quantity they're buying isn't overburdensome, but enough to be efficient for us to ship and produce enough and serve production.

Q   But there's no written commitment that they're going to buy X amount of units every so often,          12:29 correct?

A   That's correct.

Q   And the commitments to buy this minimum amount of quantity for a shipment, is that put in writing?                12:29

A   Yes, we provide that to our distributors.  We actually share with them that.

But I think it's important to redirect your original question.  When a customer orders product from us, they are dedicating a certain amount of space          12:29


800.211.DEPO (3376)
EsquireSolutions.com

to our products, right, for a certain period of time. And they spend a lot of time thinking about what should be on their set, on their shelves, and what they should display and merchandise, et cetera. So the reality is, is well -- it is actually a long-term relationship and it is a commitment from the retailer to bring a brand like ours in for the longer term because they are -- the space on that shelf for them is the most valuable and they are ultimately -- they want to make sure that they're bringing in items that they believe will be successful over the longer term.

And so that's why the relationships that we have are so long-term, because they know that we deliver high quality product and that it actually sells.

Q   Okay.  So looking at the stores on Exhibit 2 here, so it looks like, I guess, starting around line 249 with Kroger, it looks like now we're starting to get to kind of anticipated new customers, is that right; whereas most of the stores above that line are already buying product; is that right?

A   That's correct, generally, yes.

Q   Okay.  You said earlier that the projections about the number of stores and things like that, especially for the new customers, were based on



Q    Was it Micah Pilgrim, M-I-C-A-H?

A    Micah, yes, was one.

Q    Okay.  And I forget the other guy's name.

MR. AUSTIN:  I don't have any other questions right now.                                                        14:47

MR. BRUCHEY:  I have no questions.

MR. AUSTIN:  Okay.  Madam Court Reporter, do you need transcript orders on the record?

THE REPORTER:  Please.

MR. AUSTIN:  I'll take, you know, a certified original electronic copy and electronic rough, please. Just whenever you are able to get to it.  I don't have a deadline or anything, but I just would like to have a rough.                                                                 14:47

MR. BRUCHEY:  I would like a rough Saturday, latest Monday, and a copy when you can.                           14:48

MR. AUSTIN:  Go off the record?

MR. BRUCHEY:  Sure.


(The deposition concluded at 2:48 p.m.)

                    --oOo--



REPORTER'S CERTIFICATION

I, JODI L. BOSETTI, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand and later transcribed into typewriting under my direction; that the foregoing is a true record of the testimony and proceedings taken at that time.

I further certify that I am not of counsel or attorney for either or any of the parties to said proceedings, nor in any way interested in the outcome of the cause named in said caption.

IN WITNESS WHEREOF, I have this date subscribed my name.

DATED:  March 5, 2024



_____
JODI L. BOSETTI, CSR No. 11316, RPR

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

DEPOSITION ERRATA SHEET

Our Assignment No. J10972004

Case Caption:  Raison vs. Massachusetts Bay Insurance

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the above-captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.  Signed on the _____ day of _____, 20___.

_____

    JOSHUA HOLMSTROM



# Exhibit 4

**In the Matter Of:**

# RAISON D ETRE BAKERY vs MASSACHUSETTS BAY INS.

3:23-CV-014101 EMC

# DAVID BROGAN

*April 05, 2024*



800.211.DEPO (3376)
EsquireSolutions.com

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RAISON D'ETRE BAKERY LLC,       )
                                )
                Plaintiff,      )    Case No.:
                                )    3:23-CV-014101 EMC
  v.                            )
                                )
MASSACHUSETTS BAY               )
INSURANCE COMPANY; and          )
DOES 1-10,                      )
                                )
                Defendants.     )
_____  )

DEPOSITION OF DAVID BROGAN

CONDUCTED VIRTUALLY

April 5, 2024

10:01 a.m.

REPORTED BY:

Tammy Moon, CSR No. 13184, RDR, CRR



800.211.DEPO (3376)
EsquireSolutions.com

REMOTE APPEARANCES:

FOR PLAINTIFF RAISON D'ETRE BAKERY LLC:

SHERNOFF BIDART ECHEVERRIA LLP
BY:   SAMUEL L. BRUCHEY, ESQ.
600 S. Indian Hill Blvd.
Claremont, California 91711
310.246.0503
Sbruchey@shernoff.com


FOR DEFENDANT MASSACHUSETTS BAY INSURANCE COMPANY:

ELLINGSON & GUSLANI LLP
BY:   TYLER AUSTIN, ESQ.
333 Twin Dolphin Dr., Ste 230
Redwood City, California 94065
650.637.9100
Taustin@hayesscott.com


ESQUIRE
DEPOSITION SOLUTIONS

INDEX TO EXAMINATION

DAVID BROGAN

Friday, April 5, 2024

Tammy Moon CSR No. 13184, RPR, CRR

WITNESS:  DAVID BROGAN


EXAMINATION                                              PAGE

MR. AUSTIN                                                 6



INDEX TO EXHIBITS

DAVID BROGAN

Friday, April 5, 2024

Tammy Moon CSR No. 13184, RPR, CRR

| MARKED | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 2 | Raison D'Etre Bakery LLC – Sep'18 – Sep'20 Actuals + Projections thru 2022 (11.16.2020) Excel spreadsheet | 23 |
| Exhibit 3 | Bates-stamped pages RAISON-PLT000332 -RAISON-PLT000351 | 71 |
| Exhibit 4 | Bates-stamped pages RAISON_D'ETRE_CF_0584-RAISON_D' ETRE_CF_0589 | 72 |
| Exhibit 5 | Bates-stamped page RAISON-PLT000320 | 81 |
| Exhibit 6 | Bates-stamped pages RAISON-PLT000327–RAISON-PLT000329 | 84 |
| Exhibit 7 | Bates-stamped pages RAISON-PLT000239 -RAISON-PLT000240 | 116 |



INDEX TO EXHIBITS

DAVID BROGAN

Friday, April 5, 2024

Tammy Moon CSR No. 13184, RPR, CRR

Exhibit 8      Raison D'Etre Bakery - Sales Data     120
               and Actuals by Customer
               Excel spreadsheet

Exhibit 10     Albertson's - Pricing and Initial      63
               Acceptance Excel spreadsheet

Exhibit 11     Bates-stamped pages                     97
               RAISON_D'ETRE_CF_0582-RAISON_D'
               ETRE_CF_0583

Exhibit 12     Safeway POs                             98

Exhibit 13     Bates-stamped pages                    122
               RAISON_D'ETRE_CF_0590
               -RAISON_D'ETRE_CF_0592

Exhibit 14     Bates-stamped page                     129
               RAISON_D'ETRE_CF_0593



Friday, April 5, 2024, 10:01 a.m.

