WILLIAM M. SHERNOFF #38856
wshernoff@shernoff.com
SAMUEL L. BRUCHEY #271995
sbruchey@shernoff.com
**SHERNOFF BIDART ECHEVERRIA LLP**
600 South Indian Hill Boulevard
Claremont, California 91711
Tel.: (310) 246-0503
Fax: (310) 246-0380

Attorneys for Plaintiff



UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAISON D'ETRE BAKERY LLC,<br><br>Plaintiff,<br><br>vs.<br><br>MASSACHUSETTS BAY INSURANCE COMPANY; and DOES 1 through 10,<br><br>Defendants. | Case No. 3:23-cv-01401 EMC<br><br>**PLAINTIFF'S MOTION IN LIMINE # 1 TO EXCLUDE EVIDENCE OR ARGUMENT THAT APPROXIMATELY 25% OF THE PRODUCT RAISON SOLD TO ALBERTSONS IN 2020 NEVER SOLD TO THE END CUSTOMER; DECLARATION OF SAMUEL BRUCHEY**<br><br>Dept. 5<br>Judge: Hon. Edward M. Chen |

- 1 -

**INTRODUCTION**

This breach-of-contract case arises from the refusal of defendant Massachusetts Bay Insurance Company ("MBIC") to fully pay the insurance claim of plaintiff Raison d'Etre Bakery ("Raison") after a fire destroyed its production facility in October 2020, which caused the company to lose millions in business income. This included the profits Raison lost from a lucrative deal with Albertsons to supply the retailer with Raison's best-selling product, artisanal "cheese crisps," for nationwide distribution and sales.

Raison has offered ample evidence proving that its business-income projections for the Albertsons' deal were reasonable and would have been achieved but for the fire. This evidence includes the testimony of the Albertsons employee who arranged the deal with Raison, the expert opinion of a forensic accountant, and the opinion of an expert in retail supply chain and purchasing operations.

MBIC has raised several theories to cast doubt on Raison's projections. One of these theories is that the cheese crisps "failed to gain traction with the end customer in grocery stores[.]" Motion for Summary Judgment ("MSJ"), 7:12-13 [Document 24, p. 12 of 29]. In support of this theory, MBIC has offered the following explanation:

> Albertson's produced data in response to a subpoena in this case showing that Albertson's stores ordered 70,848 units of Raison's cheese crisps in 2020. Chien Decl., Exh. 10 (Alb 57-59.) By the time Raison resumed sales after the fire in January 2022, Albertson's was only able to sell 52,810 units to the end customer. Chien Decl., Exh. 11 (Alb 61-62). This means that **approximately 25% of the product Raison sold to Albertson's in 2020 never sold to the end customer** even though the cheese crisps were purchased just before the 2020 holiday season.

MSJ, 7:11-18 (original emphasis) [Document 24, p. 12 of 29]; see also Reply in Support of MSJ, 2:23-24, 5:9-11 (citing Morris Decl., ¶ 5-7 in support) [Document 31, pp. 3, 6 of 17].

This 25% figure apparently comes from the expert report of Gary White (which was submitted in support of MBIC's MSJ). In its reply, MBIC elaborated on the theory, citing White's report:

PLAINTIFF'S MOTION IN LIMINE # 1
Case No. 3:23-cv-01401 EMC

SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

According to MBIC's industry expert [Gary White], failing to sell such a large portion of the product was "a big problem" for the business relationship between Raison and Albertson's. White noted in his expert report that "[i]n the grocery industry, shelf space is extremely important. If a retailer like Albertsons was unable to sell 25% of the product it purchased, that would have been a big problem." Supplemental Austin Decl., Exh. 22 at p. 14.

Reply in Support of MSJ, 5:12-16 [Document 31, p. 6 of 17].

In turn, the numbers White used to calculate the 25% figure came from the supporting declaration of MBIC's expert, Lisa Morris, who created the following table:

| Month | Original Packs Ordered ALB_000059 | Units Ordered [A] | Units Sold ALB_000063 | Balance (Units) [B] | Everything Packs Ordered ALB_000059 | Units Ordered [A] | Units Sold ALB_000063 | Balance (Units) [B] | Total Packs Ordered | Units Ordered | Units Sold | Balance (Units) | Balance % of Total Ordered |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jul-20 | 1,008 | 12,096 | – | 12,096 | 1,008 | 12,096 | – | 12,096 | 2,016 | 24,192 | – | 24,192 | 100.00% |
| Aug-20 | 936 | 11,232 | 3,710 | 19,618 | 792 | 9,504 | 2,676 | 18,924 | 1,728 | 20,736 | 6,386 | 38,542 | 85.79% |
| Sep-20 | 792 | 9,504 | 4,531 | 24,591 | 936 | 11,232 | 3,577 | 26,579 | 1,728 | 20,736 | 8,108 | 51,170 | 77.93% |
| Oct-20 | 144 | 1,728 | 5,727 | 20,592 | 144 | 1,728 | 4,784 | 23,523 | 288 | 3,456 | 10,511 | 44,115 | 63.82% |
| Nov-20 | – | – | 6,183 | 14,409 | 144 | 1,728 | 6,132 | 19,119 | 144 | 1,728 | 12,315 | 33,528 | 47.32% |
| Dec-20 | – | – | 4,820 | 9,589 | – | – | 5,724 | 13,395 | – | – | 10,544 | 22,984 | 32.44% |
| Jan-21 | – | – | 51 | 9,538 | – | – | 23 | 13,372 | – | – | 74 | 22,910 | 32.34% |
| Feb-21 | – | – | 2,354 | 7,184 | – | – | 2,068 | 11,304 | – | – | 4,422 | 18,488 | 26.10% |
| Mar-21 | – | – | 108 | 7,076 | – | – | 211 | 11,093 | – | – | 319 | 18,169 | 25.65% |
| Apr-21 | – | – | 25 | 7,051 | – | – | 62 | 11,031 | – | – | 87 | 18,082 | 25.52% |
| May-21 | – | – | 6 | 7,045 | – | – | 18 | 11,013 | – | – | 24 | 18,058 | 25.49% |
| Jun-21 | – | – | 3 | 7,042 | – | – | 6 | 11,007 | – | – | 9 | 18,049 | 25.48% |
| Jul-21 | – | – | 7 | 7,035 | – | – | – | 11,007 | – | – | 7 | 18,042 | 25.47% |
| Aug-21 | – | – | – | 7,035 | – | – | – | 11,007 | – | – | – | 18,042 | 25.47% |
| Sep-21 | – | – | – | 7,035 | – | – | – | 11,007 | – | – | – | 18,042 | 25.47% |
| Oct-21 | – | – | – | 7,035 | – | – | – | 11,007 | – | – | – | 18,042 | 25.47% |
| Nov-21 | – | – | 4 | 7,031 | – | – | – | 11,007 | – | – | 4 | 18,038 | 25.46% |
| Dec-21 | – | – | – | 7,031 | – | – | – | 11,007 | – | – | – | 18,038 | 25.46% |
| Total | 2,880 | 34,560 | 27,529 | | 3,024 | 36,288 | 25,281 | | 5,904 | 70,848 | 52,810 | | |

Note [A]: There are 12 units per pack.

Morris Decl., ¶ 5 (red emphasis added) [Document 24-7, p. 2 of 4]. According to Morris, this table "was based on data produced by Albertson's in response to a subpoena in this case. That data is reflected in Exhibits 10 and 11 to the Declaration of Stephanie Chien." Morris Decl., ¶ 6 [Document 24-7, p. 3 of 4]. Morris has also included these numbers (and the 25% calculation) in her most recent report.

In this motion, Raison requests that the court preclude MBIC or its witnesses from asserting that "approximately 25% of the product Raison sold to Albertson's in 2020 never sold to the end customer." As explained below, the 25% figure was calculated incorrectly. Moreover, MBIC can offer no witness who is qualified to interpret the data provided by Albertsons—which is probably why the 25% calculation is wrong.

PLAINTIFF'S MOTION IN LIMINE # 1
Case No. 3:23-cv-01401 EMC

# ARGUMENT

**1.     The 25% calculation of unsold crisps is incorrect.**

As explained in MBIC's MSJ and the expert report of Gary White, 25% was arrived at by comparing the total number of units ordered by Albertsons in 2020 to the total number of units sold to the end customer before January 2022 (when Raison was able to restart production). MSJ, 7:11-18 [Document 24, p. 12 of 29]; Supplemental Austin Decl., Exh. 22 at p. 14 [Document 31-1, p. 17 of 50].

As outlined by Morris in her table (above), the number of units ordered in 2020 was 70,848 and the number of units sold to the end customer (before January 2022) was 52,810. Morris Decl., ¶ 5 [Document 24-7, p. 2 of 4]. By these numbers, this means that 18,038 units remained unsold by January 2022. This is 25.46% of the 70,848 units that were ordered by Albertsons in 2020.

But this 25% figure is wrong because Morris (and therefore White and MBIC) used the wrong amount for the units sold before January 2022. Morris claims that the number of units sold to the end customer by January 2022 was 52,810, and that this number came from Albertsons' data, which was reflected in Exhibits 10 and 11 to the Declaration of Stephanie Chien. Morris Decl., ¶ 6 [Document 24-7, p. 6 of 4]

But the number of units sold to the end customer by January 2022 is higher than 52,810. In the Albertsons' data where Morris took the numbers, the "Sum of Total Units" sold for "FY2020" is 54,252 and the total for "FY2021" is 4,946. Chien Decl., Ex. 11 [Document 24-2, p. 6 of 186]. Therefore, the total sales of units before January 2022 (the years 2020 and 2021) would be closer to the sum of these two numbers: 59,198. Thus, the number of *un*sold units (by January 2022) was closer to 11,650, which is 16% of the amount Albertsons purchased in 2020 , not 25%.

MBIC may quibble that the "FY" in this data refers to the "fiscal year," which might not align with the calendar year. But this would be missing the point. The 25% calculation would *still* be wrong. Even the total units sold in the fiscal year of 2020 *alone* (54,252) is higher than MBIC's calculation of the units sold for all of 2020 *and* 2021. Chien Decl., Ex. 11 [Document 24-2, p. 6 of 186]. Moreover, any debate over the number of units sold based on Albertsons' data underscores

- 4 -

the fact that there is no witness from Albertsons who is qualified to interpret this data (as explained in the next section).

Therefore, because the 25% figure is wrong, the Court should preclude MBIC and its experts from asserting that theory at trial. First of all, the Court may exclude relevant evidence "if its probative value is substantially outweighed by a danger of … unfair prejudice, … misleading the jury, … [or] wasting time[.]" Fed. R. Evid. 403. Here, allowing multiple experts to repeat an erroneous calculation (25%)—and then offer opinions based on that erroneous calculation— would mislead the jury and unduly prejudice Raison. If MBIC's witnesses are allowed to do so, it would also waste time because Raison's counsel would have to painstakingly explain how the calculation is wrong.

Second, an expert's testimony is not admissible unless it is "based on sufficient facts or data" and the expert's opinion "reflects a reliable application of [his or her] principles and methods to the facts of the case." Fed. R. Evid. 702 (b) & (d). Here, Morris used the wrong amount for the units sold before January 2022, which made the 25% calculation incorrect (as explained above). Thus, the opinions based on this calculation do not reflect a reliable application of the principles and methods to this case.

**2.     MBIC has no witness from Albertsons to interpret the sales data upon which it relies.**

An additional reason for excluding this evidence is that MBIC has no qualified witness to interpret the Albertsons' data—which may explain why MBIC made the above error about unsold cheese crisps.

MBIC bases its theory on the data provided by Albertsons, which was reflected in Exhibits 10 and 11 to the Declaration of Stephanie Chien, who is the Director of Category Management and Innovation in Albertsons' Own Brands division. In her declaration, Chien never advanced or supported the theory that "approximately 25% of the product Raison sold to Albertson's in 2020 never sold to the end customer." Chien Decl. [Document 24-5, p. 2 of 3]. Rather, Chien simply explained which columns in the spreadsheet containing the data are in dollars and which are in units. *Id.* She did not testify about this "25%" theory at her deposition either.

PLAINTIFF'S MOTION IN LIMINE # 1
Case No. 3:23-cv-01401 EMC

Moreover, Chien should be precluded from interpreting the Albertsons data because she lacks the requisite "knowledge, skill, experience, training or education" to do so. Fed. R. Evid. 702. For example, Chien was asked about the Albertsons' sales data at her deposition. In discussing roughly 28 columns of one of the spreadsheets with sales data, Chien did not know what eleven of them were referring to; she also admitted that she did not "know the logic" of some of features of the data. Bruchey Declaration, Ex. A [Chien Depo.], 64:3-70:21.

It should be unsurprising that Chien did not fully understand the sales data because Chien was not involved with purchasing the product. At deposition, she testified that her team at Albertsons "would not be the people that were making decision[s] to actually purchase that product, and how much of it[.]" Bruchey Declaration, Ex. A [Chien Depo.], 22:5-8. She also admitted that she did not know the specifics of how Albertsons went about getting the product on its shelves. *Id.*, 18:2-18, see also 19:1-21, 20:7-16.

Because Chien lacks the requisite "knowledge, skill, experience, training or education" to interpret the Albertson's data, MBIC's experts should not be allowed to rely on her interpretations to conclude that "approximately 25% of the product Raison sold to Albertson's in 2020 never sold to the end customer."

## CONCLUSION

For all of the above reasons, Raison respectfully requests that the Court preclude argument or evidence that "approximately 25% of the product Raison sold to Albertson's in 2020 never sold to the end customer." MBIC has provided no expert witness who is qualified to interpret the data upon which this theory is based. Moreover, because this theory is based on an incorrect calculation, it would mislead the jury and unduly prejudice Raison.

Dated: July 11, 2025                        SHERNOFF BIDART ECHEVERRIA LLP

By: _____
                        WILLIAM M. SHERNOFF
                        SAMUEL L. BRUCHEY
                        Attorneys for Plaintiff

**DECLARATION OF SAMUEL BRUCHEY**

I, SAMUEL L. BRUCHEY, declare:

1.     I am an attorney duly licensed to practice in all courts within the State of California. I am partner at Shernoff Bidart Echeverria LLP, attorneys of record for Plaintiff in this action. I have personal knowledge of the facts set forth below and, if called upon, could and would testify competently thereto.

2.     Attached as **Exhibit A** is a compilation of excerpts from a true and correct copy of the deposition transcript of Stephanie Chien.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. This declaration was executed on July 11, 2025 in Beverly Hills, California.

_____
SAMUEL BRUCHEY

PLAINTIFF'S MOTION IN LIMINE # 1
Case No. 3:23-cv-01401 EMC

# EXHIBIT A

**In the Matter Of:**

BAKERY vs MBIC

3:23-cv-014101 EMC

**STEPHANIE CHIEN**

*October 28, 2024*

*Confidential*



800.211.DEPO (3376)
*EsquireSolutions.com*

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

RAISON D'ETRE BAKERY,

      Plaintiff,

vs.          No.: 3:23-cv-014101 EMC

MASSACHUSETTS BAY INSURANCE
COMPANY,

      Defendants.

_____

DEPOSITION OF:  STEPHANIE CHIEN

CONFIDENTIAL TRANSCRIPT

October 28, 2024

REPORTED BY: SHANNON D. DENNEY, CSR No. 10385



STEPHANIE CHIEN  Confidential                          October 28, 2024
BAKERY vs MBIC                                                       2

                              APPEARANCES


  For the Plaintiff:

        SHERNOFF BIDART ECHEVERRIA, LLP
        BY:  SAMUEL BRUCHEY, ESQ.
        600 South Indian Hill Boulevard
        Claremont, CA 91711



  For the Defendants:

        HAYES, SCOTT, BONINO, ELLINGSON, GUSLANI,
        SIMONSON & CLAUSE
        BY:  TYLER AUSTIN, ESQ.
        333 Twin Dolphin Drive, Suite 230
        Redwood City, CA 94065


        DAY PITNEY LLP
        ANTHONY BONGIORNI, ESQ.
        225 Asylum Street
        Hartford, CT 06103
        Anthony.Bongiorni@albertsons.com







  ALSO PRESENT:

        DAVID BROGAN



Raison's product in 2020.

How do they go about getting that product on their shelves?

A.    I don't know the specifics of the store order process, and the systems they use.

I do know that when they place a system in the order, the procurement buyer for that warehouse places the order with the vendor, who then produces the product.

Q.    So you referenced a procurement buyer for warehouse.

What -- what is that position, and what do they do?

MR. BRUCHEY:   Object.   The question may lack foundation, and call for speculation.

Please, go ahead.

THE WITNESS:   I am not -- I don't fully understand the procurement organization structure.

Q.    MR. AUSTIN:  Do you just understand it in a general level what that job position is?

I'm just trying to understand a very basic level how these logistics works within Albertsons, and with their vendors.

So do you know -- let me just ask a question so it's clean on the record.


DEPOSITION SOLUTIONS

level?

          MR. BRUCHEY:  Foundation.  Speculation.

          Please, go ahead.

          THE WITNESS:  The initial -- the very first order to Raison would have been made at the division level.

    Q.   MR. AUSTIN:  And then is there someone that would be called a divisional buyer, or a regional buyer in each division?

    A.   Again, I am not clear on the organizational structure.

          I do know that certain buyers work with certain sales managers.

          I don't know if it's a one-to-one relationship, and that each division has its own buyer. Yeah.

    Q.   But there are buyers at the division level that decide what products to order, and how much of it?

          MR. BRUCHEY:  Let me object.  The question lacks foundation.  And it calls for speculation.

    Q.   MR. AUSTIN:  PMQ witness on several categories related to these topics.  I don't think it calls for speculation.

          But she can tell me if she doesn't know.


ESQUIRE
DEPOSITION SOLUTIONS

Villarreal, in 2020, was not making decisions about what product to order, and how much of it, correct?

A.   We were making the decision on which product to present to divisions as an option to order.

Q.   Okay.  But then you would not be the people that were making decision to actually purchase that product, and how much of it, correct?

A.   Correct.

Q.   When you say your team would choose products to present, how would you go about presenting them to the divisions?

MR. BRUCHEY:  The question is overly broad.

THE WITNESS:  Should I still answer?

Q.   MR. AUSTIN:  Go ahead.

MR. BRUCHEY:  Yes.  You may.