DAVID BROGAN,

called as a witness, having been duly sworn,

testified as follows:

THE WITNESS:  I do.

EXAMINATION BY MR. AUSTIN, COUNSEL FOR DEFENDANT

MR. AUSTIN:

Q.   Good morning, Mr. Brogan.  My name is Tyler Austin.  We met briefly off the record.  I'm the attorney for the insurance company, Massachusetts Bay Insurance Company.  Can you please state and spell your name for the record, please.

A.   David Brogan, D-A-V-I-D B-R-O-G-A-N.

Q.   Okay.  Have you ever had your deposition taken before in any other matter?

A.   Yeah.  Once about four or five years ago.

Q.   Okay.  So you generally have an understanding of how this works, so I'll just kind of quickly go through some -- I guess you can call them ground rules here.

So you are currently under oath.  And although we are not in a courtroom, we are doing this remotely, the testimony that you are going to give today has the same force and effect as if you were testifying in a court of law.  And it is under the penalty of perjury.



Do you understand that?

A.   I do.

Q.   The court reporter will record everything we say on the record.  It's important that we try to speak one at a time as much as possible.  So I'll just ask that to the extent you can, try to let me finish my question before you start answering, and I'll try to do the same.  Do you understand?

A.   I do.

Q.   We're inevitably going to have some overlap here and there.  We'll just do the best we can.

The court reporter is unable to record gestures, like nodding your head or shaking your head in response to my questions, so please always make your responses verbal.  Do you understand that?

A.   I do.

Q.   After the deposition, the court reporter will prepare your testimony in a transcript.  You will have the ability to review that transcript and make changes to the extent you wish.

However, if you do make changes, I will have the ability to comment on those changes at the time of trial.  So it's important that you try to give your best testimony today.  Do you understand?

A.   I do.



through distribution.

And those customers, in our case, were originally over 400, 500 local cafes.  If you lived in San Mateo, you'd know Peet's, our biggest customer.  In fact, Raison D'etre grew up with Peet's.  As Peet's grew, Raison D'etre grew.

And so they were our -- we had a fleet of 12 vehicles, and they delivered directly every day to 4- -- 4- to 500 cafes.  So Peet's, there was some Whole Foods in there, but -- your neighborhood -- neighborhood cafe. We'd deliver a whole suite of pastries, baked goods.

Q.   Okay.  So, now, staying on Sheet 3 of Exhibit 2, you've got actuals in Columns AK through, it looks like, BB.  And then BC and BD, there -- the columns are titled "FCST."  Is that forecast?

A.   Correct.

Q.   And then it turns into -- starting at Column BF, it turns into "plan," P-L-A-N.  How does that distinguish from forecast?

A.   I don't think it does, technically.  I would just say that that's forecast/plan.  I wouldn't see that as any different than the Q4.  It may be just it's nomenclature for that's the start of the year, and that would be the annual plan for 2021.  But essentially, that's a forecast, as far as I'm concerned.



Q.   Okay.  And then -- again, with all this stuff, excuse my lack of knowledge on this kind of industry here.  But am I correct that Raison generally did not have written agreements in place with the stores that it sold to?

A.   Correct.

Q.   So then -- so how did the process work to set up a new relationship with a customer and begin doing business with them?  Like, would there be, usually, an RFP?

A.   Occasionally.  So if it makes sense, I -- for clarity, I think it's probably a good idea if I -- if I just talk through that process because it can change. And it all depends on the size of the store.

So if you are dealing with a small chain or a one-off store, there's no RFPs.  And they typically don't work to product reset cycles and things like that, whereas the bigger chains do.

And with those smaller stores and smaller chains, typically you are not shipping direct.  And so it's very informal.  You go through a -- you go through a distributor, and then you would probably meet those customers at shows or through your -- through your distributors -- through the distributor reps or your broker reps.



With larger customers, it's always best to have a relationship directly with the buyer yourself.  And that's -- they're the prize, the large retail customers. They don't necessarily have RFPs, but they have category reviews on an annual basis.

And our challenge and opportunity with those customers is to have a seat at the table for the category review.  At that table could be, you know, a broker or it could be you.

I used to always insist that I would be at the category review table because I always thought that I could do a better, more informed job at selling our product rather than a broker who might have 20, 30 other products that they're selling.  I was intimate with it. So that's the way that you -- that it works.

But the category reviews are not so much RFPs as they are that store saying, "Hey, we're going to have a category review, let's say, in 2024 in" -- "in March for a reset in maybe September or October."  So the reviews for -- for the larger customers tend to come four to six months before -- before the launch.

Q.   Okay.  And then can you explain exactly what is a category review?  Is it just, like, a big conference call or meeting?

A.   Yeah.  So let me use Whole Foods as an example.



and one-offs that I referred to earlier.

Q.   Okay.  And is -- am I correct Joyfull is what Raison sold the cheese crisps under when it wasn't under a separate private label?

A.   Correct.

Q.   Okay.  And then -- so when these larger companies that had category reviews started doing business with you guys and there was no written agreement, how would you kind of memorialize that the relationship was beginning?  Does that make sense?

A.   Yeah.  So when you -- when you first work in -- with -- with larger companies -- and all of these companies on this list are larger companies.  They have -- there's an onboarding process that you go through.

They're similar, but each -- each company's got their own unique way of going about it.  And for the record, Albertsons is the most rigorous and demanding of any that I've been through.

So you go through -- and they go through all -- you're bona fide.  They want to see your certifications, all those kind of things.  Certain companies may have their own internal audit companies, and Albertsons do.  And I -- I saw Josh mentioned this, and I'll mention it again.