THE WITNESS:  We have a process internally for Own Brands to determine whether a product is -- makes business sense for us to attempt to launch.

And once we've passed through the stage gates of our process to internally approve that this is something we should present to the divisions, we give them slides that include details around the product, dimensions, what it will look like from a design perspective, financials, logistics, who the vendor is, et cetera.



Q.    All right.  Go ahead.

A.    I'm sorry.  I said, in cases.

Q.    Now I'm going to go to sheet three.  This is titled PO data ALB 59.

I'll give you control if you want to move around in this.

But can you explain what this sheet is showing?

A.    This appears to be the raw data behind the pivot tables.

Q.    Okay.  Let me ask:  What is "pivot" referring to?

A.    A pivot table is a tool used in Excel so you can take a large amount of data, and you kind of select that entire range, then you can organize it in different ways, such as the two different tabs that we reviewed earlier.

Q.    So essentially, from sheets one to two to three, are they showing essentially the same data, but in more and more detail?

A.    Yes.

Q.    Let me just go through some of these columns here for the record.

So column A is the item, correct?

A.    Yes.  The item code.



Q.    Item code, okay.

Column B, what is this showing?

A.    The vendor number.

Q.    So is that just specific number assigned to Raison?

A.    Yes.  That's correct.

Q.    Column C, and D, I think, are self-explanatory -- well, actually, let me ask this new question.

What is column D showing?

A.    The item description.

Q.    Okay.  Item -- excuse me.  Strike that.

What is column E showing?

A.    I don't know.

Q.    Okay.  Do you know -- let's see, column H, do you know what this is referring to?

A.    Can you click on the dropdown?

They're all blank.

Yeah.  I don't know what that disp, underscore, flag means.

Q.    Just so you know, if you have any questions, or want to look at any of this further, I think you got remote control.

A.    That's right.  Okay.

Q.    And then let's see here, column I, what is



this showing?

A.    That is the division number.

Q.    Okay.

A.    Sorry.  I was looking at J.

Column I is the warehouse weight.  I'm not exactly sure.

Q.    And then yeah, column J, what is that showing?

A.    The division ID number.

Q.    Okay.  So I think, at least as of the time of the RFP in 2020, there were only 13 Albertsons divisions; is that right?

A.    That sounds right.

Q.    How come there are number divisions going up into the 30s; do you know?

A.    It doesn't start numbering from one through, et cetera.

Q.    Okay.

A.    I don't know the logic behind it.

Q.    Yeah.  Do you know what column K is depicting?

A.    I do not, no.

Q.    What about column L?

A.    That's the distribution center.  So where the product would be shipping to.



Q.   Okay.  Is that the same thing as a warehouse?

A.   The warehouse name, yes.

Q.   Warehouse name.  Okay.

Do you know in 2020 how many warehouses there were?

A.   I don't recall.

Q.   What is column M, as in Mary, referring to?

A.   The purchase order number.

Q.   Column N is blank.

But do you know what that heading is for?

A.   I can speculate that sometimes when an item ships with another item, that column might be used to reflect the different order.  That's speculation.

Q.   Okay.  Do you know what column O is showing?

A.   Let me expand that.

Purchase order date.

Q.   Okay.  And then do you know what column P is showing?

A.   The warehouse due date.

Q.   What's a warehouse due date?

A.   That would be when the buyer would expect to receive the product in their warehouse.

Q.   Okay.  Do you know what column Q is



showing?

A.    The date where the order was actually received.

Q.    And that's received in the warehouse?

A.    Correct.

Q.    What about column R?

A.    Looks like the purchase -- the vendor cost for the purchase order.

Q.    Okay.  What about column S?

A.    The cost that would be on the invoice of the purchase order.

Q.    Okay.  And what does column T show?

A.    The number of cases that were ordered.

Q.    Okay.  Do you know what column U shows?

A.    The number of cases received.

Q.    What about column V?

A.    I don't know.

Q.    Okay.

A.    But it could be the product of the cases ordered, and the cost.

Q.    Okay.  And then what about column W?

A.    It looks like it's just truck.

Q.    So I guess showing how it was delivered?

A.    Correct.

Q.    And then do you know what column X shows?



A.    Allowance amount.

Q.    What's an allowance amount; do you know?

A.    I don't know.

Q.    Do you know what column Y is showing, or what that heading is?

A.    I would assume that if there was an allowance amount of column X, then Y is a description of that.

Q.    Okay.  What about column Z?

A.    Says, "charge type."

Again, these columns are blank, so I don't know what they're for.

Q.    Do you know what column AA is referring to?

A.    It looks like a charge amount.  But I don't know what that's for, either.

Q.    Okay.  Comb AB is blank.  I guess skip it.

Do you know what column AC is showing?

A.    The SMIC what we -- affordage a number for a category.  So deli crackers, which is in column AD, is the name of the category.  And the four digit assigned to that is the SMIC, 8235.

Q.    What about column AE?

A.    Manufacture type reflects if it's an Own Branded item, which is designated with H, or called H coding versus a National Brand item, which would be coded N.



Q.   So is that the distinction that, generally, a product that is not an Own Brand, is it then a National Brand?

A.   Correct.

Q.   So it's a binary distinction, you're either a an Own Brand, or a National Brand; is that right?

A.   Correct.

Q.   Do you -- strike that.

Does Albertsons consider products that are National Brand products to be competitors with Own Brand products?

A.   Yes.

Q.   So it can be a competitor if it's a National Brand, but with a product, it's an Own Brand?

MR. BRUCHEY:  Question is vague.

THE WITNESS:  If the question is does Own Brands consider National Brand equivalence to be competitors, the answer is "yes."

Q.   MR. AUSTIN:  Okay.  And I think our last column is AF.

A.   I don't know what that is.

Q.   Do you know, would Albertsons have a similar document for the Joyfull, I guess National Brand product that Raison was selling prior to becoming an Own Brand product?



STATE OF CALIFORNIA

I, SHANNON D. DENNEY, CSR 10385, a Certified Shorthand Reporter in and for the State of California, do hereby certify that, prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify the truth, the whole truth, and nothing but the truth; that said deposition was taken down by me in shorthand at the time and place named therein and was thereafter transcribed under my supervision; that this transcript contains a full, true and correct record of the proceedings which took place at the time and place set forth in the caption hereto.

I further certify that I have no interest in the event of this action.

EXECUTED this 13th day of November, 2024.



_____

Shannon D. Denney, CSR 10385

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am employed in the county of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is:  301 North Cañon Drive, Suite 200, Beverly Hills, California 90210.

On July 11, 2025, I served the foregoing document described as: **PLAINTIFF'S MOTION IN LIMINE # 1 TO EXCLUDE EVIDENCE OR ARGUMENT THAT APPROXIMATELY 25% OF THE PRODUCT RAISON SOLD TO ALBERTSONS IN 2020 NEVER SOLD TO THE END CUSTOMER; DECLARATION OF SAMUEL BRUCHEY** all interested parties in this action by placing  [ ] the original [X] a true copy thereof enclosed in sealed envelopes addressed as follows:

(See Attached Service List)

[]  BY MAIL  I caused such envelope to be deposited in the mail at Beverly Hills, California. The envelope was mailed with postage thereon fully prepaid.  I am "readily familiar" with this firm's practice of collection and processing correspondence for mailing.  It is deposited with U.S. postal service on that same day in the ordinary course of business.  I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than 1 day after date deposit for mailing in affidavit.

[]  BY PERSONAL SERVICE  I caused to be delivered by hand to the above-listed addressees or to the addressees on the list attached hereto.  A proof of service executed by the delivery person will be mailed under separate cover.

[]  BY OVERNIGHT MAIL/COURIER  To expedite the delivery of the above-named document, said document was sent via overnight courier for next day delivery to the above-listed party.

[] BY ELECTRONIC MAIL  By transmitting via electronic mail on or before 5:00 p.m. the document(s) listed above to each of the person(s) set forth below.

[X]  BY CM/ECF ELECTRONIC DELIVERY:  In accordance with the registered case participants and in accordance with the procedures set forth at the Court's website www.ecf.cacd.uscourts.gov.

[X]  (Federal) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.  I declare under penalty of perjury under the laws of California that the above is true and correct.

Executed on July 11, 2025, at Beverly Hills, California.

BELINDA DESJARDINS

**SERVICE LIST**

Stephen M. Hayes, Esq.
Tyler R. Austin, Esq.
**HAYES SCOTT BONINO ELLINGSON& GUSLANI LLP**
333 Twin Dolphin Drive, Suite 230
Redwood City, CA 94065
Telephone: (650) 637-9100
shayes@hayesscott.com
taustin@hayesscott.com
Attorneys for Defendant
MASSACHUSETTS BAY INSURANCE COMPANY

STEPHEN M. HAYES (SBN 83583)
shayes@hayesscott.com
TYLER R. AUSTIN (SBN 293977)
taustin@hayesscott.com
RACHEL M. SMITH (SBN 339978)
rsmith@hayesscott.com
HAYES SCOTT BONINO
ELLINGSON & GUSLANI LLP
333 Twin Dolphin Drive, Suite 230
Redwood City, California 94065
Telephone: (650) 637-9100

Attorneys for Defendant
MASSACHUSETTS BAY INSURANCE COMPANY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| RAISON D'ETRE BAKERY LLC, | **CASE NO. 3:23-cv-01401 EMC** |
|---|---|
| Plaintiff, | |
| v. | **DEFENDANT MASSACHUSETTS BAY INSURANCE COMPANY'S OPPOSITION TO PLAINTIFF'S MOTION *IN LIMINE* # 1 TO EXCLUDE EVIDENCE OR ARGUMENT THAT APPROXIMATELY 25% OF THE PRODUCT RAISON SOLD TO ALBERTSONS IN 2020 NEVER SOLD TO THE END CUSTOMER; DECLARATION OF TYLER R. AUSTIN** |
| MASSACHUSETTS BAY INSURANCE COMPANY; and DOES 1 through 10, | |
| Defendants. | |

|  |  |
|---|---|
| **Date:** | September 8, 2025 |
| **Time:** | 8:30 pm |
| **Courtroom:** | 5 |
| **Judge:** | Hon. Edward M. Chen |

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE # 1 TO EXCLUDE EVIDENCE OR ARGUMENT THAT APPROXIMATELY 25% OF THE PRODUCT RAISON SOLD TO ALBERTSONS IN 2020 NEVER SOLD TO THE END CUSTOMER– CASE NO.: 3:23-cv-01401 EMC**

## I.    INTRODUCTION

Plaintiff is correct that Lisa Morris' initial calculations based on Albertsons' data were slightly off.  However, Morris has provided a declaration in support of this opposition with the corrected numbers, showing that Albertsons actually had 22.79% of Raison's inventory remaining by January 2022 instead of 25.46% – a difference of less than 3%.  Regardless, this is not a basis to exclude this highly probative evidence.

As explained in more detail below, the reason for the error in Morris' initial report was that Albertsons' started its fiscal year in March, which meant that, for example, fiscal year 2020 included sales from January and February 2021.  Morris mistakenly transposed the data for January and February 2020 and 2021 based on this attribute of the Albertsons sales data.  Notably, the fact that Albertsons' fiscal year begins in March is also the reason why the alternative number plaintiff proposed is also incorrect.

Morris has now corrected the minor calculation error with a new table that is laid out in Morris' accompanying declaration.  This table is admissible into evidence pursuant to Federal Rule of Evidence 1006, which allows summaries of voluminous writings that cannot be conveniently examined in court.  Here, Albertsons produced two spreadsheets which contained 648 rows of retail sales data and 109 rows of wholesale data.  The data in its current form could not be effectively explained to the jury, which is why Morris condensed the data into a table that summarizes the information and makes it easily digestible.  Alternatively, even if the Court does not admit the table pursuant to Rule 1006, the table would at the very least be appropriate as a demonstrative exhibit for the testimony of Morris and several other witnesses at trial.

Plaintiff argues, ineffectively, that the table should be excluded as unduly prejudicial and a danger of misleading the jury pursuant to Federal Rule of Evidence 403, and alternatively that the table should be excluded because Morris did not reliably apply the methods and principles of her field under Federal Rule of Evidence 702.  However, the table is highly probative as it relates to causation, and whether plaintiff's low sales were caused by the fire or some other cause.  Plaintiff's own grocery industry expert, Errol Schweizer, admitted that end customer sales data – as is

-1-

reflected in Morris' table – ultimately dictates whether a product will succeed. Plaintiff's entire argument for prejudice and that the table would mislead the jury is based on the assertion that Morris' calculations were incorrect. Now that the data has been corrected, that argument no longer holds any weight.

Finally, now that the table has been corrected, there is no longer any argument that Morris did not reliably apply the methods and principles of her field. As a forensic accountant, she is qualified to review, analyze, and summarize voluminous sales data. In any event, the law is clear that alleged flaws in an expert's analysis go to the weight, not the admissibility of the evidence. If plaintiff continues to maintain that the calculations are incorrect, plaintiff can cross examine Morris and establish that fact before the jury. As such, plaintiff's motion should be denied.

## II. ALBERTSONS' END CUSTOMER SALES DATA IS HIGHLY PROBATIVE AND THERE IS NO BASIS TO EXCLUDE IT

Although plaintiff is correct that Lisa Morris' demonstrative table contained slight miscalculations, this is not a basis to exclude reference to vital end customer sales data that was subpoenaed from Albertsons. Morris has corrected her calculations, and the correct number is within 3% of her original calculation.

MBIC properly subpoenaed vital data from Albertsons. In connection with that process, Albertsons produced Stephanie Chien as its Person Most Knowledgeable to testify in deposition. Chien is a Director of Category Management and Innovation in Albertsons Own Brands division. Austin Decl., Exh. 1 (Chien MSJ Decl., ¶ 1,) Exh. 2 (Chien Depo. at 6:22-7:12.) Chien subsequently provided a declaration in connection with Raison's motion for summary judgment. Austin Decl., Exh. 1. Her declaration laid a foundation and authenticated two spreadsheets with data related to sales of Raison's cheese crisps. One spreadsheet (Exh. 10 to Chien's MSJ declaration, bates labeled ALB_0057-59) showed sales from Raison to Albertsons from fiscal years 2020 through 2024. Austin Decl., Exh. 1. The second spreadsheet (Exh. 11 to Chien's MSJ declaration, bates labeled ALB_0061-63) showed Albertsons' sales of Raison's product to the end customer ("product movement.") Austin Decl., Exh. 1 (Chien Decl., ¶ 3-4.) These two spreadsheets provided the data that is at issue in plaintiff's motion in limine number one.

Chien's declaration explained that the second spreadsheet showed "the product movement/retail sales of Raison's Albertsons Own Brand products to the end customer in fiscal years 2020-2024 …" Austin Decl., Exh. 1 (Chien Decl., ¶ 4.) She further explained in detail what data was reflected on the spreadsheet, including columns G-K which showed the total number of units sold in each fiscal year.

## III. LISA MORRIS' TABLE SUMMARIZING ALBERTSONS' SALES DATA IS ADMISSIBLE PURSUANT TO FRE 1006 OR FRE 107

The trial court has broad discretion in deciding whether to admit evidence, including expert evidence. *Burgess v. Premier Corp.*, 727 F.2d 826, 833 (9th Cir. 1984.)

Federal Rule of Evidence 1006 specifically allows summaries of voluminous materials to be admitted into evidence. Fed. R. Evid. 1006. Rule 1006(a) states, "The court may admit as evidence a summary, chart, or calculation offered to prove the content of voluminous admissible writings, recordings, or photographs that cannot be conveniently examined in court, whether or not they have been introduced into evidence." "The purpose of this Rule is to reduce the volume of written documents that are introduced into evidence by allowing in evidence accurate derivatives from the voluminous documents." *United States v. Janati*, 374 F.3d 263, 272 (4th Cir. 2004) (citing *United States v. Bakker*, 925 F.2d 728, 736 (4th Cir.1991).)

In *United States v. Gardner*, 611 F.2d 770, 776 (9th Cir. 1980,) the Ninth Circuit upheld the trial court's ruling admitting a chart into evidence that contained a summary of facts and calculations that were in evidence. The chart was initially employed as a testimonial aid, and the Ninth Circuit held it was proper to subsequently admit the chart into evidence under Federal Rule of Evidence 1006 because the defense had a full opportunity to challenge the underlying documents, and the chart "contributed to the clarity of the presentation to the jury, avoided needless consumption of time and was a reasonable method of presenting the evidence." *Id*.

Here, Morris' table is admissible in evidence as a summary of voluminous writings pursuant to Federal Rule of Civil Procedure 1006. Albertsons' monthly sales data consists of 648 rows of retail sales data[1] and 109 rows of wholesale data.[2] Austin Decl., Exh. 1 (Chien Decl. and Exhibits

---

[1] Austin Decl., Exh. 1 (Chien Decl., Exh. 11, sheet 3 at ALB_0063.)

-3-

10 and 11 thereto (ALB_0057-59 and ALB_0061-63).)  Together, these two excel spreadsheets demonstrate that not only was Raison's product falling short of projected sales to Albertsons, but the product was also failing to gain traction with the end customer.  However, the Albertsons data is so voluminous that MBIC will not be able to effectively demonstrate the impact of the data.  As such, MBIC will seek to move Morris' table into evidence as a summary and calculation of the Albertsons data, which cannot be conveniently examined in court in its current form.  This evidence falls squarely within Rule 1006 and should be admitted as such.

In the alternative, even if the Court does not permit Morris' table to be admitted pursuant to Rule 1006, at the very least the table should be allowed to be used as a demonstrative or illustrative exhibit for both Morris and Stephanie Chien to assist their testimony at trial.  Regardless of what procedure the Court chooses to apply, Morris' table summarizing Albertsons' sales data is appropriate as either a substantive or demonstrative exhibit.

## IV.    THERE IS NO BASIS TO EXCLUDE MORRIS' TABLE FROM EVIDENCE

Here, plaintiff makes two misplaced arguments for excluding reference to the amount of Raison inventory Albertsons was unable to sell.  First, plaintiff argues that "because the 25% figure is wrong, the Court should preclude MBIC and its experts from asserting that theory at trial" pursuant to Federal Rule of Evidence 403, arguing that its probative value is outweighed by a danger of unfair prejudice and misleading the jury.  Second, plaintiff argues that the evidence should be excluded pursuant to Federal Rule of Evidence 702 which requires a reliable application of expert principles and methods to the facts of the case.  Neither of these arguments are well taken.