When we say "Safeway" and "Albertsons," they're interchangeable, Albertsons being the parent company.  I know when I was reviewing the documents, I saw a lot of references to Safeway and Albertsons, but they are interchangeable.

Q.    Okay.  And I -- I think when you started with Safeway, they -- they issued, like, an award letter.  Is that right?

A.    Yeah.

Q.    And was that their memorial -- memorialization of kind of the beginning of the -- the business relationship?

A.    I guess so.  That's actually unique.  I've never seen that.  Josh has got far more experience in retail than I do, so he may have seen it.  But that's the first time I've ever seen an award letter.

Q.    Okay.

A.    It's usually memorialized with a PO.  That's when we'll consider that it's real.

Q.    Okay.  So when the first purchase order is submitted is usually when -- when a business relationship is considered to have been memorialized?

A.    Correct.  And usually in the onboarding process, when you go through all the documentation, there's a first ship question there:  When's your first



ship, and how long -- what's the lead time to first ship, and then what -- subsequent times for subsequent ships?

So you do -- prior to -- to going through this process, you get the opportunity to talk about volumes, expectations of cycles, and things like that.  And so it -- the PO is the first technical time when, yes, you have got a customer.

Q.   Okay.  And then I'm almost done with this exhibit here.  But staying on the lines 249 through, looks like -- or excuse me -- 303, the kind of potential customers, how were these timelines determined for when these companies would come online and start buying product?

A.   If you can -- if you can scroll.  So they would be -- so let's just take a look at Sprouts.  That was -- June '21 that was the anticipation that we would get that business.

So that would have been -- we would have known through them when their -- when their category review was and when their category reset.  So it's that -- those two things.

I only had -- I had one major broker, and then I had another broker who made introductions for us.  But that was a deal with our broker -- is I wanted them to



following up from when this was created, because the goal was to get all 13.

And that, I understand, was typical from their experience but that you could have certain regions that might be -- lag the others by four to six months.

Q.   Okay.

A.   Our timing on that -- the end-of-Q1 timing was that we had this discussion in September.  We knew that United would come in on board.  So within four to six months of that, that would've got us into Q1.

Q.   And the plan was to market the anticipated success from the first ten regions to the final two regions of Intermountain and SoCal to get them to come on board?

MR. BRUCHEY:  First, 11.  There's 13 in total.

MR. AUSTIN:  Sorry.  Yes.  Let me just reword that question so it's not confusing.

Q.   Am I correct the goal was to market the anticipated success from the first 11 regions, including Acme, to get the final two regions of Intermountain and SoCal to come on board in 2021?

A.   Correct.

Q.   You made a comment that you understood it was typical from experience that all 13 regions, I think, would come on board.  Is that a comment made to you by



Gloria?

A.   Yeah.  And it's -- yes, it was.

Q.   Okay.  And then again, the last two questions, just for the record -- was that statement ever made in writing?

A.   No.

Q.   And was it made in one of the weekly phone calls?

A.   Yes.

Q.   Now, once a region came on board, that still didn't guarantee any minimum volume purchases or anything like that.  Is that right?

A.   Yes.

Q.   And I think you said your first sales to Safeway were August 2020.  Is that right?

A.   Yeah.

Q.   Sorry.  I'm just kind of jumping back and forth here because we kind of have gone out of order a little bit.  Can you tell me how the order process works with Safeway as far as between the -- the regional buyers and purchase orders getting submitted to you at Raison?

A.   Yeah.  So they have a system -- an online system, so the POs came through there.  So that's where they're initiated.  How it works internally in Safeway from a national to the regional buyer, I don't know.



But what I did do when we were -- Gloria and I were monitoring, and there are emails to this effect. And they shared with -- in disclosure between Gloria and I, me chasing her for POs and then me letting her know what POs had come in so that she could then follow up with buyers.

And she said that she would be chasing down buyers for this -- for the initial sets of POs. And that is in writing. I'm probably paraphrasing, but it's certainly in emails that we shared with Hanover.

Q.   "Chasing down buyers for the initial set of POs" -- what -- what did you understand that to mean?

A.   Well, to get the ball rolling. The product managers are selling the program, and they're selling it to the regional buyers. And so it's Gloria's job -- they actually put together a marketing deck. She wouldn't show me what it was.

But they put together a marketing deck for the new products that they take out to -- to the regions, and they actively sell and promote the product on your behalf. They are internal salesperson/champion.

Q.   Okay. And then the decision about how much product to actually purchase is made region by region by that regional buyer. Is that right?

A.   Mm-hmm.



DAVID BROGAN                                           April 05, 2024
RAISON D ETRE BAKERY vs MASSACHUSETTS BAY INS.                    84

A.   No.

Q.   Do you have her phone number now?

A.   No.

Q.   When's the last time you spoke with Gloria?

A.   I spoke to Gloria on her last day at her job at Albertsons.

(Exhibit 6 was marked for identification.)

Q.   Okay.  Let's go now to Exhibit 6.  So I think this is the ultimate award letter email.  This is a May 8 email from Christopher Salas.  It says:  "David, happy Friday.  Please see the attached business award.  We look forward to building a successful relationship."

And then starting at page two of Exhibit 6, it's titled "Award Letter."  Is this the award letter that you referred to earlier?

A.   Yes.

Q.   Okay.  And then it looks like on this email is Stephanie Chien.  I believe you --

A.   Yeah.

Q.   -- referred to her earlier.  Is that right?

A.   Yeah.

Q.   That's the same Stephanie Chien?

A.   Yes.

Q.   So then -- I'm assuming at that point, she must have been in a different role because she -- you said



she eventually stepped into Gloria's role, right?

A.   No.  So Stephanie -- that's interesting because, I mean, just seeing that there, Stephanie must have been Gloria's boss.  But I never had any discussion with -- with Stephanie.  She was never referenced.  This is from Chris Salas.

So I said earlier that we -- I believed that she'd start her role -- or certainly we'd come into contact with her probably January '22.  Evidently, she was -- I don't know what her role was at that time, but she was introduced to us as a product manager in late '21 or early 2022.