### A.    Evidence Of Unsold Product Is Highly Probative And Would Not Be Prejudicial Or Mislead The Jury

In order to exclude the evidence pursuant to Rule 403, plaintiff must show that the probative value is substantially outweighed by the danger of undue prejudice or misleading the jury.  Evidence of the amount of Raison product that Albertsons was unable to sell by January 2022 is highly probative.  Causation is a central issue in this case – in other words, whether Raison's low sales numbers were caused by the fire, or whether they were caused by something else.  Raison first

---

[2] Austin Decl., Exh. 1 (Chien Decl., Exh. 10, sheet 3 at ALB_0059.)

-4-

began selling private label products to Albertsons in July 2020 and which it sold for 3.5 months until the fire occurred on October 16, 2020. Austin Decl., Exh. 6 (Holmstrom Depo. at 101:21-102:23.) The percentage of inventory that Albertsons was unable to sell by January 2022 is thus highly probative, as it shows that Raison's product sold <u>before the fire</u> was not succeeding in terms of "product movement" or retail sales to Albertsons' end customers. Since this product was delivered to Albertsons before the fire, the fire could not have been the cause of the low retail sales numbers.

Even plaintiff's own grocery industry expert, Errol Schweizer, acknowledged in deposition that retail sales to the end customer are what ultimately dictate the success or failure of a product:

> Q. Am I correct that ultimately whether a product, whether it's private label or not, whether it succeeds depends on whether the end customer desires and purchases the product; right? That's the make or break?
> A. At the end of the day, the customer bats last. Yeah. The customer has to vote for the product by buying it. Austin Decl., Exh. 3 (Schweizer Depo. at 87:12-18.)

Schweizer also agreed that generally, when the end customer is not showing a high demand for a product, stores will buy less of that product from the supplier. Austin Decl., Exh. 3 (Schweizer Depo. at 87:19-88:3.) MBIC's own experts echoed this sentiment. Austin Decl., Exh. 5 (White Report at p. 14) ("I expect that the poor performance of the product [in sales to the end customer] in 2020 led to the lower-than-expected sales to Albertsons when operations resumed in 2022."); Exh. 4 (Balian Report at p. 2) (if a product is not selling to the end customer, "then decreasing the orders or at times placing no orders would be the normal course of action to sell off the original products ordered.") Thus, evidence showing the level of retail sales made to the end customer – especially retail sales before January 2022, which could not have been affected by the fire – are highly probative of the level of success plaintiff's product would have had but for the fire.

On the other hand, Morris' table illustrating the amount of product remaining unsold on a monthly basis would not cause any prejudice to plaintiff, nor would it mislead the jury. Plaintiff's argument for prejudice and the danger of misleading the jury is based entirely on the assertion that the numbers in Morris' table were incorrect. Those numbers have now been fixed.[3] Notably, the

---

[3] Declaration of Lisa Morris ("Morris Decl."), ¶ 5-9, Exh. A.

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE # 1 TO EXCLUDE EVIDENCE OR ARGUMENT THAT APPROXIMATELY 25% OF THE PRODUCT RAISON SOLD TO ALBERTSONS IN 2020 NEVER SOLD TO THE END CUSTOMER– CASE NO.: 3:23-cv-01401 EMC**

numbers in Morris' initial report were much closer to the accurate numbers than plaintiff suggests in its motion in limine. The previous mistake in Morris' calculation – as well as the mistake in plaintiff's calculation – arises from the fact that Albertsons begins its fiscal year in March. Austin Decl., Exh. 1 (Chien Decl., ¶ 4.) As such, the totals for "fiscal year 2020" include January and February of 2021, and the totals for "fiscal year 2021" include January and February of 2022, and so on. *Id*. Because of this, Morris initially transposed the numbers for January and February sales between fiscal year 2020 and 2021. Morris Decl., ¶ 8. Morris's current calculation, included in her declaration, uses the correct numbers and shows that Albertsons was unable to sell 22.79% of its Raison inventory by January 2022. Because this number is accurate, there can be no prejudice to plaintiff and it would not mislead the jury to allow Morris' table summarizing the Albertsons data into evidence.

**B.      There Is No Basis To Exclude Evidence Of Unsold Product Pursuant To Federal Rule Of Evidence 702**

The second misplaced argument plaintiff makes is that Morris' table summarizing the Albertsons data should be excluded because Morris did not reliably apply the principles and methods of an expert in preparing the table. This argument also fails.

"As a general matter, flaws in a proffered expert's analysis typically go to the weight, rather than the admissibility, of the expert's testimony." *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 973 (C.D. Cal. 2012) (citing *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002)); *see also Burgess, supra*, 727 F.2d at 836 (inconsistencies in accountant's calculations went to the weight, not the admissibility, of the accountants' worksheets.) As the Ninth Circuit noted in *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002,) "Vigorous cross-examination of a[n expert] study's inadequacies allows the jury to appropriately weigh the alleged defects and reduces the possibility of prejudice." (citations omitted.)

Again, because the numbers have now been fixed, plaintiff's argument that Morris did not reliably apply principles and methodology of a forensic accounting expert loses its teeth. Moreover, as noted above, any purported mistakes or inconsistencies in an expert's analysis or calculations should go to the weight of the evidence, not the admissibility. Thus, even if plaintiff

-6-

still felt there was some error in Morris' methodology, plaintiff would have the ability to cross examine Morris at trial, and the alleged mistakes would go to the weight of the evidence, not admissibility.

Plaintiff is also incorrect that MBIC's witnesses will not be able to lay a foundation for and explain the exhibit at trial. Stephanie Chien has already laid a foundation for and authenticated the spreadsheets of Albertsons' sales data in her prior declaration. Austin Decl., Exh. 1 (Chien Decl.) Chien explained in her declaration that she has been the Director of Category Management and Innovation in Albertsons Own Brands division since 2019. She also stated that the spreadsheets were typical of documents "created, used or requested in the regular course of business for Albertsons, and would have been made at or near the time of the act, condition, or event." Austin Decl., Exh. 1 (Chien Decl., ¶ 2.) She further stated, "Based upon my training, education, and experience, I have found such documents to be reliable." Austin Decl., Exh. 1 (Chien Decl., ¶ 2.) If plaintiff insists, Chien can and will provide this testimony again at trial.

Morris is also qualified to prepare the above table and to discuss it at trial. Morris is a forensic accounting expert. Her preparation of the above table falls squarely within her area of expertise and was made consistent with the methodology and principles of her field. All she did to prepare the above table was to review extensive spreadsheets with wholesale and retail sales data, and prepare a separate table to summarize and explain that data in a more easily digestible fashion. Her expertise as a forensic accountant certainly qualifies her to do so.

Because Chien can lay a foundation and authenticate the underlying sales data, and Morris is qualified to prepare and lay a foundation for her table MBIC's other witnesses, including industry experts, Gary White and Alex Balian, can refer to and rely on Morris' table as an accurate summary of relevant sales data. All of this is proper and there is no basis to exclude the table from evidence.

**V.    CONCLUSION**

Plaintiff's motion *in limine* to exclude evidence or argument related to the percentage of product that remained as of January 2022 must be denied on the grounds that the calculation is relevant admissible evidence and plaintiff has failed to establish the evidence should be excluded.

-7-

Dated:  July 18, 2025                                HAYES SCOTT BONINO
                                                     ELLINGSON & GUSLANI LLP


                                          By:_____*/S/ Tyler R. Austin*_____
                                                     STEPHEN M. HAYES
                                                     TYLER R. AUSTIN
                                                     RACHEL M. SMITH
                                                     Attorneys for Defendant
                                                     MASSACHUSETTS BAY INSURANCE
                                                     COMPANY

-8-

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE # 1 TO EXCLUDE EVIDENCE OR
ARGUMENT THAT APPROXIMATELY 25% OF THE PRODUCT RAISON SOLD TO ALBERTSONS IN
2020 NEVER SOLD TO THE END CUSTOMER– CASE NO.: 3:23-cv-01401 EMC**

## DECLARATION OF TYLER R. AUSTIN

I, Tyler R. Austin, declare as follows:

1.     I am an attorney with Hayes Scott Bonino Ellingson & Guslani LLP, counsel of record for Defendant Massachusetts Bay Insurance Company ("MBIC") in the above-referenced matter.  I have personal knowledge of each matter stated herein and, if called as a witness, I could and would competently testify thereto.

2.     I submit this Declaration in support of MBIC's motion in limine to exclude plaintiff's accounting experts opinions.

3.     Attached hereto as **Exhibit 1** is a true and correct copy of the declaration of Stephanie Chien submitted in support of MBIC's motion for summary judgment.

4.     Attached hereto as **Exhibit 2** are the relevant portions of the deposition transcript of Stephanie Chein at 6:22-7:12.

5.     Attached hereto as **Exhibit 3** are the relevant portions of the deposition transcript of Erroll Schweizer at 87:12-18; 87:19-88:3.

6.     Attached hereto as **Exhibit 4** is a true and correct copy of Alex Balian's expert report.

7.     Attached hereto as **Exhibit 5** is a true and correct copy of Gary White's expert report.

8.     Attached hereto as **Exhibit 6** are the relevant portions of the deposition transcript of Joshua Holmstrom at 101:21-102:23.

I declare under the penalty of perjury under the laws of the United States and of the State of California that the foregoing is true and correct.

Executed on July 18, 2025 at Davis, California.

_/s/ Tyler R. Austin_
Tyler R. Austin

-9-

# EXHIBIT 1

STEPHEN M. HAYES (SBN 83583)
shayes@hayesscott.com
TYLER R. AUSTIN (SBN 293977)
taustin@hayesscott.com
HAYES SCOTT BONINO ELLINGSON & GUSLANI LLP
333 Twin Dolphin Drive, Suite 230
Redwood City, California 94065
Telephone: (650) 637-9100

Attorneys for Defendant
MASSACHUSETTS BAY INSURANCE COMPANY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAISON D'ETRE BAKERY LLC,<br><br>        Plaintiff,<br><br>    v.<br><br>MASSACHUSETTS BAY INSURANCE COMPANY; and DOES 1 through 10,<br><br>        Defendants. | **CASE NO.: 3:23-cv-01401 EMC**<br><br>**DECLARATION OF STEPHANIE CHIEN IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT**<br><br>**Date:**  January 23, 2025<br>**Time:**  1:30 pm<br>**Courtroom:**  5<br>**Judge:**  Hon. Edward M. Chen |

**DECLARATION OF STEPHANIE CHIEN IN SUPPORT MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT – CASE NO. 3:23-cv-01401 EMC**

I, Stephanie Chien, declares as follows:

1.     I am a Director of Category Management and Innovation in Albertson's Own Brands division.  I have held that position with Albertson's since 2019.  This declaration is made from my own personal knowledge and if called upon to do so, I could and would testify competently to the matters herein. I have personal knowledge of each matter stated herein and, if called as a witness, I could and would competently testify thereto.

2.     The documents referenced in this declaration are typical of those created, used, or requested in the regular course of business for Albertson's, and would have been made at or near the time of the act, condition, or event.  Based upon my training, education, and experience, I have found such documents to be reliable.

3.     Attached hereto as **Exhibit 10** is a true and correct copy of a spreadsheet prepared by Albertsons, (ALB_0057-0059) showing the purchase orders Albertsons submitted to Raison for Raison's Albertson's Own Brand products in fiscal years 2020-2023.   The numbers on this spreadsheet are in packs of 12 units.  Column F on Sheet 1 shows the total number of packs of 12 ordered by Albertson's and Column G shows the total number of packs of 12 actually received by Albertson's.  Sheet 2 shows more detail, including the purchase order date for each purchase order in Column F.   Again, Columns G and H shows the total number of packs of 12 ordered and received by Albertson's.

4.     Attached hereto as **Exhibit 11** is a true and correct copy of a spreadsheet prepared by Albertsons, (ALB_0061-0063) showing the product movement/retail sales of Raison's Albertson's Own Brand products to the end customer in fiscal years 2020-2024 (with fiscal year starting in March.)  On Sheet 1, Columns B-F and L are in dollars, while Columns G-K and M are in units (the unit numbers would have to be divided by 12 to get the number of packs of 12 that were sold.)  Sheet 2 provides more detail showing the total units of Raison's Albertson's Own Brand products sold to the end customer in fiscal years 2020-2024 by division.  Column B shows in which division the sale occurred, Column G shows the fiscal year the sale occurred, Columns H and I show the dollar value of the sales to the end customer, and Columns J-K show the number of units

- 1 -

sold to the end customer.

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on December 16, 2024 at Dublin, California

*Stephanie Chien*
_____
Stephanie Chien

- 2 -

**DECLARATION OF STEPHANIE CHIEN IN SUPPORT MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT – CASE NO. 3:23-cv-01401 EMC**

# EXHIBIT 2

**In the Matter Of:**

BAKERY vs MBIC

3:23-cv-014101 EMC

**STEPHANIE CHIEN**

*October 28, 2024*

*Confidential*

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
*EsquireSolutions.com*

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

RAISON D'ETRE BAKERY,
                                    )
            Plaintiff,              )
                                    )
vs.                                 )    No.: 3:23-cv-014101 EMC
                                    )
MASSACHUSETTS BAY INSURANCE         )
COMPANY,                            )
                                    )
            Defendants.             )
_____)


DEPOSITION OF:  STEPHANIE CHIEN

CONFIDENTIAL TRANSCRIPT


October 28, 2024


REPORTED BY: SHANNON D. DENNEY, CSR No. 10385



STEPHANIE CHIEN  Confidential                                  October 28, 2024
BAKERY vs MBIC                                                              2

APPEARANCES


For the Plaintiff:

      SHERNOFF BIDART ECHEVERRIA, LLP
      BY:   SAMUEL BRUCHEY, ESQ.
      600 South Indian Hill Boulevard
      Claremont, CA 91711



For the Defendants:

      HAYES, SCOTT, BONINO, ELLINGSON, GUSLANI,
      SIMONSON & CLAUSE
      BY:   TYLER AUSTIN, ESQ.
      333 Twin Dolphin Drive, Suite 230
      Redwood City, CA 94065


      DAY PITNEY LLP
      ANTHONY BONGIORNI, ESQ.
      225 Asylum Street
      Hartford, CT 06103
      Anthony.Bongiorni@albertsons.com




ALSO PRESENT:

      DAVID BROGAN



STEPHANIE CHIEN  Confidential                                      October 28, 2024
BAKERY vs MBIC                                                              3

INDEX OF EXAMINATION

                                                              PAGE

BY MR. AUSTIN                                                     4

BY MR. BRUCHEY                                                   83

BY MR. AUSTIN                                                   117

BY MR. BRUCHEY                                                  132

BY MR. BONGIORNI                                               135

BY MR. BRUCHEY                                                  135

                        ---oOo---


                        INDEX OF EXHIBITS

Exhibit 3   E-mail dated January 16, 2020            137

Exhibit 4   2020-01-23 Proposal                      137

Exhibit 8   Sales Data and Actuals                   137

Exhibit 10  Pricing and Initial Acceptance           137

Exhibit 16  ALB 000057-000059                        137

Exhibit 17  Albertson's subpoenaed records           137

Exhibit 18  Plaintiff's Doc Production               137

                        ---oOo---



BE IT REMEMBERED that on October 28, 2024, commencing at the hour of 9:00 a.m., before me, Shannon D. Denney, a Certified Shorthand Reporter, empowered to administer oaths and affirmations pursuant to Section 2093(b) of the Code of Civil Procedure, personally appeared

STEPHANIE CHIEN

a witness herein, having been duly sworn, was examined and testified as follows:

EXAMINATION BY

Q.   MR. AUSTIN:  Good morning, Ms. Chien.  My name is Tyler Austin.  I'm the attorney for Massachusetts Bay Insurance Company in this case.  We are the party that subpoenaed Albertsons pursuant to which I understand you're appearing today.

Real quick, I'm going to just note on the record that counsel for Albertsons has requested that this testimony today be designated as confidential persuant to the parties' stipulated protective order in the case.  So it will be designated that way, and we can address the specifics later.

Ms. Chien, have you ever had your deposition taken before?

A.   No.  I have not.



Q.    Okay.  So I'll just go over a few kind of logistics at the beginning here, and then we will get going.

So you are currently under oath.  And although we're doing this kind of informally, and over Zoom, the testimony that you're going to give today has the same force and effect as if you were testifying in a court of law.

Do you understand that?

A.    Yes.

Q.    So the court reporter is going to be recording everything we say on the record.  So it's important that we try to speak one at a time.  And that's especially important as we do this every Zoom.

So to the extent you can, if you could take pauses after my questions, that will also allow plaintiff's counsel to make any objections he might have.  And then we will just try to take our time and get through it.

You understand?

A.    Yes.

Q.    The court reporter is not able to record gestures as a response, like nodding, or shaking your head.  You can do that, but just make sure that you also have a verbal response to all questions.  Okay?



A.   Yes.

Q.   So during the deposition, plaintiff's counsel might have some objections to my questions.  There's no judge here today.  He's doing that to preserve his objections at the time of trial.

So if he puts an objection on the record, just wait, allow him to make his objection, and once he's done, you can go ahead and answer my question.

Do you understand?

A.   Yes.

Q.   Okay.  So I'll just start by getting some background information from you.

What's your highest level of education?

A.   Graduate degree.  MBA.

Q.   Okay.  In what university did you obtain that from?

A.   Kellogg School of Management at Northwestern University.

Q.   Good school.  What year did you graduate, or obtain that degree?

A.   2010.

Q.   Are you currently employed by Albertsons?

A.   Yes, I am.

Q.   And what is your job title?

A.   Category management and innovation product



director for Own Brands, overseeing deli and bakery.

Q.   Are you able to explain, just at a high level, what your responsibilities are in that role?

A.   Sure.  For the Own Brands portfolio, my team and I oversee category management on our existing items.

So maintaining health of the business, including making pricing, promotion, product recommendations, as well as innovation, which include new product launches.

Q.   When did you start with Albertsons?

A.   2016.

Q.   And what positions have you held at Albertsons, to the extent they were different than the current one you hold today?

A.   Sure.  I was senior manager over the deli -- I'm sorry.  Senior manager over the dairy refrigerated desk.  Then I was director over home care and pet.  And then lastly, in 2019, I joined the deli bakery desk, all as the director, all with Own Brands.