Q.   Okay.  Do you know who Danielle Bicomong is? B, as in "ball," -I-C-O-M-O-N-G?

A.   No.

Q.   Page three references an expiration date of June 30th, 2021.  Was this award letter renewed?

A.   No.  I didn't take the expiration date to mean anything.  I just took this as being an award letter because it's not a contract for -- for anything else. It's not a contract for the supplied goods.  It's just saying, "Hey, you've won the business."  I just saw it as a technical document.

Q.   Okay.  I apologize.  One of the downsides of working remote is gardeners, and mine just showed up.



So I'm trying to close my window here.

(Break taken.)

Q.   Mr. Brogan, you understand you are still under oath?

A.   Yes.

Q.   Okay.  I'll kind of try to pick up the pace here.

(Off the record.)

Q.   Just let me fall back and ask a few questions that I skipped over earlier.  Did Raison anticipate any increase in labor for the increased demand from its Safeway expansion in Q4 2020 and into 2021?

A.   Yes.

Q.   And what type of labor increase did it anticipate?

A.   Well, consistent with our labor for making cheese crisps -- with that, I had spoken to a local temp agency.  We -- we always get -- people come by on a daily basis or, I should say, weekly basis.

We'll have anywhere between five and ten people knock on the door looking for work.  But I did reach out to an agency and make sure that they could handle what we considered anticipated demand.

Q.   Okay.  And -- and did you have any documents showing what that anticipated demand was?



more "We'll tell the regional buyers this will be available."  Is that right?

A.    That she would be reselling.

Q.    "Reselling" was the language.  Is that right?

A.    No.  So it was "and reselling."  So they would inform them -- and that she would be reselling.  And the amount of reselling that went, I don't know.  But that was the difference in the language.

Q.    Okay.  And those were phone calls with Gloria before and after the loss?

A.    Yeah.

Q.    Okay.  I think that's all I have.

Sam, do you have anything?

MR. BRUCHEY:  No, I don't have any questions at this time.

MR. AUSTIN:  Okay.  Madam Court Reporter, do you need transcript orders on the record?

(Reporter clarification.)

MR. AUSTIN:  Sam, go ahead.

MR. BRUCHEY:  I'll take a copy of the transcript, and I'd also like a rough, please.

(Reporter clarification.)

MR. AUSTIN:  I'll take a copy, that electronic rough as well, please, and then a certified electronic and hard copy.



(The matter concluded, 2:27 p.m.)



DECLARATION UNDER PENALTY OF PERJURY

I, DAVID BROGAN, do hereby certify under penalty of perjury that I have read the foregoing transcript of my deposition taken on April 5, 2024; that I have made such corrections as appear noted on the Deposition Errata Page, attached hereto, signed by me; that my testimony as contained herein, as corrected, is true and accurate.

Dated this              day of            2024.


DAVID BROGAN



STATE OF CALIFORNIA )
                    )
COUNTY OF SACRAMENTO)

        I, TAMMY MOON, CSR No. 13184, Certified Shorthand Reporter, do hereby certify:

        That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

        That said proceedings were taken by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

        That I am neither counsel for, nor related to, any party to said proceedings, nor in any way interested in the outcome thereof.

        I further certify that I am not a party to any stipulation, if made, that would waive my duties mandated by the Court Reporters Board of California.

        In witness whereof, I have hereunto subscribed my name.

        Dated:  16th of April, 2024



_____

        Tammy Moon, CSR No. 13184, RDR, CRR

Reference No.: 11122754


Case:  RAISON D ETRE BAKERY vs MASSACHUSETTS BAY INS.


        DECLARATION UNDER PENALTY OF PERJURY

        I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.


        _____

              David Brogan


              NOTARIZATION OF CHANGES

                 (If Required)


Subscribed and sworn to on the _____ day of


_____, 20_____ before me,


(Notary Sign)_____


(Print Name)                        Notary Public,


in and for the State of _____



# Exhibit 5

**In the Matter Of:**

RAISON D'ETRE BAKERY vs MASSACHUSETTS BAY

3:23-cv-014101 EMC

# JOANNE SALVAGGIO

*November 01, 2024*

*Confidential*



800.211.DEPO (3376)
*EsquireSolutions.com*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

-oOo-

| | |
|---|---|
| RAISON D'ETRE BAKERY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) Case No. | |
| MASSACHUSETTS BAY INSURANCE ) 3:23-cv-014101 EMC | |
| COMPANY, ) | |
| ) | |
| Defendant. ) | |
| ) | |

CONFIDENTIAL TRANSCRIPT

VIDEOCONFERENCE DEPOSITION OF JOANNE SALVAGGIO

November 1, 2024

12:03 p.m.

Geneva, New York

Robin C. Hice, CSR No. 13203(Remote)



APPEARANCES OF COUNSEL

FOR PLAINTIFFS:

Shernoff Bidart Echeverria LLP
SAMUEL BRUCHEY (Via videoconference.)
600 South Indian Hill Boulevard
Claremont, California 91711
(310) 246-0503
Sbruchey@shernoff.com


FOR DEFENDANTS:

Hayes Scott Bonino Ellingson & Guslani LLP
TYLER AUSTIN (Via videoconference.)
333 Twin Dolphin Drive, Site 230
Redwood City, California 94065
(650) 637-9100
Taustin@hayesscott.com



Also present at the deposition was:  David Brogan.



I N D E X
WITNESS:   JOANNE SALVAGGIO

EXAMINATION                                                        PAGE


By Mr. Austin.......................................4

By Mr. Bruchey.....................................43


FURTHER EXAMINATION

By Mr. Austin......................................71

By Mr. Bruchey.....................................73




E X H I B I T S


MARKED                                                            PAGE


Exhibit 19, Excel Spreadsheet.....................25

Exhibit 20, Email Thread..........................33

Exhibit 21, Email Thread..........................36

Exhibit 22, Email Thread..........................41


Previously marked Exhibit 4 and Exhibit 8 attached for

reference.



GENEVA, NEW YORK

Friday, November 1, 2024; 12:03 p.m.


JOANNE SALVAGGIO,

having first been duly sworn, testified as follows:


EXAMINATION

BY MR. AUSTIN:

Q.   Good afternoon, Ms. Salvaggio.  My name is
Tyler Austin.  I am the attorney for the insurance
company in this case.

Have you ever had your deposition taken
before?