Q.   And then that is the same position now that you've held since 2019?

A.   Correct.

Q.   Did you do anything to prepare for your deposition today?



A.    Yes.

Q.    Can you just tell me what you did to prepare? Other than, of course, don't disclose any discussions that you had with your counsel.  But anything else, can you please explain?

A.    Reviewed documents that were provided.

Q.    And then the documents that you reviewed, is that the production that was made to the parties in this case?

MR. BRUCHEY:  What production are you talking about?

MR. AUSTIN:  The documents that you reviewed, the documents that were produced by Albertsons in response to the Subpoena in this case.

MR. BRUCHEY:  Thank you.

Q.    MR. AUSTIN:  Or if you don't know, then you can just say you don't know.

A.    I don't know.

Q.    That's fine.  Do you recall about how many pages the documents were that you reviewed?

A.    There were multiple documents.  So I don't recall the precise number of pages.

Q.    What kind of documents were included?

A.    Purchase orders, CCG agreements, e-mails.

Q.    What are CCG agreements?



So no certified copy is what you're saying?

MR. BONGIORNI:  Yeah.

MR. AUSTIN:  I'm happy to just send you my certified copy when I get it.  You can get a copy of it.

MR. BONGIORNI:  Great.

(Whereupon Exhibits 3, 4, 8, 10, 16, 17 and 18 were marked for identification.)

(Whereupon deposition concluded 12:53 p.m.)



DEPOSITION ERRATA SHEET

Our Assignment No. J11897847

Case Caption:   Raison D'Etre Bakery vs. Massachusetts
                Bay Insurance Co.

          DECLARATION UNDER PENALTY OF PERJURY

     I declare under penalty of perjury that I have

read the entire transcript of my Deposition taken in

the captioned matter or the same has been read to me,

and the same is true and accurate, save and except for

changes and/or corrections, if any, as indicated by me

on the DEPOSITION ERRATA SHEET hereof, with the

understanding that I offer these changes as if still

under oath.

     Signed on the _____ day of _____, 20___.

                    _____



STATE OF CALIFORNIA

I, SHANNON D. DENNEY, CSR 10385, a Certified Shorthand Reporter in and for the State of California, do hereby certify that, prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify the truth, the whole truth, and nothing but the truth; that said deposition was taken down by me in shorthand at the time and place named therein and was thereafter transcribed under my supervision; that this transcript contains a full, true and correct record of the proceedings which took place at the time and place set forth in the caption hereto.

I further certify that I have no interest in the event of this action.

EXECUTED this 13th day of November, 2024.



_____

Shannon D. Denney, CSR 10385

# EXHIBIT 3

**In the Matter Of:**

RAISON D'ETRE BAKERY vs MASSACHUSETTS BAY

3:23-cv-014101 EMC

**ERROL SCHWEIZER**

*July 09, 2025*



800.211.DEPO (3376)
*EsquireSolutions.com*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--

RAISON D'ETRE BAKERY, LLC,          )
                                    )
            Plaintiff,              )
                                    ) Case No.
        vs.                         ) 3:23-cv-014101 EMC
                                    )
MASSACHUSETTS BAY INSURANCE         )
COMPANY; and DOES 1 through 10,     )
inclusive,                          )
                                    )
            Defendants.             )
_____)

VIDEOCONFERENCE DEPOSITION OF EXPERT

ERROL SCHWEIZER

APPEARING REMOTELY FROM AUSTIN, TEXAS

Wednesday, July 9, 2025

12:01 p.m.

REPORTED BY:  CYNTHIA A. PACINI, CSR #6117

APPEARING REMOTELY FROM YOLO COUNTY, CALIFORNIA


ESQUIRE
DEPOSITION SOLUTIONS

*800.211.DEPO (3376)*
*EsquireSolutions.com*

REMOTE APPEARANCES OF COUNSEL


On Behalf of the Plaintiff Raison D'Etre Bakery, LLC:

SHERNOFF BIDART ECHEVERRIA LLP
600 S. Indian Hill Blvd.
Claremont, California  91711
310.246.0503
By:  Natalie Tsaturyan, Esq.
     ntsaturyan@shernoff.com


On Behalf of the Defendant Massachusetts Bay
Insurance Company:

HAYES SCOTT BONINO ELLINSON & GUSLANI LLP
333 Twin Dolphin Drive, Suite 230
Redwood City, California  94065
650.637.9100
By:  Tyler R. Austin, Esq.
     taustin@hayesscott.com


--o0o--



800.211.DEPO (3376)
EsquireSolutions.com

INDEX OF EXAMINATION

WITNESS:   ERROL SCHWEIZER

EXAMINATION                                              PAGE

BY MR. AUSTIN ..................................    4


EXHIBITS MARKED FOR IDENTIFICATION

No.                    Description                       PAGE

Exhibit 1    Multipage document titled "FRCP              6
             Rule 26 Report of Errol Schweizer,"
             dated December 17, 2024

Exhibit 2    Multipage document titled                   46
             "Plaintiff's Disclosure of Expert
             Witnesses"

Exhibit 3    Multipage document titled                   121
             "Plaintiff's Rebuttal Disclosure
             of Expert Witnesses"

Exhibit 4    Thirteen-page document titled               76
             "Whole Foods Knows Its Customers.
             Do You Know Yours?"

Exhibit 5    Two-page document titled "Invoice,"         45
             dated October 18, 2024

Exhibit 6    Fourteen-page spreadsheet                   96

Exhibit 7    Multipage document titled "Amended          101
             Expert Report of Lisa C. Morris"

Exhibit 8    Seven-page sales document                   147



VIDEOCONFERENCE DEPOSITION OF EXPERT

ERROL SCHWEIZER

Thursday, July 9, 2025

--oOo--

P R O C E E D I N G S

THE REPORTER:  Good afternoon.  My name is Cynthia Pacini.  I am a California Certified Shorthand reporter and the deposition officer for today's deposition.  My CSR license number is 6117.

Would counsel please state your appearances and who you represent for the record, and then I will swear in the witness.

MR. AUSTIN:  My name is Tyler Austin.  I am the attorney for defendant, Massachusetts Bay Insurance Company.

MS. TSATURYAN:  My name is Natalie Tsaturyan and I am the attorney for plaintiffs.

--oOo--

ERROL SCHWEIZER,

having been first duly sworn remotely, was examined and testified as follows:

EXAMINATION

BY MR. AUSTIN:

    Q.   Good afternoon, Mr. Schweizer.  Can you start by telling me, have you ever had your deposition taken



for SCU of missing product from their stores.  That came from the top at Whole Foods.  That came from our CEO.  That all stores were required to sell all private label items as a competitive hedge against Trader Joe's and Kroger.

Q.    Okay.

A.    So it was a regular part of operations and as head of grocery, 75 percent of private label items fell into grocery, I had sign-off on all private label forecasts.  I had sign-off on all private label cost scenarios with suppliers, like what the product cost.  I had to sign off on the retail price strategy.  I had to sign off on the gross margin and penny profit on all those items.

And I was usually presented with a range of suppliers for each private label option.  So if they were like, they put out a bid for, like, frozen peas, they would present to me a range of options of frozen pea manufacturers that we would typically sign off on together, but I had final say because it was in my department and influence the gross margin and sales targets that I was fully responsible for.

Q.    Raison's parm crisp product were being sold at a private label product at Whole Foods as well; is that right?



A.   I don't believe they were private label.  From what I recall, they were a third-party brand called Joyfull.

Q.   So it was a third-party Joyfull product?

A.   It's not a known brand.  Raison owned the brand and sold this third-party product to Whole Foods and other retailers as a nonexclusive.

Q.   Okay.  So at Albertsons, Raison was selling their product as a private label product and we're talking here about how grocery stores do as much as they can to ensure the success of private label products.

Am I correct that ultimately whether a product, whether it's private label or not, whether it succeeds depends on whether the end customer desires and purchases the product; right?  That's the make or break?

A.   At the end of the day, the customer bats last. Yeah.  The customer has to vote for the product by buying it.

Q.   Okay.  So when stores are ordering product -- you know, I understand that Whole Foods ordering products is done one way; at Albertsons, it's done another way.  But regardless of how it's done, if the end customer is not showing a high demand for the product, the product ultimately is going to be purchased less by the stores; is that right?



A.    In a general sense.

Q.    Yeah.  In a general sense?

A.    In a general sense, yeah.  This is a process where we call category management where we review the product data on a regular basis of all category to determine what people are buying and how.  For each category, there's different sales metrics and indices that each product has to achieve.  So yogurt is different than beans, which is different than potato chips, which is different than pasta.

Q.    Okay.  And the company looks at the amount of product that's being sold and if the customer is buying more of a product, they will increase how much they're buying, and if the customer buys less of a product, then the store will decrease the amount they're buying; is that right?

A.    It's kind of an oversimplification.  The stores are just typically responsible for reordering product once it sells through on a daily basis.  However, many stores have auto replenishment now where that is done by an algorithm or machine learning and the store is just responsible for managing the out-of-stocks.

That is all based on the amount of product that is sold through the register or turned through the



register.  It doesn't account for products sitting in warehouses.  It doesn't account for voids on shelf or out-of-stocks for any reason or damaged product which never makes it to shelf.

Q.   At the time of this case, in 2020 to 2022, Albertsons didn't have that auto replenishment process; is that right?

A.   I do not know.

Q.   Okay.  You used the word "void" sometimes.  Does that just mean when a product runs out?

A.   No.  When I say "void," it means that a product is not showing sales in a store even though the store is supposed to be selling it.

So the reasons for a product void could either be, A, they sold zero units which is highly unlikely; B, the product is sitting in their back room not stocked out; C, the product never came to the store; or D, the product was damaged and was just spoiled out.  Either way, a void just means they're showing zero movement of a particular product.

Q.   Okay.  So, again, regardless of what the exact process is, if a product is doing well, whoever is in charge of bringing in that product generally should be buying more of that product from the supplier in order to increase profits; is that right?



MR. AUSTIN:  That's kind of like just a catch-all question at the end there.

Okay.  I don't have any more questions, Natalie.

MS. TSATURYAN:  I don't have any questions, but I wanted to check the Albertsons subpoena exhibit.

What was the Bates range on that?

MR. AUSTIN:  So the one I ended up using was -- it was Exhibit 6 and it was ALB00061 to 00063.

MS. TSATURYAN:  And this was produced through Albertsons.  Okay.

MR. AUSTIN:  Right.

Okay.  And Madam Court Reporter, did you say you wanted to get transcript orders on the record?

THE REPORTER:  Yes.

MR. AUSTIN:  So, yeah, so I'll take an expedited copy and an electronic rough as soon as possible.

MS. TSATURYAN:  Same as well.

THE REPORTER:  Okay.

                    --o0o--

(Deposition was concluded at 4:17 p.m.)

                    --o0o--



REPORTER'S CERTIFICATE

I, Cynthia A. Pacini, CSR No. 6117, a Certified Shorthand Reporter in and for the State of California, do hereby certify:

That, ERROL SCHWEIZER, prior to being examined, the witness named in the foregoing proceedings was by me duly sworn remotely to testify to the truth; that said proceedings were taken before me at the time and place therein set forth and were thereafter transcribed into typewriting under my direction and supervision;

I further certify that I am neither counsel for, nor related to, any party to said proceedings, and not in any way interested in the outcome thereof.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [X] was [ ] was not requested.

In witness whereof, I have hereunto subscribed my name.

Date:  July 15th, 2025

*Cynthia A. Pacini*

_____

CYNTHIA A. PACINI, CSR #6117



DEPOSITION ERRATA SHEET

Assignment No.: J13136639

Case Caption: Raison D'Etry Bakery, LLC vs.
                    Massachusetts Bay Insurance Company

DECLARATION UNDER PENALTY OF PERJURY

       I, ERROL SCHWEIZER, declare under penalty of
perjury that I have read the entire transcript of my
deposition taken in the above-captioned matter or the
same has been read to me, and the same is true and
accurate, save and except for changes and/or
corrections, if any, as indicated by me on the
Deposition Errata Sheet hereof, with the understanding
that I offer these changes as if still under oath.

       Signed on the _____ day of
_____, 20____.

_____

  SIGNATURE OF DEPONENT



# EXHIBIT 4

# Balian & Associates

***Retail Industry Consultant***
6442 Platt Ave., # 1807
West Hills, CA 91307-3218

December 4, 2024

This report was produced at the request of Tyler Austin, Esq. of Hayes, Scott, Bonino, Ellingson & Guslani, LLP regarding a claim for loss of business income filed by Raison D'etre Bakery. Raison has filed suit against Massachusetts Bay Insurance Co. seeking further business income loss benefits related to a fire at their baking facilities.

My opinions and conclusions are supported by being in the retail industry as an owner, operator, and consultant for more than 65 years. I have been qualified as a retail safety expert and given expert testimony in Superior and Federal courts in all matters pertaining to retail operations throughout the United States. The areas that I have testified about have included, but are not limited to, customer safety, floor maintenance procedures, retail operations, food preparation, and employee training as to the customary and accepted practice of the retail industry. My further qualifications are presented in the attached CV, Exhibit 1 of this report.

My opinions and conclusions are based on my education and experience in the supermarket and retail industry in addition to reviewing the following materials;

1.  Filed Complaint;

2.  Deposition Testimony of David Brogan;

3.  Deposition Testimony of Gloria Villareal,

4.  Deposition Testimony of CPA, James Kinsel;

5.  Deposition Testimony of Raison Bakery CEO, Joshua Holmstrom;

6.  Deposition Testimony of, Company Consultant, Mark Borden;

1

7. Deposition Testimony of Massachusetts General Adjuster, Willie Mack Vol I & II;

8. Continuing Commodity Guaranty;

9. Shipping Orders;

10. Brogan Pricing & Initial Acceptance;

11. Albertson Sales Data;

12. Raison Statement of Operating Loss;

13. Raison Response to Production of Documents;

14. Analysis of Product Movement;

15. Report by Gary White;

16. Report by Lisa Morris and

17. Analysis of Units Ordered & Units Sold,

DISCUSSION:

A crucial factor when evaluating product movement and acceptance in supermarkets is simply the customer accepting and buying the product in question. Once on the shelf, is the turnover of the product such that the product is successfully selling to the end customer. A cardinal sin in retail is not having products on the shelf when there is customer demand for that product. Another "cardinal sin" in retail is wasting shelf space with a product that is not selling successfully. Both situations will affect the ordering process, either causing the store to increase ordering or reduce ordering. Both conditions will put the store in an undesirable and costly position.

These situations will cause the store to react in the process of evaluating why either condition exists. If an out-of-stock condition exists, increasing the orders would be the expected course of action. If, however, the product is not selling, then decreasing the orders or at times placing no orders would be the normal course of action to sell off the

2

Page 3 of 8

original products ordered.  Unsold products are a very costly situation in retail because first, it has been paid for, yet no sales have been realized, and second, valuable shelf space is being occupied by an inactive product where other products could replace that does sell.

This explains the situation of the Safeway[1] operations regarding the purchasing of Raison's Cheese Crisps.  Raison sold its products to Safeway for 3.5 months from July 2020 through October 16, 2020 before the fire took place.  As shown below, in June 2020 Raison prepared projections for its sales to Safeway,  Raison only did 58% of the sales it projected for its first quarter of business with Safeway.  That is despite the fact that Raison had already incorporated a "ramp up" period into the projections taking into account that sales would start slower.  In the first two weeks of October 2020, Raison was on pace to only make 11% of the sales to Safeway it had projected.[2]

**RAISON D'ETRE BAKERY LLC**
**ACTUAL SALES vs. PLAN SALES (JUL'20 >)**

| PLAN BY CUSTOMER | Q3'19 | Q4'19 | Q1'20 | Q2'20 | Q3'20 | Q4'20 | Q1'21 | Q2'21 | Q3'21 | Q4'21 |
|---|---|---|---|---|---|---|---|---|---|---|
| WFM | | | | | $ 996,457 | $ 1,174,656 | $ 1,191,248 | $ 1,363,079 | $ 1,579,485 | $1,799,697 |
| Safeway | | | | | $ 298,506 | $ 2,212,324 | $ 4,046,874 | $ 4,593,749 | $ 4,757,811 | $5,031,249 |
| All Other | | | | | $ 1,022,241 | $ 1,062,241 | $ 1,178,391 | $ 1,487,216 | $ 2,153,872 | $2,351,564 |
| TOTAL | | | | | $ 2,317,204 | $ 4,449,222 | $ 6,416,513 | $ 7,444,045 | $ 8,491,169 | $9,182,510 |

| ACTUAL BY CUSTOMER | | | | *sales impacted by COVID | | *Fire Loss on 10-16-20 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| WFM | $ 845,962 | $ 1,073,486 | $ 946,161 | $ 737,934 | $ 913,726 | $ 730,379 | $ 763,023 | | | |
| Safeway | $ - | $ - | $ - | $ - | $ 172,378 | $ 41,272 | $ - | | | |
| All Other | $ 1,576,676 | $ 1,685,551 | $ 1,338,458 | $ 1,292,486 | $ 1,281,383 | $ 795,068 | $ 901,874 | | | |
| TOTAL | $ 2,422,638 | $ 2,759,037 | $ 2,284,619 | $ 2,030,420 | $ 2,367,488 | $ 1,566,718 | $ 1,664,897 | | | |

| VARIANCE | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| WFM | | | | | $ (82,731) | $ (444,278) | $ (428,225) | | | |
| Safeway | | | | | $ (126,127) | $(2,171,052) | $(4,046,874) | | | |
| All Other | | | | | $ 259,142 | $ (267,173) | $ (276,517) | | | |
| TOTAL | | | | | $ 50,284 | $(2,882,504) | $(4,751,616) | | | |

---

[1] My understanding is that Albertson's owns Safeway.  References to Safeway and/or Albertson's are used interchangeably in this report.
[2] See Exh. 8 to Deposition of David Brogan and Josh Holmstrom.