A.   No.

Q.   Okay.  I am going to go through some kind of
ground rules with you here before we get started.
First, can you state and spell your name for the record.

A.   Yes.  Joanne J-O-A-N-N-E, Salvaggio,
S-A-L-V-A-G-G-I-O.

Q.   Okay.  And then your last name used to be
Bolonda, correct?

A.   Yes.

Q.   And that is -- go ahead.

A.   B-O-L-O-N-D-A.

Q.   Okay.  And when did your last name change



about?

A.    November of 2023.

Q.    Okay.  So I am going to go through some logistics here to start.  So as you know from the court reporter, you are currently under oath.  And although we are doing this remotely by Zoom, that oath enforces and requires you and has the same impact as if you were testifying in a court of law.

Do you understand that?

A.    Yes.

Q.    Okay.  The court reporter is going to record everything we say on the record and there will be a transcript that you can review after the deposition. It's important that we try to speak one at a time so that the court reporter can get everything on the record.  So to the extent you can speak, if you can just speak slowly and then try to pause after my questions, because plaintiff's counsel will likely have some objections throughout.  He will put those on the record and then you will go ahead and answer the question.

Do you understand?

A.    Yes.

Q.    And then just to clarify on that last point, there is no judge here today.  But during the deposition the attorneys can make objections to questions just to



It's been a while.  But it was -- we would have calls with Gloria, right, and then we certainly would have calls with Devyn.  And then there was someone else who Devyn reported to.  I just can't recall the name.

Q.   Do you know what Gloria Villareal's role was with Albertsons?

MR. BRUCHEY:  Object for the record that the question may lack foundation and call for speculation, but please go ahead.

THE WITNESS:  Oh, as far as what her role was?

BY MR. AUSTIN:

Q.   Yeah.  Do you know what her role was with Albertsons?

A.   She -- my understanding was she managed private label brands for deli.  That's my understanding. Again, it's been a while so...

Q.   Okay.  And then -- sorry, go ahead.

A.   Oh, no, go ahead.

Q.   So as far as her work with Gloria Villareal -- strike that.

As far as Gloria Villareal's work with Raison, what did you understand her role to be with respect to Raison and it's products?

MR. BRUCHEY:  So let me object on the same grounds, foundation and speculation, but please go



ahead.

THE WITNESS:  What her role was, was my understanding, again, I came in later when -- after the fire we were just trying to get it back -- get everything going once the facility was ready.  So she was the contact that we were working with to launch the items throughout Albertsons divisions.

BY MR. AUSTIN:

Q.    Okay.  So she was there to assist Raison in launching and I guess expanding its product within Albertsons?

A.    Yes.

Q.    Did Gloria Villareal ever communicate to you that any Albertson division that agreed to bring on Raison product would have to buy at least 95 percent of an estimated volume on an annual basis?

A.    Not that I recall, no.

Q.    Did she ever communicate to you that Albertsons had any minimum purchase requirements either contracturally or internally?

A.    No, not that I am aware of.

Q.    Did anyone at Albertsons ever communicate to you that Albertsons had any sort of minimum purchase requirement with respect to Raison's product?

A.    No.  It was -- oh, sorry.  It was more they



were there to say we can suggest things to the divisions, but the divisions have to make -- like, they have to authorize it to bring it on.  It wasn't -- like that was what we were tying to work with both Gloria and Devyn on is how to get more of these divisions on.

Q.   Okay.  And then once the divisions decided to bring the product on, it was also still up to the divisions how much they would buy; is that right?

MR. BRUCHEY:  So let me --

THE WITNESS:  Yes.

MR. BRUCHEY:  -- before you answer that, that question may lack foundation and call for speculation.

Go ahead.

BY MR. AUSTIN:

Q.   You can just repeat your answer.

A.   Oh, just that, no, there was -- my understanding was that it was the division's decision what they would bring in, what they would buy, and how they would replenish.

Q.   Okay.

A.   -- control -- sorry.  I lost you for a minute. It was to my interpretation of it, was that it was somewhat decentralized, right, where these divisions were making the decision.  They could -- Gloria or Devyn could suggest, but the divisions would make the decision



to buy?

MR. BRUCHEY:  So I am going to -- excuse me just for a second, Tyler.  I am going to object on foundation grounds and move to strike.

BY MR. AUSTIN:

Q.    Okay.  It's -- don't worry about that, Joanne.  It doesn't mean anything.

A.    Okay.

Q.    So while you were at Raison, did you learn of any problems with the product that were making it difficult to sell?

A.    We were -- I would go to stores as custom in the industry, check stores and see how things were going.  And the -- I was finding product that was out of code.  There was some breakage.  There was a package issue that, you know, the product wasn't really staying together.  It was kind of getting in pieces.  So from what it looked like, I mean movement seemed to be slower than anticipated.

Q.    Okay.  So we have had some other testimony about the packaging.  So is it your understanding that the way that the product was packaged was making it difficult to sell; is that right?

MR. BRUCHEY:  I am going to --

THE WITNESS:  Yes.



MR. BRUCHEY:  -- object that question is leading.

MR. AUSTIN:  Yeah.  It's -- she's a third party witness.  I can lead as much as I want.

MR. BRUCHEY:  You know what, you don't need to do that.  I can put my objection on the record.

MR. AUSTIN:  All right.

BY MR. AUSTIN:

Q.   Okay.  So you mentioned the problem with packaging.  Did you learn of any other problems with the product that were making it more difficult to sell while you were there?

A.   I don't think it stems from the packaging.  It was -- I think it was a few things where it was smaller, it was hard to see on the shelf, and there was breakage and maybe some freshness issues is my recollection.

Q.   Okay.  What about did you ever hear from anyone at Albertsons that the product might be too expensive for the Safeway customer base?

A.   I don't recall that, no.

Q.   Did you ever have that opinion?

A.   It was -- it was a premium product in the category, so it's -- it's -- it's subjective.  But what I would say is if consumers are buying it, like, I think my concerns stemmed from like if people weren't picking



Q.   Who did you speak with at the bakery about why those changes were going to be made?

A.   It was essentially the whole team, so David, Josh, Mark, the -- a lot of people were involved in that decision, and it was to help with the breakage primarily.