At the same time, Raison's product was also not selling to the customer nearly as fast as it was being ordered by Safeway, even though Safeway was purchasing much less than Raison had projected.  As shown in the below table prepared by Matson, Driscoll & Damico Forensic Accountants, in 2020 Raison sold 70,848 units of its product to Safeway.  Through December 2021, Safeway only sold 52,810 units to the end customer.  This means Safeway was unable to sell 25% of Raison's product, which took up shelf space throughout that timeframe.  As discussed above, this was a "cardinal sin" in the retail industry.

| Month | Original | | | | Everything | | | | Total | | | | Balance % of Total Ordered |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Packs Ordered | Units Ordered | Units Sold | Balance (Units) | Packs Ordered | Units Ordered | Units Sold | Balance (Units) | Packs Ordered | Units Ordered | Units Sold | Balance (Units) | |
| | ALB_000059 | [A] | ALB_000063 | [B] | ALB_000059 | [A] | ALB_000063 | [B] | | | | | |
| Jul-20 | 1,008 | 12,096 | - | 12,096 | 1,008 | 12,096 | - | 12,096 | 2,016 | 24,192 | - | 24,192 | 100.00% |
| Aug-20 | 936 | 11,232 | 3,710 | 19,618 | 792 | 9,504 | 2,676 | 18,924 | 1,728 | 20,736 | 6,386 | 38,542 | 85.79% |
| Sep-20 | 792 | 9,504 | 4,531 | 24,591 | 936 | 11,232 | 3,577 | 26,579 | 1,728 | 20,736 | 8,108 | 51,170 | 77.93% |
| Oct-20 | 144 | 1,728 | 5,727 | 20,592 | 144 | 1,728 | 4,784 | 23,523 | 288 | 3,456 | 10,511 | 44,115 | 63.82% |
| Nov-20 | - | - | 6,183 | 14,409 | 144 | 1,728 | 6,132 | 19,119 | 144 | 1,728 | 12,315 | 33,528 | 47.32% |
| Dec-20 | - | - | 4,820 | 9,589 | - | - | 5,724 | 13,395 | - | - | 10,544 | 22,984 | 32.44% |
| Jan-21 | - | - | 51 | 9,538 | - | - | 23 | 13,372 | - | - | 74 | 22,910 | 32.34% |
| Feb-21 | - | - | 2,354 | 7,184 | - | - | 2,068 | 11,304 | - | - | 4,422 | 18,488 | 26.10% |
| Mar-21 | - | - | 108 | 7,076 | - | - | 211 | 11,093 | - | - | 319 | 18,169 | 25.65% |
| Apr-21 | - | - | 25 | 7,051 | - | - | 62 | 11,031 | - | - | 87 | 18,082 | 25.52% |
| May-21 | - | - | 6 | 7,045 | - | - | 18 | 11,013 | - | - | 24 | 18,058 | 25.49% |
| Jun-21 | - | - | 3 | 7,042 | - | - | 6 | 11,007 | - | - | 9 | 18,049 | 25.48% |
| Jul-21 | - | - | 7 | 7,035 | - | - | - | 11,007 | - | - | 7 | 18,042 | 25.47% |
| Aug-21 | - | - | - | 7,035 | - | - | - | 11,007 | - | - | - | 18,042 | 25.47% |
| Sep-21 | - | - | - | 7,035 | - | - | - | 11,007 | - | - | - | 18,042 | 25.47% |
| Oct-21 | - | - | - | 7,035 | - | - | - | 11,007 | - | - | - | 18,042 | 25.47% |
| Nov-21 | - | - | 4 | 7,031 | - | - | - | 11,007 | - | - | 4 | 18,038 | 25.46% |
| Dec-21 | - | - | - | 7,031 | - | - | - | 11,007 | - | - | - | 18,038 | 25.46% |
| Total | 2,880 | 34,560 | 27,529 | | 3,024 | 36,288 | 25,281 | | 5,904 | 70,848 | 52,810 | | |

Note [A]: There are 12 units per pack.

As I also noted above, if a vendor's product is not selling, you can expect that the retailer will decrease and potentially stop making orders altogether.  That is what happened here with Safeway (see below table.)  Safeway purchased between 20,000 and 24,192 units per month in the first quarter of sales in 2020 (Q3 2020.)  When Raison resumed sales to Safeway in 2022, Safeway decreased the amount of product it was purchasing.  Safeway did not purchase any product in the first four months of 2022, then beginning in May 2022 Safeway purchased an average of

10,368 units per month over the next 6 months.  This number is much closer to the volume Safeway was actually able to sell to the end customer before the fire.  Over the 5 months from August to December 2020, Safeway sold an average of 9,572 units per month.

| Month | Original | | | Everything | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|
| | Packs Ordered | Units Ordered | UnitsSold | Packs Ordered | Units Ordered | UnitsSold | Packs Ordered | Units Ordered | UnitsSold |
| | ALB_000059 | [A] | ALB_000063 | ALB_000059 | | ALB_000063 | | [A] | |
| May-22 | 432 | 5,184 | 5,560 | 432 | 5,184 | 4,673 | 864 | 10,368 | 10,233 |
| Jun-22 | 720 | 8,640 | 4,538 | 576 | 6,912 | 3,576 | 1,296 | 15,552 | 8,114 |
| Jul-22 | 144 | 1,728 | 4,474 | 144 | 1,728 | 3,728 | 288 | 3,456 | 8,202 |
| Aug-22 | 576 | 6,912 | 3,991 | 288 | 3,456 | 3,361 | 864 | 10,368 | 7,352 |
| Sep-22 | 576 | 6,912 | 3,856 | 432 | 5,184 | 3,207 | 1,008 | 12,096 | 7,063 |
| Oct-22 | 432 | 5,184 | 4,091 | 432 | 5,184 | 3,004 | 864 | 10,368 | 7,095 |
| Nov-22 | 144 | 1,728 | 3,936 | 288 | 3,456 | 2,992 | 432 | 5,184 | 6,928 |
| Dec-22 | 288 | 3,456 | 3,952 | 144 | 1,728 | 3,028 | 432 | 5,184 | 6,980 |
| Jan-23 | 144 | 1,728 | 2,038 | | - | 1,511 | 144 | 1,728 | 3,549 |
| Feb-23 | 288 | 3,456 | 1,080 | 144 | 1,728 | 991 | 432 | 5,184 | 2,071 |
| Mar-23 | 288 | 3,456 | 2,951 | 432 | 5,184 | 1,701 | 720 | 8,640 | 4,652 |
| Apr-23 | 288 | 3,456 | 2,715 | 144 | 1,728 | 1,835 | 432 | 5,184 | 4,550 |
| May-23 | 144 | 1,728 | 2,313 | 144 | 1,728 | 1,823 | 288 | 3,456 | 4,136 |
| Jun-23 | 432 | 5,184 | 2,328 | 292 | 3,504 | 1,678 | 724 | 8,688 | 4,006 |
| Jul-23 | - | - | 2,614 | - | - | 1,728 | - | - | 4,342 |
| Aug-23 | 288 | 3,456 | 2,196 | 288 | 3,456 | 1,326 | 576 | 6,912 | 3,522 |
| Sep-23 | 733 | 8,796 | 1,699 | 576 | 6,912 | 1,335 | 1,309 | 15,708 | 3,034 |
| | | | | | | | | | |
| Averages | | | | | | | | | |
| Aug-20 - Sep-20 | 912 | 10,944 | 4,121 | 912 | 10,944 | 3,127 | 1,824 | 21,888 | 7,247 |
| Aug-20 - Dec-20 | 374 | 4,493 | 4,994 | 403 | 4,838 | 4,579 | 778 | 9,331 | 9,573 |
| Jan-22 - Oct-22 | 288 | 3,456 | 3,970 | 230 | 2,765 | 3,249 | 518 | 6,221 | 7,219 |
| Nov-22 - Sep-23 | 276 | 3,313 | 2,529 | 245 | 2,675 | 1,813 | 499 | 5,988 | 4,343 |

Note [A]: There are 12 units per pack.

There can be multiple explanations for Raison's lower than expected sales. The demographics and socioeconomic factors of the average customer shopping at Safeway are very different from Raison's other customers, such as Whole Foods Markets.  Safeway's stores extend over a large geographic area representing customers with a diversified background. The Joyfull name, known in stores such as Whole Foods Markets, is well recognized by their customers.  Once in Safeway, the name was changed to the store's private label.  Customer dynamics are resistant to change, especially to a new unrecognizable product even if the product itself is the same product sold in Whole Foods as an example.

5

Customers will shop in stores that will satisfy their own interests and needs. When evaluating product movement in any supermarket, one must consider the location of the market and the demographics of customers. Product movement will depend on what the product is, the price of the product and how it is promoted, depending on the demographics of the customers that shop in the supermarket.

Raison produced a snack item that was sold under the label of "Joyful Bakery." The product itself was a cheese cracker called "cheese crisp" that was sold in Whole Foods under the label of "Perfect Crisps" in addition to other specialty stores such as Heinen's and Central Markets and restaurants.  They were also in the process of expanding their exposure in the general supermarket space by looking at Safeway stores.  They were successful in acquiring Safeway as a new account and an initial order of 24,192 units was sent in July 2020, however, based on the "Analysis of Units Ordered & Sold" document, Raison experienced a decrease in orders in August and September and was on pace for another decrease in October before the fire occurred.  In the months prior to the holidays what should have occurred was an increase in orders for the product.  This raises questions regarding product acceptance in the stores. The fire that broke out at the bakery in October had no relevance nor did it affect the shortfall in orders in the previous 3.5 months.

Raison proceeded to file a loss of business income claim with Massachusetts Bay Insurance Company based on projections that were prepared before the fire.  The projections also forecasted that Raison would be selling to all 13 Safeway divisions with 2,247 stores by January 2021, but at least two divisions with 437 stores had declined to bring on the product. Raison acknowledged in deposition that it did not adjust its projections that were the basis for its business income claim to account for

6

the significant sales shortfalls before the fire or the fact that two divisions declined the product.  .

CONCLUSIONS:

Raison's projections that were prepared in June 2020 were unrealistic and overly aggressive.  Raison sold to Safeway for 3.5 months before the fire, and it fell far short of its projections doing only 58% of the sales it had forecasted.  At least two divisions with 437 stores declined to bring on Raison's product.  The product also did not succeed with the end customer as Safeway stores were unable to sell 25% of the product it purchased from Raison.

Store managers for a large corporation like Safeway are under intense pressure to sell product that comes into the store and to keep up product movement.  When Raison resumed sales after the fire, it had an even larger shortfall compared to its projections ,which was reflected in Safeway's orders which were approximately the same as the average monthly sales to the end customer before the fire.

Raison believed it had a product that would succeed in its aggressive expansion into a new customer base in Safeway and it prepared overly ambitious projections.  However, it appears Raison failed to recognize customer differences in demographics, name change, and price points when it moved to a new customer base in Safeway as compared to its other customers such as those who shop at Whole Foods.

Raison failed to recognize that customer preferences will be different geographically and demographically.  Raison's sales projections were unrealistic and ignored visible factors that explained the sales shortfalls compared to their projections.   When Raison resumed sales in 2022, it appears its sales were not

7

impacted by the fire.  Instead, the product simply failed to successfully establish itself in a new and competitive market.  Retail is a dynamic and volatile industry. The sales trend from before the fire continued after the fire but sales were even lower.  The lower than expected sales before the fire to Safeway and to the end customer indicated that the product would continue to struggle to gain market share, which it did after the fire.  This was likely due to the change in demographics and geographical areas of Safeway stores.

## RESERVATIONS:

I reserve the right to supplement or amend my opinions based upon any future depositions or discovery conducted in the case that may affect the opinions expressed above.  All opinions contained in this report are based on my experience and knowledge of the retail industry and held to a reasonable degree of professional certainty.

ALEX J. BALIAN, MBA

# EXHIBIT 5

# GW RETAIL EXPERT

# Expert Report and Opinions
## By Gary White

**REGARDING:**

| | |
|---|---|
| **PLAINTIFF:** | RAISON D'ETRE BAKERY LLC |
| | vs. |
| **DEFENDANT:** | MASSACHUSETTS BAY INSURANCE COMPANY; and DOES 1 through 10 / THE HANOVER INSURANCE GROUP |
| **CASE NO.:** | 23-CIV-00691 |
| **DOL:** | OCTOBER 16, 2020 |
| **DATE OF REPORT:** | DECEMBER 2024 |

**ORGANIZATION OF REPORT:**

A. Introduction
B. Background and Summary of Opinions
C. Review of Raison D'etre Product Management Responsibility
D. Findings and Conclusions
E. Documents Reviewed
F. CV of Gary White, Expert and Report Writer

## A. INTRODUCTION

**Responsibilities of Expert Witness:** My review of this case relates directly to Raison D'etre Bakery, the vendor/manufacturer involved in this incident. As an expert witness possessing extensive knowledge and experience regarding retail executive management to include retail buying practices, general product development and launch, retail relations with vendors and customers, and execution of such for retail companies and their operations, I have developed opinions in this case. I am particularly suited to render this expert opinion as to whether and to what degree a vendor selling new products responsibly forecasts, distributes, manages, and merchandises those products to the public, as well as the vendor's obligation to its stakeholders to accurately plan their business ventures.

**Standard of Expert Opinion:** My opinions expressed in this report are to a reasonable degree of certainty and are based upon my education, experience, and training of over 35 years in the retail and product production industry.

1



**Biographical Statement:** As an experienced retail executive, I have served as Chief Executive Officer and Chief Operations Officer in several different retail companies. I have functioned as a division head and as the head of an operating company. I have also been responsible for store, retail field, and vertical product development, as well as corporate management. I have been retained to review and advise on several legal retailer cases and asked to contribute my knowledge and experience pertaining to many retail categories and functions including store, customer, and operational product development. I have experience and work history with businesses operating similarly to Raison D'etre Bakery LLC.

**Education:** Extensive retail management training, professional development courses, and leadership training have played a major part in my professional career and advancement. Some of my educational development includes, but is not limited to, High Potential Executive College at Target Corp., advanced management courses at both Harvard University and Stanford University School of Management, and a Fellowship at Henry Crown - The Aspen Institute.

## B. BACKGROUND AND SUMMARY OF OPINIONS

I have 35+ years of experience in the business world associated with the management of large national corporations that interact with consumers, design and produce products, and contract manufacturers for products to be sold at the local retail store level daily. There are roles and responsibilities for the various levels of management, whether through corporate, regional, inventory planners, buyers, or managers. An important part of these responsibilities is to keep the customer reasonably satisfied with expected, desired products when invited to your store or to buy your products directly. It is also the responsibility of a business desiring to be successful, to take steps to control inventory when plans have been exceeded, and, to lessen the risk when sales are not upwardly trending.

Going to market with a large expansion is an intensive, multi-step process that requires a significant amount of planning on the part of the brand, meeting the standards of new and/or potential retailers, and a strong execution for increased production and delivery of product. Each step of the process, from introducing your product to buyers, to getting your product on their shelves, to testing the success of different markets, produces distinct markers and/or work product. Identifying these markers and work product can help illustrate how far along in the process Raison D'etre Bakery was in their expansion, and how the fire may or may not have impacted the company's losses.

According to Raison D'etre, their products had previously been distributed and sold in approximately 3,000 stores and in 2020, they were in the process of expanding to 5,200 or more stores through major grocer Albertsons/Safeway. Having your product sold in 2,200 additional stores is a *significant* expansion. The amount and/or kind of proof provided by Raison D'etre to support their claim can tell us where they were in the process of expansion, how much effort, time, and money they had invested in that expansion, and if the goals/projections for such a

2



broad expansion were likely or not likely to have been met in Raison D'etre's projected time frame from the date of the October 16, 2020 fire.

The below points examine the more major and common steps of the process for brands looking to expand into stores owned by large retailers and help determine to what extent that expansion should be considered when further assessing Raison D'etre Bakery's business interruption.

## C. REVIEW OF RAISON D'ETRE PRODUCT MANAGEMENT RESPONSIBILITY

**CHANNEL DEVELOPMENT STRATEGY**

1. **Raison D'etre's Failure to Reach Their First Quarter Sales Target with Albertsons and Subsequent Failure to Adjust Their Forecast Accordingly**

   Expanding the number of retailer locations that sell your product requires that your product be introduced to the buyers representing those retailers' regions. It is my experience that buy teams are extremely busy and not easy to impress. On occasion a buyer or someone with access to a buyer from a given retailer might encounter your product on their own. Much more commonly, brands will develop an intentional plan for introducing their product to those buyers as Raison D'etre did with Albertsons.

   - Raison D'etre products were introduced to Albertsons regional buyers by Gloria Villareal, Albertsons' Assistant Brand Manager on the deli team. It was a normal and customary way for products to be internally reviewed at Albertsons and shown to other team members.

   - Cheese crisps crackers, the product Raison D'etre had planned to sell to Albertsons, were and are an upward trending product in the market. It is popular for customers to include this product in/on charcuterie boards. This was confirmed by the product introduction management team at Albertsons and Raison D'etre.

     **Gloria Villareal Deposition – August 8, 2024:**

     Pg. 118 Ln. 22-24

     > Q. So -- so in January 2022, was charcuterie just as
     >    popular as it was in August 2020?
     >
     > A. More so.

     **Joanne Salvaggio Deposition – November 1, 2024:**

     Pg. 30 Ln. 15-17

     > Q. And what about in 2022, were charcuterie products just
     >    as popular with consumers at that time?

3



*A. Yes. They still are today.*

- Albertsons has 13 buying regions. Only 9 of the 13 regions initially agreed to buy the Raison D'etre product in question. That means a large number of stores were not willing to represent this Raison D'etre product on their shelves. Joshua Holmstrom, CEO of Raison D'etre and their designated PMK, stated Raison D'etre had the expectation those 4 additional regions would also begin selling their product by the end of January 2021.

**Joshua Holmstrom Deposition – February 28, 2024:**

Pg. 82 Ln. 7 – Pg. 83 Ln. 13

*Q. So you have mentioned that as of Q3 Raison had nine Safeway divisions committed. And that's Q3 of 2020, correct?*

*A. That's correct.*

*Q. And then Gloria said that two more were going to come on and you expected the rest by 2020; is that right?*

*A. 2021, January 2021, yes.*

*Q. How many Safeway divisions were there, total, at that time?*

*A. 13.*

*Q. Okay. So you would have then expected to get the remaining four by January of 2021?*

*A. We would have expected to get two additional ones in Q4 and an additional two in 2021. January of 2021 was our assumption at that time.*

*Q. Okay. And your belief, your understanding is based on discussions with David and, what, anything else besides discussions with David? That was a bad question. Let me strike that question.*

*You never had any direct communications with Safeway; is that right?*

*A. That is correct.*

*Q. Okay. Was your belief that you would get two more Safeway divisions by Q4 of 2020 and the final three in January of 2021 based, in part, on your discussions with David Brogan?*

4



*A. That is correct.*

*Q. And other than your discussions with Mr. Brogan, was there anything else that contributed to that belief?*

*A. No, I guess.*

- According to Stephanie Chien, Albertsons Category Management and Innovation Product Director for Own Brands, vendors, in this case Raison D'etre, are never given a commitment regarding product quantities.