MR. BRUCHEY:  Got it.  That's all I have. Thank you very much.

MR. AUSTIN:  No more questions for me.

Madam Court Reporter, would you like orders on the record?

THE REPORTER:  Yes, please.

MR. AUSTIN:  So, Sam, I don't know what you want.  I will take an electronic rough in addition to an electronic final and the certified copy.

MR. BRUCHEY:  I would like an electronic rough.  I'd like an electronic copy in PDF and in TXT formats please.

(Whereupon, the deposition concluded at 1:48 p.m.)



DECLARATION UNDER PENALTY OF PERJURY


        I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter, or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

        Signed on the _____ day of _____, 20_____.


                    _____
                            JOANNE SALVAGGIO



DEPOSITION ERRATA SHEET


Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____



JOANNE SALVAGGIO  Confidential                              November 01, 2024
RAISON D'ETRE BAKERY vs MASSACHUSETTS BAY                              78

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

SIGNATURE:_____DATE:_____

                    JOANNE SALVAGGIO



REPORTER'S CERTIFICATION

I, Robin C. Hice, Certified Shorthand Reporter, in and for the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceeding, prior to testifying, were placed under oath; that a verbatim record of the proceeding was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney of any of the parties.

IN WITNESS WHEREOF, I have subscribed my name this 7th day of November, 2024.

Robin Hice, CSR No. 13203



**CASE NAME:  Raison D'Etre Bakery LLC v. MBIC**
**CASE NO.:      3:23-cv-014101 EMC**

## PROOF OF SERVICE

I am a resident of the State of Wisconsin. My business address is 333 Twin Dolphin Drive, Suite 230, Redwood City, CA 94065.  I am employed in the County of San Mateo where this service occurs.  I am over the age of 18 years, and not a party to the within cause.  I am readily familiar with my employer's normal business practice for collection and processing of correspondence for mailing with the U.S. Postal Service, and that practice is that correspondence is deposited with the U.S. Postal Service the same day as the day of collection in the ordinary course of business.

On the date set forth below, following ordinary business practice, I served a true copy of the foregoing document(s) described as:

**DEFENDANT MASSACHUSETTS BAY INSURANCE COMPANY'S MOTION IN LIMINE NO. 1 FOR AN ORDER EXCLUDING OR LIMITING EVIDENCE OR ARGUMENT THAT ALBERTSON'S DIVISIONS WERE OBLIGATED TO PURCHASE AT LEAST 95% OF THE ANNUAL VOLUME OF PLAINTIFF'S ESTIMATES; DECLARATION OF TYLER R. AUSTIN**

☐   (BY MAIL) I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States mail at Redwood City, California.

☒   (BY EMAIL) by transmitting via email the document(s) listed above to the corresponding email address(es), or as stated on the attached service list, on this date before 5:00 p.m.

☐   (BY OVERNIGHT DELIVERY) I caused such envelope(s) to be delivered to an overnight delivery carrier with delivery fees provided for, addressed to the person(s) on whom it is to be served.

William M. Shernoff, Esq.
Samuel L. Bruchey, Esq.
SHERNOFF BIDART ECHEVERRIA LLP
600 S. Indian Hill Blvd.
Claremont, CA 91711
Telephone: (310) 246-0503
Facsimile: (310) 246-0380
Email(s):      wshernoff@shernoff.com
                     sbruchey@shernoff.com
                     BDesJardins@shernoff.com
                     cwarburton@shernoff.com
                     ntsaturyan@shernoff.com

***Attorneys for Plaintiff***

☒   *(Federal)* I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on July 11, 2025 at Madison, Wisconsin.

_____
Rachel Smith

-1-
PROOF OF SERVICE – CASE NO. 3:23-cv-014101 EMC

**Plaintiff's Opposition to MBIC's Motion In Limine No. 1**

WILLIAM M. SHERNOFF #38856
wshernoff@shernoff.com
SAMUEL L. BRUCHEY #271995
sbruchey@shernoff.com
HOWARD S. SHERNOFF, OF COUNSEL #263556
howard@shernoff.law
**SHERNOFF BIDART ECHEVERRIA LLP**
600 South Indian Hill Blvd.
Claremont, CA 91711
Phone: (310) 246-0503
Fax: (310) 246-0380

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAISON D'ETRE BAKERY, LLC, | Case no. 23-CV-01401-EMC |
| Plaintiff, | **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION IN LIMINE NO. 1, TO EXCLUDE EVIDENCE THAT ALBERTSONS' DIVISIONS WERE OBLIGATED TO PURCHASE AT LEAST 95% OF THE ANNUAL VOLUME OF PLAINTIFF'S ESTIMATES** |
| v. | |
| MASSACHUSETTS BAY INSURANCE COMPANY, | |
| Defendant. | Trial Date:   September 8, 2025 |
| | Time:        8:30 a.m. |
| | Hon. Edward M. Chen |
| | Courtroom 5 |

- 1 -

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION IN LIMINE NO. 1

## MEMORANDUM OF POINTS AND AUTHORITIES

Motion in Limine Number One of Massachusetts Bay Insurance Company (MBIC) seeks an order excluding evidence that Albertsons' divisions were obligated to purchase at least 95% of the annual volume of the estimates contained in the Requests for Proposals extended to Raison d'Etre Bakery (Raison). The motion seeks only one specific exclusion: testimony of former Albertsons' employee Gloria Villareal as to the extent of Albertsons' commitment to purchase Raison's products. MBIC argues the testimony is not relevant because it has been "overruled" by contradictory testimony offered by another Albertsons employee, Stephanie Chien. It argues that admitting Villareal's testimony will confuse issues for the jury.

MBIC is wrong on all counts. Villareal's testimony is highly relevant as it speaks to the accuracy of forecasts that Raison submitted to MBIC in support of its business income (BI) insurance claim. The bakery would have achieved its forecasts but for the fire because the divisions that had agreed to sell its cheese crisps were obligated to purchase at least 95 percent of their annual estimates.