**Stephanie Chien Deposition – October 28, 2024:**

Pg. 111 Ln. 4-11

*A. We have never given any vendor any sort of commitment on what the divisions are required to take 95 percent, or otherwise, of the volumes that we forecast. We don't that have control over the divisions. There's no expectation, or commitments the divisions have given to us.*

*All we provide for our vendors, when a new item launch, is an estimate. And we make it clear, from the beginning, that it is an estimate, and just a forecast.*

- Prior to the fire interrupting Raison D'etre's ability to produce and ship additional product, sales of that product were already significantly below the brand's sales plan/forecast within the first 3.5 months of the product launch in Albertsons/Safeway. Going forward, Raison D'etre failed to lower their sales plan/forecast even though a clear trend had been established in those first 3.5 months.

Mark Borden, Raison D'etre's CFO, acknowledges that the brand missed their sales mark in the first 3.5 months of business with Albertsons but asserts that the amount by which they missed was not significant enough to adjust their forecasts. In my experience, I would disagree. The approximately 42% by which they missed their mark was indeed significant and should have been accounted for. The brand was counting on their efforts to "ramp-up" the product launch to help them meet their goals. However, the trends demonstrated in the first 3.5 months, in my opinion, should have caused them to reassess and set more realistic goals.

**Mark Borden Deposition – April 16, 2024**

Pg. 47 Ln. 8 - Pg. 48 Ln. 17

*Q. Okay. So then just to address the specific point, though, the projection for Q3 2020 of $298,506 sold to*

5



*Safeway, that already built in a significant ramp-up compared to future quarters, and the number that was actually sold, 172,378, fell short of the ramp-up number that was projected; is that right?*

*[…]*

*THE WITNESS: Yeah. So it -- it was a miss of 126,000, but that was not significant enough, given the direction that things were going, and the forecast, it was still a ramp-up into Q4. You can see it going to 2.2 million on the plan. So to gauge that it was a miss at that stage, I think, is a little too early.*

*BY MR. AUSTIN:*

*Q. Okay. So I understand that, but I'm asking a very specific question here, which is, that the projected number in Q3 that Raison fell short of as far as sales to Safeway of $298,506, that number itself was already taking into account a ramp-up, and that number still was not hit?*

*That's the specific question I'm asking.*

*[…]*

*THE WITNESS: If you are asking, was that number not hit, I would say yes, it was not hit, but I think you are missing kind of the -- there's a lot more there, especially with ramp-up and forecasting, and from my perspective when you forecast, things happen sometimes better, sometimes a little bit delayed than that, and that's not significant enough, in my mind, to trigger a reforecast as well as -- I mean, as it relates to Safeway, especially when you look at the total being over as well.*

Raison D'etre's current CEO, Joshua Holmstrom, confirmed that the company did not reassess their numbers when the sales trended below their forecast within the first two months. He too was relying on the "ramp up" to help them meet their goals, yet even when the sales numbers did "ramp up" before the fire they still fell significantly below the unadjusted projections.

**Joshua Holmstrom Deposition – February 28, 2024:**

Pg. 104 Ln. 9 – Pg. 105 Ln. 23

*Q. … I believe there's also a unit number that is 105,479 units projected Safeway, but only sold 60,911. So my*

6



*question is, these were your projections prior to the loss, both of these numbers came in significantly below what was projected. And did you make any adjustments to these numbers in this forecast to take that into account that your first two months fell significantly below?*

*A. No. And the reason for that was, again, we were literally eight weeks into the launch of Safeway. As I've explained to you, JSL and Hanover, distributors don't always order in the way that brands are scanned. There are a lot of factors that go into how distributors order and what goes into those distribution centers. So, ultimately, we were literally eight weeks into the launch when the fire, maybe slightly longer when the fire occurred. So, you know, we still had confidence that we were going to get to the projections that were in the forecast model based on what we knew at the time, and so I had not updated the forecast at that point.*

*Q. Has Raison done any analysis as to why it missed the sales targets in the first quarter, the first two months of sales to Safeway before the loss?*

*A. Not a detailed analysis. But as I explained, we believe it was just, you know, ramp-up timing.*

*Q. Okay. But these numbers still fell below -- strike that.*

*So you understood at the time you made this forecast that there was going to be a ramp-up, correct?*

*A. Correct. You'll see that in the forecast. We believe there was a ramp-up, yes.*

*Q. And the numbers that actually came in still came in significantly below your projection, even taking into account that there was going to be a ramp-up, right?*

*[…]*

*THE WITNESS: Yeah.*

## 2. Vendor Acceptance Requirements

Most vendors, especially large national and regional retailers, have a set standard of requirements that potential vendors must meet before the retailer will enter a formal business arrangement with said vendor. This was also the case for Albertsons and Raison D'etre Bakery, with Raison D'etre clearly being aware of those requirements. Raison D'etre knew they would have to be reaudited for SQF (Safe Quality Food) requirements, something that could and should have been re-scheduled as quickly as possible after the production

7



facility was rebuilt. In my experience, there are specialty agencies that can be employed to help speed up the process, considering the condition of the business at that time. Raison D'etre did not engage such an agency, even though reducing the amount of time it would take to get their products back on the shelves at Albertsons was important to reaching their forecast goals and to not giving up shelf space to a competitor.

3. **Customer Acceptance**

The Cheese Crisp category was clearly a hot trend, but in my experienced opinion and based on market research I did in September 2022, there were some important fixes Raison D'etre needed to make in order for more customers to accept their product:

- Raison D'etre's product looked less appetizing than products from competitors as Raison D'etre's product had too many cracked and chipped pieces to represent a premium product.

- The retail shelf price on Raison D'etre's product was at least $1 higher than most competitors.

- The "clamshell" packaging used by Raison D'etre failed to make the product look superior or premium.

- Raison D'etre did not have an online, direct-to-consumer business that would expand their brand and the reach of their product, like their major competitor, ParmCrisp. While Raison D'etre was waiting for their business with Albertsons to increase, they failed to maximize their potential and the popularity of the trend by expanding their reach with online sales. The best performing businesses leverage online business opportunities as well as brick and mortar.

4. **Most Large Retailers Require New Vendors to Start Small**

Large retailers usually test new products in a smaller sampling of stores before they commit to carry a product in all outlets. This is a "best practice" for any vendor as it minimizes injury to the business if a product is not well received by the consumers in one or even all markets.

- When considering the rollout of the Raison D'etre product to major vendors like Albertsons/Safeway, it's important to ask in how many stores of the new retailers were Raison D'etre Bakery products tested?

- Albertsons shared what I would consider an aggressive "ramp up" plan for the following year—a plan that, according to trend, was *too* aggressive.

- Reviewing consumer feedback is critical for a business with few and new products, especially when that business is attempting to build a premium brand. It allows the brand to act on that feedback and adjust the product as they continue to grow. Considering that

8



in the fall of 2022, some 2 years after the fire, Raison D'etre brands were still being packaged in "clamshells" and cracked and broken crisps could still be found in stores, I would conclude that they either weren't getting feedback, which is unlikely, or they were continuing their established pattern of failing to make adjustments to their business plan to present and sell a better product.

**SALES SUPPORT, LOGISTICS TEAM/PLANNING TEAM**

1. **Hiring Additional Staff for the Expansion**

Raison D'etre Bakery would most likely need additional human capital and/or services to handle the increased work and product load resulting from the planned Albertsons expansion. This approach helps ensure, in my experience, that the product goes to market with the support and planning it needs and puts its best foot forward. It appears that Raison had not hired sufficient additional staff to support the planned Albertsons expansion.

**David Brogan Deposition – April 5, 2024:**

Pg. 86 Ln. 9 – Pg. 87 Ln. 8

> Q. Just let me fall back and ask a few questions that I skipped over earlier. Did Raison anticipate any increase in labor for the increased demand from its Safeway expansion in Q4 2020 and into 2021?
>
> A. Yes.
>
> Q. And what type of labor increase did it anticipate?
>
> A. Well, consistent with our labor for making cheese crisps -- with that, I had spoken to a local temp agency. We -- we always get -- people come by on a daily basis or, I should say, weekly basis.
>
>   We'll have anywhere between five and ten people knock on the door looking for work. But I did reach out to an agency and make sure that they could handle what we considered anticipated demand.
>
> Q. Okay. And -- and did you have any documents showing what that anticipated demand was?
>
> A. I had extensive conversations with the agency. I've -- that may be in an email. It may not be. But certainly in our conversations, we were talking how many people that would be.
>
> Q. And what did you anticipate that labor increase to be?

9



> A. *Off the top of my head, I would think in the region of about -- anywhere between 20 to 30 people.*

**Mark Borden Deposition Vol. II – November 22, 2024:**

Pg. 37 Ln. 20 – Pg. 38 Ln. 1

> Q. *Well, let's start with employees of Raison. Did Raison hire any additional sales rep employees to assist with the expansion before the fire took place?*
>
> A. *I know there was plans to, but I don't -- I -- no, I do not think anyone was hired at that time or found yet to be hired prior to the fire.*

- When I was retained to assist Massachusetts Bay Insurance Company during the claim, I asked several questions that were passed on to Raison D'etre, then Raison D'etre provided responses to my questions. One of the questions I asked was whether more product reps were hired to support the Albertsons expansion, and Raison responded that no one was hired until June 2021. Below is an excerpt from my September 1, 2022 report recounting that question and answer:

"QUESTION 14

HANOVER:  Were more product reps hired to accommodate the increase in retailers?

RAISON:    Plans were in place to hire a National Sales Team to manage rapid increase in demand. These plans were put on hold immediately after the fire. In June of 2021 we hired a Chief Growth Officer and subsequently additional regional sales directors."

**MERCHANDISING AND MARKETING PROGRAMS**

1. **Product Reps and/or Merchandisers**

Once an agreement had been made with a retailer, Raison D'etre would have most likely needed to hire additional product reps and/or merchandisers to handle the increased business. Product reps are responsible for selling the product to the retailer on the brand's behalf and offering specials and promotions. Merchandisers are the people who sometimes physically stock the displays/shelves at the retail location. Sometimes these people are one and the same. More stores and retailers normally mean the brand would need more people to cover them.

Raison D'etre did not initially hire product reps and merchandisers to support the planned 30% increase in store locations. CEO Joshua Holmstrom represented merchandising as being

10



an important effort in the sale of the product but there is no evidence of any merchandising efforts by Raison D'etre to do exactly what Mr. Holmstrom suggested.

**Joshua Holmstrom Deposition – February 28, 2024:**

Pg. 121 Ln. 7-13

> A. That is correct. And the reason that is important is
> that our brand performs exceptionally well when it is
> merchandised well, when it is displayed in the right
> places, when it is promoted in the right way, and,
> ultimately, when consumers know it's there. And that is
> -- those things are driven by the retailer, not the
> consumer.

I would add that it is up to the vendor to teach the retailer about their product and drive the retailer on how that product is presented in the store. Vendors often use PowerPoint presentations and planograms to show the vendor how the product is best presented to the consumer. The vendor's product reps and merchandisers then follow up on how the product is being presented to the consumers when they visit the retailer's stores.

## D. FINDINGS AND CONCLUSIONS

In my opinion, there are five key areas in which Raison D'etre's efforts to increase the reach of their parmesan crisps product in the marketplace fell short and kept the Albertsons/Safeway expansion of that product from being as successful as they had hoped both before and in the aftermath of the fire.

- **Raison D'etre had unreasonable and unobtainable sales projections that would not have been met, regardless of the fire.** Once it had been established that the initial numbers for the sales forecasts had been missed by at least 42%, Raison D'etre's leadership never revisited/adjusted those forecasts.

- **Raison D'etre leadership did not actively manage their business in a way that would help maximize their success.** As an Albertsons vendor they should have been studying the sales of their product by location and had their product reps/merchandisers visiting store locations and strategizing their approach to those stores and regions based on sales.

- **Raison D'etre did not hire/contract product reps and merchandisers to assist with the launch until June 2021.** Before the fire, they had put their product into 2,200 additional stores but did not hire additional staff to help stock those stores, check on the placement of the product, manage their relationships with the store managers, and in general, to be boots on the ground so that the brand had a better handle on why their product was or was not selling as they had forecasted—a very common tactic of retailers when launching new product.

11



- **The look and presentation of the product in the packaging and on store shelves failed to meet the standards of what was meant to be a premium product.** The poor packaging also frequently led to broken product, which could be seen by the customers through the transparent "clamshell" packaging.

- **Additionally, the price of the product was not competitive in comparison to other premium products of the same or a similar nature that were already being sold in those stores, such as ParmCrisps, the price of which was 14% less than Raison D'etre's products.** In the grocery business, where customers often count their pennies, that is a significant difference.

Joanne Salvaggio, the Chief Growth Officer, had concerns about the forecast and projections.

**Joanne Salvaggio Deposition – November 1, 2024:**

Pg. 31 Ln. 7-9

> Q. Let me ask this: Did you agree with the projections that you saw at Raison for the projected sales of its products while you were there?
>
> […]

Pg. 31 Ln. 16-23

> A. I started to have concerns as 2022 progressed just to kind of see what would realistically be able to grow, how -- you know, to be able to reach growth goals based on performance.
>
> Q. Okay. And based on the performance in what you saw from the product, did you eventually come to believe that the projections you were seeing were too high?
>
> […]

Pg. 32 Ln. 6-8

> A. Yeah. I mean I just from -- I had concerns just as far as the performance and to be able to reach those growth goals given the performance.

According to the excel spreadsheets provided by Raison D'etre there was a significant sales shortfall in the 3.5 months of sales to Albertsons before the fire. Raison D'etre did not change their forecast based on that trend, as confirmed by CEO and PMK for this case, Joshua Holmstrom.

12



**Joshua Holmstrom Deposition – February 28, 2024:**

Pg. 32 Ln. 15-23

> Q. *Were these projections updated as time went on, like with rolling forecasts?*
>
> A. *Up through the fire?*
>
> Q. *Yes.*
>
> A. *I believe this was the most recent version. But, obviously, we would be looking to forecast on a regular basis to see if anything changed, but I believe this was the most recent version leading up to the fire.*

Pg. 104 Ln. 11 – Pg. 105 Ln. 5

> Q. *… So my question is, these were your projections prior to the loss, both of these numbers came in significantly below what was projected. And did you make any adjustments to these numbers in this forecast to take that into account that your first two months fell significantly below?*
>
> A. *No. And the reason for that was, again, we were literally eight weeks into the launch of Safeway. As I've explained to you, JSL and Hanover, distributors don't always order in the way that brands are scanned. There are a lot of factors that go into how distributors order and what goes into those distribution centers.*
>
> *So, ultimately, we were literally eight weeks into the launch when the fire, maybe slightly longer, when the fire occurred. So, you know, we still had confidence that we were going to get to the projections that were in the forecast model based on what we knew at the time, and so I had not updated the forecast at that point.*

The Analysis of Product Movement below includes calculations from Matson, Driscoll & Damico Forensic Accountants using data taken from the spreadsheets in question. They show Raison D'etre did not meet their projected numbers by a significant percentage before the fire, yet they never did their due diligence by adjusting their forecasts. Now it appears they want to be monetarily compensated based on projections that were proven to be inaccurate.

**Analysis of Product Movement**

The analysis of Product Movement below includes calculations from Matson, Driscoll & Damico Forensic Accountants using data provided by Albertsons. As shown in the table, Raison D'etre sold

13



70,848 units of their product to Albertsons in 2020. This included sales made in the 3.5 months before the October 16, 2020 fire in addition to one purchase order for 1,728 units that came in after the fire and was apparently filled from Raison D'etre's stock that was not destroyed in the fire. After November 2020, Raison D'etre did not make any further sales to Albertsons until operations resumed in 2022.

| Month | Original Packs Ordered ALB_000059 | Original Units Ordered [A] | Original Units Sold ALB_000063 | Original Balance (Units) [B] | Everything Packs Ordered ALB_000059 | Everything Units Ordered [A] | Everything Units Sold ALB_000063 | Everything Balance (Units) [B] | Total Packs Ordered | Total Units Ordered | Total Units Sold | Total Balance (Units) | Balance % of Total Ordered |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jul-20 | 1,008 | 12,096 | - | 12,096 | 1,008 | 12,096 | - | 12,096 | 2,016 | 24,192 | - | 24,192 | 100.00% |
| Aug-20 | 936 | 11,232 | 3,710 | 19,618 | 792 | 9,504 | 2,676 | 18,924 | 1,728 | 20,736 | 6,386 | 38,542 | 85.79% |
| Sep-20 | 792 | 9,504 | 4,531 | 24,591 | 936 | 11,232 | 3,577 | 26,579 | 1,728 | 20,736 | 8,108 | 51,170 | 77.93% |
| Oct-20 | 144 | 1,728 | 5,727 | 20,592 | 144 | 1,728 | 4,784 | 23,523 | 288 | 3,456 | 10,511 | 44,115 | 63.82% |
| Nov-20 | - | - | 6,183 | 14,409 | 144 | 1,728 | 6,132 | 19,119 | 144 | 1,728 | 12,315 | 33,528 | 47.32% |
| Dec-20 | - | - | 4,820 | 9,589 | - | - | 5,724 | 13,395 | - | - | 10,544 | 22,984 | 32.44% |
| Jan-21 | - | - | 51 | 9,538 | - | - | 23 | 13,372 | - | - | 74 | 22,910 | 32.34% |
| Feb-21 | - | - | 2,354 | 7,184 | - | - | 2,068 | 11,304 | - | - | 4,422 | 18,488 | 26.10% |
| Mar-21 | - | - | 108 | 7,076 | - | - | 211 | 11,093 | - | - | 319 | 18,169 | 25.65% |
| Apr-21 | - | - | 25 | 7,051 | - | - | 62 | 11,031 | - | - | 87 | 18,082 | 25.52% |
| May-21 | - | - | 6 | 7,045 | - | - | 18 | 11,013 | - | - | 24 | 18,058 | 25.49% |
| Jun-21 | - | - | 3 | 7,042 | - | - | 6 | 11,007 | - | - | 9 | 18,049 | 25.48% |
| Jul-21 | - | - | 7 | 7,035 | - | - | - | 11,007 | - | - | 7 | 18,042 | 25.47% |
| Aug-21 | - | - | - | 7,035 | - | - | - | 11,007 | - | - | - | 18,042 | 25.47% |
| Sep-21 | - | - | - | 7,035 | - | - | - | 11,007 | - | - | - | 18,042 | 25.47% |
| Oct-21 | - | - | - | 7,035 | - | - | - | 11,007 | - | - | - | 18,042 | 25.47% |
| Nov-21 | - | - | 4 | 7,031 | - | - | - | 11,007 | - | - | 4 | 18,038 | 25.46% |
| Dec-21 | - | - | - | 7,031 | - | - | - | 11,007 | - | - | - | 18,038 | 25.46% |
| Total | 2,880 | 34,560 | 27,529 | | 3,024 | 36,288 | 25,281 | | 5,904 | 70,848 | 52,810 | | |

Note [A]: There are 12 units per pack.