Admitting Villareal's testimony will not confuse issues or waste time. It will simply allow the jury to determine which witness they find more credible on the issue. As discussed below, there is good reason to favor Villareal's testimony over Chien's on this point.

Finally, the Court has already ruled in this case that any conflict in testimony among the Albertsons' employees must be resolved by the jury. Accordingly, the motion should be denied.

**1.      Villareal's testimony is highly relevant to the calculation of Raison's damages.**

Evidence is admissible at trial if it is relevant. Fed. R. Evid. 402 ("All relevant evidence is admissible . . . . Evidence which is not relevant is not admissible"). "Relevant evidence" is evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION IN LIMINE NO. 1

Relevant evidence may be inadmissible if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. Fed. R. Evid. 403. In deciding whether to grant a party's request to exclude evidence, courts evaluate the admissibility and not the weight of the evidence: "Although district courts have broad discretion in ruling on motions in limine, courts must be careful not to use them to resolve factual disputes or to weigh evidence." *Acad. of Motion Picture Arts & Scis. v. GoDaddy.com, Inc.*, 2015 U.S. Dist. LEXIS 186633, at *4-6 (C.D. Cal.).

In this case, Villareal's testimony that participating Albertsons divisions were obligated to purchase at least 95 percent of the annual revenue estimates is highly relevant to the issue of whether MBIC breached its insurance contract with Raison by paying less than the full amount of business income Raison claimed to have lost from Albertsons due the fire. Villareal's testimony is straightforward and unwavering.

> **Q.** So then the next part that I'm trying to understand here is you made a reference to some commitment number, some minimum commitment number, that the divisions had once they decided to bring the product in that was different than the estimated cost. What's that number called?
>
> **A.** There's two different numbers. The costs at that point are no longer negotiable. The only thing that would be negotiable at that point is there's an estimated volume number that the divisions— that is issued to Raison. And then I would negotiate with the divisions and say, "Do you think you could meet this number?" And they would say, "Yeah, you know, you could bump it up. You can bring it down a little bit." You give them a little bit of wiggle room. And, because they know their divisions better than we do, and they would at that point correct our calculations if needed.
>
> **Q.** Okay. And when you say they could have a little bit of wiggle

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION IN LIMINE NO. 1

room, do you have an approximate percentage that the divisions could increase or decrease their volume commitment as opposed to the numbers, the estimated volume that Albertsons came up with in the first place?

A. They can go anywhere above the number. They cannot go below five percent of the number.

Q. Okay. So, let's say the estimated volume for a specific division that Albertsons made at the front end—let's just say was 100 units annually to have that number. Any specific division is required to buy at least five percent of that number. So at least five?

A. No.

Q. Okay. So tell me how that works.

A. If they said they only wanted 95 units versus a hundred, they have that wiggle room. The five percent is not only five percent of the number we've committed.

Q. So once any division comes on, they are then required to buy at least 95 percent of the estimated annual volume in the RFP; is that right?

A. Correct. But the option was always there for them to go above and beyond.

Villareal Depo., 89:4-91:14. When asked as a follow-up how Albertsons would enforce the commitment if a division did not honor it, Villareal stated that she did not know because she had never seen a division not honor its minimum annual commitment. *Id.*, 94:19-23.

It is undisputed in this case that the national office of Albertsons created annual revenue estimates for the crisps. The estimates identified the specific number of units each of the 13 Albertsons divisions was expected to sell. Both Villareal and her supervisor, Stephanie Chien, testified that they were directly involved in the calculation of those estimates. The figures were presented by Albertsons to Raison in 2020 and used as a basis to negotiate

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION IN LIMINE NO. 1

certain price points pertaining to the upcoming launch of the crisps as a private label product. After the fire in October 2020, Raison based its calculation of its business income losses with Albertsons upon the annual estimates.

Villareal's testimony that the divisions were obligated to sell at least 95 percent of the annual estimates supports Raison's position that its BI calculation was accurate and that MBIC breached the insurance contract by paying a lesser amount based upon the actual pre-fire sales data.

Throughout this litigation, MBIC has attacked the accuracy of Raison's BI claim. It emphasizes that actual sales figures during the launch of the crisps in the weeks prior to the fire fell below projected levels. It argues, based upon limited testimony from a former bakery employee, that concerns about the crisps' "clamshell" packaging contributed to disappointing sales figures. Thus, MBIC argues, the actual pre-fire sales figures are the only true measure of the business income the bakery lost with Albertson due to the fire.

Villareal rejects that position. At deposition, she testified emphatically that the participating divisions at Albertsons were excited about the launch of the crisps. She was unequivocal that the revenue estimates were accurate, and that, given more time, those estimates would have been met. Deposition of Gloria Villareal, 54:17-55:2. Her certainty on this point is based in large part on her knowledge that the divisions were required to meet their annual revenue estimates. Her testimony is directly relevant to the question of whether MBIC underpaid Raison's claim by rejecting the estimates.

**2.      Villareal's testimony is not unduly prejudicial and will not confuse the issues, mislead the jury or waste time at trial.**

In its motion, MBIC argues Villareal's testimony on the 95 percent commitment issue has been "overruled" by her supervisor Stephanie Chien who countered that no such commitment existed. It argues that due to her senior position at Albertsons, Chien's testimony should be given "more weight" and to admit Villareal's testimony into evidence would be unduly prejudicial, confuse the jury and waste time at trial. Not so.

It is precisely the role of the jury to weigh conflicting evidence and resolve issues of

- 5 -

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION IN LIMINE NO. 1

credibility. Indeed, there is good reason to believe that on this point Villareal's testimony is more credible than Chien's. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from facts are jury functions, not those of a judge"); *Samarzia v. Clark County,* 859 F.2d 88, 90 (9th Cir. 1988) ("it is the exclusive function of the jury to weigh the credibility of the witnesses").

More than anyone else at Albertsons, Villareal, an assistant product manager, was intimately involved in Albertsons' relationship with Raison. Villareal discovered the crisps for Albertsons. She introduced the bakery to the Own Brands division in Albertsons' national office. She worked with the bakery and the national office to secure Albertsons' commitment to launch the crisps under its own label. She calculated the estimates and, more than anyone else, communicated directly with division leaders about the product. Villareal Depo., 54:17-55:2, 65:11-66:1 Simply put, she would know better than anyone else at Albertsons whether the divisions had committed to purchase at least 95 percent of the annual estimates.