Out of the 70,848 units of product Albertsons purchased in 2020, Albertsons was only able to sell 52,810 units of the product to the end customer by December 2021. This means that Albertsons was unable to sell 25% of the product it purchased from Raison D'etre in 2020 to the end customer, despite the fact that all of the product was delivered in time for the 2020 holiday season. In the grocery industry, shelf space is extremely important. If a retailer like Albertsons was unable to sell 25% of the product it purchased, that would have been a big problem.

I expect that the poor performance of the product in 2020 led to the lower-than-expected sales to Albertsons when operations resumed in 2022. This is supported by the data, which shows that when Albertsons regional buyers started purchasing product from Raison D'etre again in May 2022, the average monthly purchase amounts were approximately equal to the amount Albertsons was actually able to sell to the end customer in 2020.

In 2020, Albertsons stores purchased between 20,000 and 25,000 units per month, but the most they were able to sell to the end customer was between 10,500 and 12,500 units per month. When operations resumed in 2022, the average monthly volume purchased by Albertsons approximated the average monthly quantity sold to the end customer in 2020. This makes sense, as grocery stores are always careful not to purchase more product than they think they can sell to the end customer so that they don't have wasted shelf space with product that is not selling.

Raison D'etre appears to have lacked the plan to organize and execute such a large undertaking as well as a successful launch strategy.

14



Additionally, the retail price of the Raison D'etre product was higher than any other parmesan crisps in the market, yet the cracking, breaking crisps, and clamshell packaging being used at the time of the fire did not present well and kept it from looking like a premium product.

**Joanne Salvaggio Deposition – November 1, 2024**

Pg. 50 Ln. 19 – Pg. 51 Ln. 4

Q. Okay. And did you also observe breakage?

A. Yes.

Q. So tell me more specifically what you observed with respect to that.

A. It would be instead of having the full paddle, it would be pieces, like broken pieces, which we later resolved with a new package. But that's what we were seeing with the package that we launched with.

Q. On how many occasions in these dozen or so visits to Albertsons stores did you observe breakage?

A. Nearly all of them.

Pg. 15 Ln. 20-25

Q. Okay. So we have had some other testimony about the packaging. So is it your understanding that the way that the product was packaged was making it difficult to sell; is that right?

MR. BRUCHEY: I am going to --

THE WITNESS: Yes.

In September of 2022 I visited stores in Southern California to complete a product market review of parmesan crisps and product comparison in key categories such as presentation and product pricing. I performed this review 23 months after the fire and found that Raison D'etre's pricing was not competitive, nor was their packaging and presentation, an issue which was confirmed by Joanne Salvaggio's deposition testimony. As Joanne Salvaggio was seeing this problem in her visits to stores in early 2022, and my review took place almost two years after the fire, it leads me to believe Raison D'etre has a habit of not actively managing their business.

I have included my findings from my September 2022 market review below:

It is my judgement that the products offered by Raison D'etre/JoyFull Bakery are similar to products being offered by many other brands, who

15



are offering them at better/more competitive prices. Parmesan crisps are considered a trendy, entertainment snack and not necessarily a staple. It is often sold in departments that merchandise unique cheeses and wines.

Parmesan crisps are being sold in many retail outlets—both brick and mortar and online. Below are examples of where these kinds of crisps are being sold by retailers with thousands of locations:

- Target Stores
- Amazon
- Albertsons
- Gelson's
- Whole Foods
- Bristol Farms

I have no statistical growth rate for this product.

I did not find any Raison D'etre/JoyFull Bakery products in Albertsons. As reported, this was to be a major growth vehicle, adding 2200 more Albertsons store locations in 2021. Today, Albertsons carries the very popular brand "ParmCrisps." ParmCrisps are also sold at Target and Amazon.

## PRODUCT COMPARISON IN KEY GROCERIES

During my research I shopped four grocery stores—Gelson's, Whole Foods, Albertsons, and Bristol Farms. Raison D'etre has listed two of these grocery stores as carrying their products. I found Raison D'etre/JoyFull Bakery products in Whole Foods and Gelson's **but not in Albertsons** or Bristol Farms.

Here are the offerings I found:

1. Perfectly Crisp/Raison D'Etre - Jalapeño
   Sold at Whole Foods
   3 oz. at $7.99

16





*These Jalapeño Cheese Crisps are a recent addition to the Raison D'etre/JoyFull assortment. All the boxes of this product available at this store had a significant amount of broken and crumbling crisps at the bottom of the package. That many crumbs in the bottom of the package is not appetizing, which in turn is not good for sales and it has been a noted point of annoyance in customer reviews.

2.  Perfectly Crisp/Raison D'etre - Super Seed
    Sold at Whole Foods
    3 oz. at $7.99



3.  Perfectly Crisp/Raison D'etre – Everything
    Sold at Whole Foods
    3 oz. $7.99

17



4. JoyFull Bakery/Raison D'etre – Everything
Sold at Gelson's
3 oz. $7.99



5. JoyFull Bakery/ Raison D'etre
Sold at Gelson's
3 oz. $7.99



6. ParmCrisps/That's How WE Roll – Four Cheese
Sold at Albertsons, Target, Amazon, and others
3 oz. $6.99, on sale for $5.99

GN RETAIL EXPERT



7.  ParmCrisps/That's How WE Roll – Original
    Sold at Albertsons, Target, Amazon, and others
    3 oz. $6.99, on sale for $5.99



8.  ParmCrisps/That's How WE Roll – Everything
    Sold at Albertsons, Target, Amazon, and others
    3 oz. $6.99, on sale for $5.99



9.  Baked Parmesan/Bristol Farms – Quinoa Crisp

19



Sold at Bristol Farms
2 oz. $5.49



10. Bristol Farms – Baked Parmesan Crisps
Sold at Bristol Farms
2 oz. $5.49



11. Bristol Farms – Everything
Sold at Bristol Farms
2 oz. $5.49



20

## ADDITIONAL GW RETAIL EXPERT COMMENTS

The parmesan crisps category of product has become very common in many retail outlets. In my research I have found that Raison D'etre products are not competitively priced, nor well presented:

- Parmesan crisps are sold in thousands of competing outlets. This puts pressure on all parmesan crisps brands to be competitive in price, including Raison D'etre/JoyFulls, which is currently not meeting that standard.
- Bristol Farms had the best merchandise display. JoyFull's display was meager and not notable. See photos below.
- If this is an important growth category for Raison D'etre, and one that appears to have very large projections for sales increases, the effort in stores appears to be lacking as compared to their competitors.

**Bristol Farms Display**

From a retailer's point of view, Bristol Farms' display is well-merchandised for a trendy category. Their in-house parmesan crisps are being merchandised with other cheese products, on a corner display, and with interesting décor that calls attention to this non-shopping list, trendy item. This is merchandising designed to pique the shopper's interest and get them to investigate this novelty item further.

 

21

**Gelson's Display**

This display of Raison D'etre/JoyFull parmesan crisps is meager and tells me Gelson's is not committed to this novelty and relatively new product. This display was positioned at the back of the counter with small quantities that look neither powerful nor meaningful. From a retailer's perspective, this display looks like an afterthought and lacks the ability to create customer excitement. In my merchandising experience, these kinds of displays do not help products meet their projected sales numbers.

 

## E.  DOCUMENTS REVIEWED

**In Preparing My Opinion:**

I have reviewed the following materials, which are commonly examined in any area of expertise, to render a professional/expert opinion and I reserve the right develop opinions further if or when additional information is provided:

- RAISON_ Complaint, Notice of CMC, Assignment to Judicial Officer(1999164.1)
- Product Expansion Responses 9.1.2022
- Raison D'etre Talking Points
- Responses to latest Hanover questions - Updated 8-11-2022
- Product Expansion Responses 9-6-2022

- 20220516 Raison D'Etre Bakery
- Purchase Order - Clamshells - Blanket PO - 5-5-20
- Purchase Order - Master Case - Blanket PO - 5-19-20
- 2016-12-05 Continuing Commodity Guaranty and Indemnity Agreement
- 2020-01-28 Continuing Commodity Guaranty and Indemnity Agreement

22



# EXHIBIT 6

**In the Matter Of:**

RAISON D ETRE BAKERY V. MASSACHUSETTS BAY INSURANCE

3:23-cv-014101 EMC

**JOSHUA HOLMSTROM, PMK**

*February 28, 2024*



800.211.DEPO (3376)
EsquireSolutions.com

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


RAISON D'ETRE BAKERY LLC,

      Plaintiff,

   vs.                              No. 3:23-cv-014101 EMC

MASSACHUSETTS BAY INSURANCE
COMPANY; and DOES 1 through 10,

      Defendants.
_____


REMOTE VIDEOCONFERENCE DEPOSITION OF

RAISON D'ETRE BAKERY LLC'S PMK

JOSHUA HOLMSTROM

Wednesday, February 28, 2024

11:02 a.m. - 2:48 p.m.

Volume 1


JODI L. BOSETTI, CSR No. 11316, RPR



APPEARANCES OF COUNSEL


For Plaintiff:

        SHERNOFF BIDART ECHEVERRIA, LLP
        BY:   SAMUEL L. BRUCHEY
        Attorney at Law
        600 S. Indian Hill Boulevard
        Claremont, California 91711
        (310) 246-0503
        sbruchey@shernoff.com


For Defendants:

        HAYES SCOTT BONINO ELLINGSON & GUSLANI, LLP
        BY:   TYLER R. AUSTIN
        BY:   RACHEL M. SMITH
        Attorneys at Law
        333 Twin Dolphin Drive, Suite 230
        Redwood City, California 94065
        (650) 637-9100
        taustin@hayesscott.com
        rsmith@hayesscott.com



```
                          INDEX


WITNESS                                    EXAMINATION

JOSHUA HOLMSTROM
Volume 1



          BY MR. AUSTIN                              4


               EXHIBITS

DEPOSITION                                      PAGE

 Exhibit 1    Notice of Raison's deposition        7

 Exhibit 2    Full-year Summary Financials as of  31
              9-30-2020

 Exhibit 3    January 16th, 2020, e-mail from     76
              Patrice LaFrank to David Brogan

 Exhibit 4    Proposal dated 1-23-20              78

 Exhibit 5    E-mail dated 4-11-2020 to Sean      79
              McFall

 Exhibit 6    E-mail to David Brogan dated        87
              5-8-2020

 Exhibit 7    E-mail to Joanne Bolonda dated      89
              8-3-2021

 Exhibit 8    Spreadsheet                         91

 Exhibit 9    Spreadsheet                        109
```



Videoconference, Wednesday, February 28, 2024

11:02 a.m. - 2:48 p.m.


JOSHUA HOLMSTROM,

having been administered an oath, was examined and

testified as follows:


EXAMINATION

BY MR. AUSTIN:

Q   Good morning/afternoon, Mr. Holmstrom.  My    11:02

name is Tyler Austin and I'm the attorney for the

insurance company, Massachusetts Bay Insurance

Company.

We met briefly off the record, but could you

state and spell your name for the record, please.    11:03

A   Joshua, J-O-S-H-U-A, Holmstrom,

H-O-L-M-S-T-R-O-M.  I go by Josh.

Q   Okay.  Thank you.

Have you ever had your deposition taken

before, Mr. Holmstrom?    11:03

A   No, I have not.

Q   So I'll just go over some kind of ground

rules with you before we get started here.

So you are currently under oath, and although

we are doing this somewhat informally by Zoom here,    11:03



what went to the distributors and the scans are what actually went through the retail -- went through Whole Foods from a scan perspective.

Q   And when you say scan, that is what was actually sold to the customer?                          13:53

A   Correct, to the end customer, being the consumer like you or me.

Q   And do you have that same data for Safeway?

A   We do not.

Q   Raison does not have that data anywhere?      13:54

A   They don't -- so scanned data is, historically, very expensive to purchase if you're a small company.  So there are suppliers like AT Nielsen and SPINS to offer that data.  It's extremely expensive and we ultimately declined to purchase it,      13:54 especially given that the program was just ramping up before the fire.  So we did not have access.

The other thing is that not all accounts -- not all accounts share their private label data.  So Whole Foods is unique in this regard in that they have     13:54 their own portal and we're able to get data in a consistent way.  And, ultimately, that's why you have this data.

Q   Yeah.

A   But not every retailer has the same data      13:54



capabilities as Whole Foods.

Q   And so there's nothing that you have or that has been submitted that shows, after shipments of product went to Safeway, what the customers actually did and whether they were buying it and how much?     13:55

A   We do not have that scanned data.

Q   All right.  What does sheet 4 of Exhibit 8 show?

A   So this is actuals.  So as you recall from my earlier testimony, many of our customers go through     13:55 distributors.  So, for example, I'll use DTI.  So DTI is a distributor on the West Coast.  They sell products to Gelson's.  There might be other smaller retailers in there.

So I believe what Hanover was asking for in     13:55 this question is they wanted to see what our actuals were by distributor historically.  Most of these customers fall under all other in the actual versus planned variance.  Does that make sense?

Q   Yeah.     13:56

So if I go back to sheet 1, the Detailed Lock Plan, line 215, this shows the number of stores that Raison projected selling to for Safeway from July 2020 through into 2021, correct?

A   That is correct.     13:57



Q   All right.  So then in August 2020 Raison expected to be selling to 315 Safeway stores and by September 2020, to be selling to 800 Safeway stores; is that right?

A   That's correct.                                         13:57

Q   Where on here -- is there anywhere that relates on a store count basis on here that shows the actual number of stores that Raison was sold to in those months, August and September 2020?

A   There is not data for that.                             13:57

Q   There's not data for that --

A   We did not have access to that store level data.

Q   So you don't know how many -- do you not know now or you didn't know at the time you made this --   13:58 you would have known at the time you made this.

You do not know how many stores you sold to for Safeway in August and September of 2020?

A   No.  But, again, I will say that the POs were starting to come in July and August.  As you may or   13:58 may not know, the way this happens is customers order in, they order product to go into their distribution centers and then to set shelves.

So generally what happens is you get a smaller number of orders to start.  The purpose is to   13:58



get into DCs and then out onto the shelves.  As the consumer starts to buy the product, we would expect those orders to start to increase quite a bit.  So, ultimately, this is where the time of the fire really impacted us, because we were right in the middle of rolling out Safeway, literally right in the middle of starting to get product on the shelf when the fire occurred.  So ultimately it just -- it just stopped the program dead stop, right in the middle of us getting the product into the marketplace.

Q   Okay.  If I'm looking at this correctly, it looks like line 8 on tab 2 of Exhibit 8 here shows forecasting sales to Safeway for Q3 of 2020 of 298,506, but actual sales for Safeway Q3 2020 was 172,378; is that right?

A   That's correct.

Q   So that is made up of those two months that you were selling product to Safeway prior to the buyer, correct?

A   Yes.  But, again, my forecast is based on what I believe the scan number would have been, not the shipment number.  So, ultimately, they're not -- so this is only actual shipments to Safeway.

Q   Well, isn't this supposed to be an apples to apples number here?  When you forecasted 298,000,

13:59

13:59

14:00

14:00

14:00



Q    Was it Micah Pilgrim, M-I-C-A-H?

A    Micah, yes, was one.

Q    Okay.  And I forget the other guy's name.

MR. AUSTIN:  I don't have any other questions right now.                                                    14:47

MR. BRUCHEY:  I have no questions.

MR. AUSTIN:  Okay.  Madam Court Reporter, do you need transcript orders on the record?

THE REPORTER:  Please.

MR. AUSTIN:  I'll take, you know, a certified            14:47
original electronic copy and electronic rough, please.
Just whenever you are able to get to it.  I don't have
a deadline or anything, but I just would like to have
a rough.

MR. BRUCHEY:  I would like a rough Saturday,            14:48
latest Monday, and a copy when you can.

MR. AUSTIN:  Go off the record?

MR. BRUCHEY:  Sure.


(The deposition concluded at 2:48 p.m.)

                    --oOo--



REPORTER'S CERTIFICATION

I, JODI L. BOSETTI, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand and later transcribed into typewriting under my direction; that the foregoing is a true record of the testimony and proceedings taken at that time.

I further certify that I am not of counsel or attorney for either or any of the parties to said proceedings, nor in any way interested in the outcome of the cause named in said caption.

IN WITNESS WHEREOF, I have this date subscribed my name.

DATED:  March 5, 2024



JODI L. BOSETTI, CSR No. 11316, RPR

                    DEPOSITION ERRATA SHEET


Our Assignment No. J10972004

Case Caption:  Raison vs. Massachusetts Bay Insurance


           DECLARATION UNDER PENALTY OF PERJURY


           I declare under penalty of perjury that I
have read the entire transcript of my deposition taken
in the above-captioned matter or the same has been
read to me, and the same is true and accurate, save
and except for changes and/or corrections, if any, as
indicated by me on the DEPOSITION ERRATA SHEET
hereof, with the understanding that I offer these
changes as if still under oath.  Signed on the _____
day of  _____, 20___.