Although Chien was Villareal's supervisor at Albertsons, she concedes that Villareal worked most closely with Raison, and that she (Chien) had a supportive role in that regard. Deposition of Stephanie Chien ["Chien Depo."], 14:5-18. Chien acknowledged that she does not typically communicate directly with Albertsons buyers. Chien Depo., 84:21-25. She admits, too, that Villareal was the point person from the national office that communicated directly with division leaders. Chien Depo., 91:6-23. Put differently, Villareal was in closest contact with the divisions about their interest in the crisps. Chien Depo.*,* 93:18-94:3. In fact, Chien acknowledged that she does not know whether Villareal presented division leaders with the national office's annual revenue estimates to solicit their commitment. Chien Depo., 104:19-21.

MBIC goes to great lengths to argue that no one at Raison was aware of the co-called obligation that the divisions purchase at least 95 percent of the annual estimates. This argument is a red herring and should be dismissed by the Court.

- 6 -

SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

The 95 percent obligation was an <u>internal</u> commitment that the divisions made with the Albertsons' national office. It was not a commitment that the divisions made to Raison. In fact, as Villareal testified, Raison communicated exclusively with the national office. It did not communicate with division leaders. The national office was responsible for working with the divisions and making certain that they satisfied their obligations. Villareal testified to all of this at deposition and will again at trial. It is no wonder, then, that Raison was unaware of this commitment. The fact that executives at Raison were ignorant to this fact does not suggest that there was no commitment. It only suggests that the commitment was an internal requirement imposed upon the divisions.

**3.      This Court has already ruled that the trier of fact must resolve credibility disputes between Villareal and Chien.**

MBIC's motion should be denied furthermore because it constitutes an impermissible second attempt at summary judgment. "Motions in limine may not be used as a disguise for a motion for summary judgment or to dismiss." *Acad. of Motion Picture Arts & Scis. v. GoDaddy.com, Inc.*, 2015 U.S. Dist. LEXIS 186633 at *5 (citing Jones, et al., Rutter Group Prac. Guide Fed. Civ. Trials & Evid., ¶ 4:345 (The Rutter Group, 2006). MBIC, in its motion for summary judgment, challenged Ms. Villareal's testimony concerning the 95-percent commitments of Albertsons' divisions, and it did so using the very same opposing testimony that it submits on this motion. The Court ruled that it could not resolve the conflict in testimony as a matter of law:

> MBIC acknowledges, however, that a former Albertsons employee, Gloria Villareal, testified during her deposition that any division that agreed to bring on Raison's product would have had to purchase at least 95% of the volume projected in the RFP. But it argues that this testimony should be given no credit because Stephanie Chien, Ms. Villareal's supervisor, testified in her own deposition that Ms. Villareal was incorrect. *At summary judgment, the Court cannot resolve this credibility dispute between Ms. Villareal and Ms. Chien.*

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION IN LIMINE NO. 1

February 9, 2025 Order on Summary Judgment (emphasis added).

The instant motion repeats MBIC's request that the Court deem its witness more credible than Raison's witness and in so doing, eviscerate Raison's case before it reaches the jury. There could not be a more flagrant example of a party trying to take the proverbial second bite at the apple.

Because MBIC has failed completely to demonstrate how or why Ms. Villareal's testimony would be inadmissible, and because the Court has already ruled that the matter of conflicting testimony presents an issue of triable fact, Motion in Limine Number One should be denied.

Date: July 18, 2025                              SHERNOFF BIDART ECHEVERRIA LLP

By: _____
WILLIAM M. SHERNOFF
SAMUEL L. BRUCHEY
HOWARD S. SHERNOFF
Attorneys for Plaintiff

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION IN LIMINE NO. 1

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am employed in the county of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is:  301 North Cañon Drive, Suite 200, Beverly Hills, California 90210.

On July 18, 2025, I served the foregoing document described as **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION IN LIMINE NO. 1, TO EXCLUDE EVIDENCE THAT ALBERTSONS' DIVISIONS WERE OBLIGATED TO PURCHASE AT LEAST 95% OF THE ANNUAL VOLUME OF PLAINTIFF'S ESTIMATES** on all interested parties in this action by placing [  ] the original [X] a true copy thereof enclosed in sealed envelopes addressed as follows:

**(See Attached Service List)**

[] BY MAIL  I caused such envelope to be deposited in the mail at Beverly Hills, California.  The envelope was mailed with postage thereon fully prepaid.  I am "readily familiar" with this firm's practice of collection and processing correspondence for mailing.  It is deposited with U.S. postal service on that same day in the ordinary course of business.  I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than 1 day after date deposit for mailing in affidavit.

[] BY PERSONAL SERVICE  I caused to be delivered by hand to the above-listed addressees or to the addressees on the list attached hereto.  A proof of service executed by the delivery person will be mailed under separate cover.

[] BY OVERNIGHT MAIL/COURIER  To expedite the delivery of the above-named document, said document was sent via overnight courier for next day delivery to the above-listed party.

[X] BY ELECTRONIC MAIL  By transmitting via electronic mail on or before 5:00 p.m. the document(s) listed above to each of the person(s) set forth below.

[] BY CM/ECF ELECTRONIC DELIVERY:  In accordance with the registered case participants and in accordance with the procedures set forth at the Court's website www.ecf.cacd.uscourts.gov.

[X]  (Federal) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.  I declare under penalty of perjury under the laws of California that the above is true and correct.

Executed on July 18, 2025, at Beverly Hills, California.

_____
Cole Warburton

**SERVICE LIST**

Stephen M. Hayes, Esq.
Tyler R. Austin, Esq.
**HAYES SCOTT BONINO ELLINGSON& GUSLANI LLP**
333 Twin Dolphin Drive, Suite 230
Redwood City, CA 94065
Telephone: (650) 637-9100
shayes@hayesscott.com
taustin@hayesscott.com
acalderon@hayesscott.com
rsmith@hayesscott.com

Attorneys for Defendant
MASSACHUSETTS BAY INSURANCE COMPANY