_____

       JOSHUA HOLMSTROM



**CASE NAME:  Raison D'Etre Bakery LLC v. MBIC**
**CASE NO.:       3:23-cv-014101 EMC**

**PROOF OF SERVICE**

I am a resident of the State of Wisconsin. My business address is 333 Twin Dolphin Drive, Suite 230, Redwood City, CA 94065.  I am employed in the County of San Mateo where this service occurs.  I am over the age of 18 years, and not a party to the within cause.  I am readily familiar with my employer's normal business practice for collection and processing of correspondence for mailing with the U.S. Postal Service, and that practice is that correspondence is deposited with the U.S. Postal Service the same day as the day of collection in the ordinary course of business.

On the date set forth below, following ordinary business practice, I served a true copy of the foregoing document(s) described as:

**DEFENDANT MASSACHUSETTS BAY INSURANCE COMPANY'S OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE # 1 TO EXCLUDE EVIDENCE OR ARGUMENT THAT APPROXIMATELY 25% OF THE PRODUCT RAISON SOLD TO ALBERTSONS IN 2020 NEVER SOLD TO THE END CUSTOMER; DECLARATION OF TYLER R. AUSTIN**

**DECLARATION OF LISA MORRIS IN SUPPORT OF MASSACHUSETTS BAY INSURANCE COMPANY'S OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 1**

☐      (BY MAIL) I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States mail at Redwood City, California.

☒      (BY EMAIL) by transmitting via email the document(s) listed above to the corresponding email address(es), or as stated on the attached service list, on this date before 5:00 p.m.

☐      (BY OVERNIGHT DELIVERY) I caused such envelope(s) to be delivered to an overnight delivery carrier with delivery fees provided for, addressed to the person(s) on whom it is to be served.

William M. Shernoff, Esq.
Samuel L. Bruchey, Esq.
SHERNOFF BIDART ECHEVERRIA LLP
600 S. Indian Hill Blvd.
Claremont, CA 91711
Telephone: (310) 246-0503
Facsimile: (310) 246-0380
Email(s):       wshernoff@shernoff.com
                      sbruchey@shernoff.com
                      BDesJardins@shernoff.com
                      cwarburton@shernoff.com
                      ntsaturyan@shernoff.com

***Attorneys for Plaintiff***

☒      *(Federal)* I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

-1-

Executed on July 18, 2025 at Madison, Wisconsin.

_____
Rachel Smith

**PROOF OF SERVICE – CASE NO. 3:23-cv-014101 EMC**

STEPHEN M. HAYES (SBN 83583)
shayes@hayesscott.com
TYLER R. AUSTIN (SBN 293977)
taustin@hayesscott.com
HAYES SCOTT BONINO ELLINGSON & GUSLANI LLP
333 Twin Dolphin Drive, Suite 230
Redwood City, California 94065
Telephone: (650) 637-9100

Attorneys for Defendant
MASSACHUSETTS BAY INSURANCE COMPANY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAISON D'ETRE BAKERY LLC,<br><br>        Plaintiff,<br><br>    v.<br><br>MASSACHUSETTS BAY INSURANCE COMPANY; and DOES 1 through 10,<br><br>        Defendants. | **CASE NO.: 3:23-cv-01401 EMC**<br><br>**DECLARATION OF LISA MORRIS IN SUPPORT OF MASSACHUSETTS BAY INSURANCE COMPANY'S OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 1**<br><br>**Date:**      September 8, 2025<br>**Time:**      8:30 pm<br>**Courtroom:**  5<br>**Judge:**     Hon. Edward M. Chen |

I, Lisa Morris, declare as follows:

1.      I am a certified public accountant and a certified valuation analyst and I have been providing forensic accounting services for over 25 years. A true and correct copy of my Curriculum Vitae is attached to this declaration as Exhibit 22. It sets forth my education, training, experience, and qualifications as a CPA, valuation analyst, and expert.

2.      I have been retained by Hayes Scott Bonino Ellingson & Guslani LLP in this matter. I was retained to quantify the financial damages resulting from the fire on October 16, 2020.

3.      This declaration is made from my own personal knowledge and if called upon to do so, I could and would testify competently to the matters herein. I have personal knowledge of each matter stated herein and, if called as a witness, I could and would competently testify thereto.

4.      I submit this Declaration in support of Defendant MBIC's Opposition to Plaintiff's Motion In Limine No. 1.

5.      I provided my initial expert report in this matter on December 20, 2024, and I subsequently provided an amended expert report revising minor typographical errors.  In preparing my report, I received, reviewed, and analyzed data produced by Albertson's in the form of two excel documents bates labeled ALB_000057-59 and ALB_000061-63.   The spreadsheets were referenced as exhibits 10 and 11 to the December 16, 2024, declaration of Stephanie Chien.

6.      In my report, I prepared a table that summarized the above referenced data produced by Albertson's.  The table showed the monthly units that Albertson's purchased from Raison as well as the monthly units Albertson's sold to the end customer from July 2020 through December 2021.  The table also included columns on the right that showed the balance of inventory remaining at Albertson's after each month, in both units and a percentage of the total units ordered.

7.      It has since come to my attention that I made some slight errors in calculating the numbers in the table.  As Stephanie Chien explained in her declaration, Albertson's fiscal year begins in March.  This means that fiscal year 2020 would have included January and February 2021 numbers in the fiscal year totals.

8.      When reviewing the data provided by Albertson's, I erroneously utilized data

**DECLARATION OF LISA MORRIS IN SUPPORT OF DEFENDANT'S OPPOSITION TO MIL NO. 1**
**CASE NO. 3:23-cv-01401 EMC**

labeled January FY2021 and February FY2021 instead of January FY2020 and February FY2020, as I had assumed the units January FY2021 and February FY2021 represented units sold for January 2021 and February 2021 when they actually represented units sold for January 2022 and February 2022 since Albertson's fiscal year begins in March.

9. I have revised my calculations and prepared a new table, which I have included below and attached hereto as **Exhibit A**. My initial report calculated that Albertson's still had 25.46% of the inventory it purchased from Raison on hand by January 2022. As shown in the table below, Albertson's actually had 22.79% of Raison's product remaining by January 2022. The updated calculations resulted in less than a 3.00% difference.

| | ALB_00063 | | | | ALB_000059 | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Month | Month(Date) per Source | Units Sold Prior Year | Units Sold Current Year | Cumulative Units Sold Current Year | Packs Ordered PO Order Date | Units Ordered (12 units per Pack) | Cumulative Units Ordered | Balance of Units | Balance % of Total Ordered |
| Jul-20 | N/A | N/A | N/A | - | 2,016 | 24,192 | 24,192 | 24,192 | 100.00% |
| Aug-20 | August FY2020 | - | 6,386 | 6,386 | 1,728 | 20,736 | 44,928 | 38,542 | 85.79% |
| Sep-20 | September FY2020 | - | 8,108 | 14,494 | 1,728 | 20,736 | 65,664 | 51,170 | 77.93% |
| Oct-20 | October FY2020 | - | 10,511 | 25,005 | 288 | 3,456 | 69,120 | 44,115 | 63.82% |
| Nov-20 | November FY2020 | - | 12,315 | 37,320 | 144 | 1,728 | 70,848 | 33,528 | 47.32% |
| Dec-20 | December FY2020 | - | 10,544 | 47,864 | - | - | 70,848 | 22,984 | 32.44% |
| Jan-21 | January FY2020 | - | 5,013 | 52,877 | - | - | 70,848 | 17,971 | 25.37% |
| Feb-21 | February FY2020 | - | 1,375 | 54,252 | - | - | 70,848 | 16,596 | 23.42% |
| Mar-21 | March FY2021 | - | 319 | 54,571 | - | - | 70,848 | 16,277 | 22.97% |
| Apr-21 | April FY2021 | - | 87 | 54,658 | - | - | 70,848 | 16,190 | 22.85% |
| May-21 | May FY2021 | - | 24 | 54,682 | - | - | 70,848 | 16,166 | 22.82% |
| Jun-21 | June FY2021 | - | 9 | 54,691 | - | - | 70,848 | 16,157 | 22.81% |
| Jul-21 | July FY2021 | 81 | 7 | 54,698 | - | - | 70,848 | 16,150 | 22.80% |
| Aug-21 | August FY2021 | 6,538 | - | 54,698 | - | - | 70,848 | 16,150 | 22.80% |
| Sep-21 | September FY2021 | 8,123 | - | 54,698 | - | - | 70,848 | 16,150 | 22.80% |
| Oct-21 | October FY2021 | 10,761 | - | 54,698 | - | - | 70,848 | 16,150 | 22.80% |
| Nov-21 | November FY2021 | 12,116 | 4 | 54,702 | - | - | 70,848 | 16,146 | 22.79% |
| **Dec-21** | **December FY2021** | **10,418** | **-** | **54,702** | **-** | **-** | **70,848** | **16,146** | **22.79%** |
| Jan-22 | January FY2021 | 4,930 | 74 | 54,776 | - | - | 70,848 | 16,072 | 22.69% |
| Feb-22 | February FY2021 | 1,285 | 4,422 | 59,198 | - | - | 70,848 | 11,650 | 16.44% |

I declare under the penalty of perjury under the laws of the State of California and of the United States that the foregoing is true and correct.

Executed on July 18, 2025 at Walnut Creek, California.

_Lisa Morris_

Lisa Morris

DECLARATION OF LISA MORRIS IN SUPPORT OF DEFENDANT'S OPPOSITION TO MIL NO. 1
CASE NO. 3:23-cv-01401 EMC

Exhibit A

**Analysis of Product Movement**
Raison D'Etre Bakery LLC vs. Massachusetts Bay Insurance Company
Date of Loss - October 16, 2020

| Month | Month(Date) per Source | Units Sold Prior Year | Units Sold Current Year | Cumulative Units Sold Current Year | | Packs Ordered PO Order Date | Units Ordered (12 units per Pack) | Cumulative Units Ordered | | Balance of Units | Balance % of Total Ordered |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | ALB_00063 | | | | ALB_000059 | | | | | |
| Jul-20 | N/A | N/A | N/A | - | | 2,016 | 24,192 | 24,192 | | 24,192 | 100.00% |
| Aug-20 | August FY2020 | - | 6,386 | 6,386 | | 1,728 | 20,736 | 44,928 | | 38,542 | 85.79% |
| Sep-20 | September FY2020 | - | 8,108 | 14,494 | | 1,728 | 20,736 | 65,664 | | 51,170 | 77.93% |
| Oct-20 | October FY2020 | - | 10,511 | 25,005 | | 288 | 3,456 | 69,120 | | 44,115 | 63.82% |
| Nov-20 | November FY2020 | - | 12,315 | 37,320 | | 144 | 1,728 | 70,848 | | 33,528 | 47.32% |
| Dec-20 | December FY2020 | - | 10,544 | 47,864 | | - | - | 70,848 | | 22,984 | 32.44% |
| Jan-21 | January FY2020 | - | 5,013 | 52,877 | | - | - | 70,848 | | 17,971 | 25.37% |
| Feb-21 | February FY2020 | - | 1,375 | 54,252 | | - | - | 70,848 | | 16,596 | 23.42% |
| Mar-21 | March FY2021 | - | 319 | 54,571 | | - | - | 70,848 | | 16,277 | 22.97% |
| Apr-21 | April FY2021 | - | 87 | 54,658 | | - | - | 70,848 | | 16,190 | 22.85% |
| May-21 | May FY2021 | - | 24 | 54,682 | | - | - | 70,848 | | 16,166 | 22.82% |
| Jun-21 | June FY2021 | - | 9 | 54,691 | | - | - | 70,848 | | 16,157 | 22.81% |
| Jul-21 | July FY2021 | 81 | 7 | 54,698 | | - | - | 70,848 | | 16,150 | 22.80% |
| Aug-21 | August FY2021 | 6,538 | - | 54,698 | | - | - | 70,848 | | 16,150 | 22.80% |
| Sep-21 | September FY2021 | 8,123 | - | 54,698 | | - | - | 70,848 | | 16,150 | 22.80% |
| Oct-21 | October FY2021 | 10,761 | - | 54,698 | | - | - | 70,848 | | 16,150 | 22.80% |
| Nov-21 | November FY2021 | 12,116 | 4 | 54,702 | | - | - | 70,848 | | 16,146 | 22.79% |
| **Dec-21** | December FY2021 | 10,418 | - | **54,702** | | - | - | **70,848** | | **16,146** | **22.79%** |
| Jan-22 | January FY2021 | 4,930 | 74 | 54,776 | | - | - | 70,848 | | 16,072 | 22.69% |
| Feb-22 | February FY2021 | 1,285 | 4,422 | 59,198 | | - | - | 70,848 | | 11,650 | 16.44% |
| Mar-22 | March FY2022 | 303 | 6,736 | 65,934 | | - | - | 70,848 | | 4,914 | 6.94% |
| Apr-22 | April FY2022 | 87 | 7,572 | 73,506 | | - | - | 70,848 | | (2,658) | -3.75% |
| May-22 | May FY2022 | 20 | 10,233 | 83,739 | | 864 | 10,368 | 81,216 | | (2,523) | -3.11% |
| Jun-22 | June FY2022 | 8 | 8,114 | 91,853 | | 1,296 | 15,552 | 96,768 | | 4,915 | 5.08% |
| Jul-22 | July FY2022 | 7 | 8,202 | 100,055 | | 288 | 3,456 | 100,224 | | 169 | 0.17% |
| Aug-22 | August FY2022 | - | 7,352 | 107,407 | | 864 | 10,368 | 110,592 | | 3,185 | 2.88% |
| Sep-22 | September FY2022 | - | 7,063 | 114,470 | | 1,008 | 12,096 | 122,688 | | 8,218 | 6.70% |
| Oct-22 | October FY2022 | - | 7,095 | 121,565 | | 864 | 10,368 | 133,056 | | 11,491 | 8.64% |
| Nov-22 | November FY2022 | 4 | 6,928 | 128,493 | | 432 | 5,184 | 138,240 | | 9,747 | 7.05% |
| Dec-22 | December FY2022 | - | 6,980 | 135,473 | | 432 | 5,184 | 143,424 | | 7,951 | 5.54% |
| Jan-23 | January FY2022 | 98 | 5,285 | 140,758 | | 144 | 1,728 | 145,152 | | 4,394 | 3.03% |
| Feb-23 | February FY2022 | 4,419 | 4,536 | 145,294 | | 432 | 5,184 | 150,336 | | 5,042 | 3.35% |
| Mar-23 | March FY2023 | 6,809 | 4,652 | 149,946 | | 720 | 8,640 | 158,976 | | 9,030 | 5.68% |
| Apr-23 | April FY2023 | 7,615 | 4,550 | 154,496 | | 432 | 5,184 | 164,160 | | 9,664 | 5.89% |
| May-23 | May FY2023 | 10,183 | 4,136 | 158,632 | | 288 | 3,456 | 167,616 | | 8,984 | 5.36% |
| Jun-23 | June FY2023 | 8,162 | 4,006 | 162,638 | | 724 | 8,688 | 176,304 | | 13,666 | 7.75% |
| Jul-23 | July FY2023 | 8,141 | 4,342 | 166,980 | | - | - | 176,304 | | 9,324 | 5.29% |
| Aug-23 | August FY2023 | 7,371 | 3,522 | 170,502 | | 576 | 6,912 | 183,216 | | 12,714 | 6.94% |
| Sep-23 | September FY2023 | 7,070 | 3,034 | 173,536 | | 1,309 | 15,708 | 198,924 | | 25,388 | 12.76% |
| Oct-23 | October FY2023 | 7,023 | 2,685 | 176,221 | | | | | | | |



**Analysis of Product Movement**
Raison D'Etre Bakery LLC vs. Massachusetts Bay Insurance Company
Date of Loss - October 16, 2020

| | | ALB_00063 | | | | | ALB_000059 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Month | Month(Date) per Source | Units Sold Prior Year | Units Sold Current Year | Cumulative Units Sold Current Year | | Packs Ordered PO Order Date | Units Ordered (12 units per Pack) | Cumulative Units Ordered | | Balance of Units | Balance % of Total Ordered |
| Nov-23 | November FY2023 | 6,880 | 2,841 | 179,062 | | | | | | | |
| Dec-23 | December FY2023 | 6,961 | 2,927 | 181,989 | | | | | | | |
| Jan-24 | January FY2023 | 5,313 | 3,549 | 185,538 | | | | | | | |
| Feb-24 | February FY2023 | 4,568 | 2,071 | 187,609 | | | | | | | |
| Mar-24 | March FY2024 | 4,760 | 1,264 | 188,873 | | | | | | | |
| Apr-24 | April FY2024 | 4,436 | 145 | 189,018 | | | | | | | |
| May-24 | May FY2024 | 4,161 | 75 | 189,093 | | | | | | | |
| Jun-24 | June FY2024 | 4,120 | 28 | 189,121 | | | | | | | |
| Jul-24 | July FY2024 | 4,204 | 20 | 189,141 | | | | | | | |
| Aug-24 | August FY2024 | 3,542 | 4 | 189,145 | | | | | | | |
| Sep-24 | September FY2024 | 2,960 | 4 | 189,149 | | | | | | | |
| Oct-24 | October FY2024 | 2,620 | 4 | 189,153 | | | | | | | |
| Feb-25 | February FY2024 | 621 | 229 | 189,382 | | | | | | | |

| | | ALB_00063 | ALB_00063 | ALB_000061 | ALB_000059 | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Fiscal Year | Period | PY Units Sold | CY Units Sold | CY Units Sold | CY Unit Ordered | Cumulative Units Sold | Cumulative Ordered Units | Balance of Units | Balance % of Total Ordered |
| FY 2020 | Mar-20 - Feb-21 | | 54,252 | 54,252 | 70,848 | 54,252 | 70,848 | 16,596 | 23.42% |
| FY 2021 | Mar-21 - Feb-22 | 54,252 | 4,946 | 4,946 | - | 59,198 | 70,848 | 11,650 | 16.44% |
| FY 2022 | Mar-22 - Feb-23 | 4,946 | 86,096 | 86,096 | 79,488 | 145,294 | 150,336 | 5,042 | 3.35% |
| FY 2023 | Mar-23 - Feb-24 | 86,096 | 42,315 | 42,315 | | 187,609 | | | |
| FY 2024 | Mar-24 - Feb-25 | | 1,773 | 1,773 | | 189,382 | | | |
| | Jul-20 - Dec-21 | | 54,702 | | | | 70,848 | | |



For Discussion Purposes Only